## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEITH YAEGER and MICHAEL SCHULER, individually and on behalf of others similarly situated,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>SUBARU OF AMERICA, INC., a New Jersey Corporation,<br>FUJI HEAVY INDUSTRIES, LTD., a Japanese Corporation,<br><br>                    Defendants. | No.<br><br><br>**CLASS ACTION**<br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Keith Yaeger and Michael Schuler (together, "Plaintiffs"), bring this action against Defendants Subaru of America, Inc. ("SOA") and Fuji Heavy Industries, Ltd. ("Fuji" or "FHI") (collectively "Defendants" or "Subaru"), by and through their attorneys, individually and behalf of all others similarly situated, and allege as follows:

## INTRODUCTION

1.      This is a class action lawsuit brought by Plaintiffs on behalf of themselves and a class of current and former Subaru vehicle owners and lessees with defective piston rings in model years ("MY") 2011-2014 Subaru Forester 2.5L, MY 2013 Legacy 2.5L, MY 2013 Outback 2.5L, MY 2012-2013 Impreza

2.0L and MY 2013 XV Crosstek 2.0L vehicles (the "Class Vehicles" or "Vehicles").[1]

2.    This action arises from Defendants' failure, despite their longstanding knowledge of a material design defect, to disclose to Plaintiffs and other consumers that the Class Vehicles are predisposed to an oil consumption defect (referred to herein as the "Oil Consumption Defect").   This defect – which typically manifests during and/or shortly after the limited warranty period has expired – will inevitably cause the Class Vehicles to prematurely burn off and/or consume abnormal and excessive amounts of engine oil.

3.    Significantly, the existence of the Oil Consumption Defect poses a safety risk to the operator and passengers of the Class Vehicles because it prevents the engine from maintaining the proper level of engine oil, and causes an excessive amount of engine oil consumption that can neither be reasonably anticipated nor predicted.  Further, the Oil Consumption Defect can cause engine failure while the Class Vehicles are in operation at any time and under any driving condition or speed.  This exposes the driver and occupants of the Class Vehicles, as well as others who share the road with them, to an increased risk of accident, injury, or death.

_____

[1] Plaintiffs reserve the right to amend or add to the vehicle models included in the definition of Class Vehicles after conducting discovery.

4.      Not only did Subaru actively conceal the material fact that particular components within the Class Vehicles' engines are defective, they did not reveal that the existence of the defect would diminish the intrinsic and resale value of the Class Vehicles and lead to the safety concerns described herein.

5.      Subaru has long been aware of the Oil Consumption Defect.  Yet, notwithstanding its longstanding knowledge of this design defect, Subaru has routinely refused to repair the Class Vehicles without charge when the defect manifests.

6.      Many other owners and lessees of the Class Vehicles have communicated with Defendants' agents to request that they remedy and/or address the Oil Consumption Defect and/or resultant damage at no expense.  Defendants have failed and/or refused to do so.

7.      Subaru has also refused to take any action to correct this concealed design defect when it manifests in the Class Vehicles outside of the warranty period.  Since the Oil Consumption Defect typically manifests within and/or shortly outside of the warranty period for the Class Vehicles – and given Defendants' knowledge of this concealed, safety related design defect – any attempt by Subaru to limit the warranty with respect to the Oil Consumption Defect is unconscionable here.

8.      Despite notice and knowledge of the Oil Consumption Defect from the numerous complaints it has received, information received from dealers, National Highway Traffic Safety Administration ("NHTSA") complaints, and its own internal records – including durability testing and oil consumption testing – Subaru has not recalled the Class Vehicles to repair the Oil Consumption Defect, offered its customers a suitable repair or replacement free of charge, or offered to reimburse its customers who have incurred out-of-pocket expenses associated with the defect (such as reimbursement for additional engine oil) or to repair the defect.

9.      As a result of Defendants' unfair, deceptive and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiffs, have suffered an ascertainable loss of money and/or property and/or loss in value.  The unfair and deceptive trade practices committed by Defendants were conducted in a manner giving rise to substantial aggravating circumstances.

10.     Had Plaintiffs and other Class members known about the Oil Consumption Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles, or would have paid substantially less for them. The Oil Consumption Defect has also injured Class members by requiring them to constantly replenish (and pay for) engine oil in the Class Vehicles at an unreasonably rapid pace. In addition, Class members are being charged for oil

consumption tests on their Class Vehicles that would not be necessary but for the existence of the Oil Consumption Defect.

11.     As a result of the Oil Consumption Defect and the monetary costs associated with attempting to repair such defect, Plaintiffs and the Class members have suffered an injury in fact, incurred damages, and have otherwise been harmed by Subaru's conduct.

12.     Accordingly, Plaintiffs bring this action to redress Defendants' violations of various states' consumer fraud statutes, and also seek recovery for Defendants' breach of express warranty, breach of implied warranty, breach of the duty of good faith and fair dealing, and common law fraud.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

14.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 because Defendants transact business in this district, are subject to personal

jurisdiction in this district, and therefore are deemed to be citizens of this district.

Additionally, Defendants have advertised in this district and have received

substantial revenue and profits from their sales and/or leasing of Class Vehicles in

this district; therefore, a substantial part of the events and/or omissions giving rise

to the claims occurred, in part, within this district.

15.    This Court has personal jurisdiction over Defendants because they

have conducted substantial business in this judicial district, and intentionally and

purposefully placed Class Vehicles into the stream of commerce within New

Jersey and throughout the United States.

## THE PARTIES

**The Plaintiffs**

**A.      Plaintiff Yaeger**

16.    Plaintiff Keith Yaeger ("Plaintiff Yaeger") is a citizen of the State of

California, residing at 1665 South Redwood Street, Escondido, California, 92025.

17.    In or around 2013, Plaintiff Yaeger purchased a new 2014 Subaru

Forester 2.5L from Auto Nation Subaru ("Auto Nation"), an authorized Subaru

dealer and repair center located in Roseville, California.

18.    Plaintiff Yaeger purchased (and still owns) this vehicle for personal,

family and/or household uses.  His vehicle bears Vehicle Identification Number

JF2SJACC5EG402209.

19.     In or around December 2013, with approximately 6,000 miles on his vehicle, Plaintiff Yaeger noticed his Subaru was consuming engine oil at an unacceptable rate.  As a result, Plaintiff Yaeger was forced to add engine oil to his vehicle between Subaru's recommended engine oil change intervals in order to avoid catastrophic engine failure.

20.     On or about December 2, 2013, Plaintiff Yaeger took his vehicle to Barber Subaru ("Barber"), an authorized Subaru dealer and repair center located in Ventura, California, to undergo an oil consumption test.  Plaintiff Yaeger was quoted a cost of $100 for services related to the oil consumption test.

21.     During this time, Barber performed an engine oil and filter service on Plaintiff Yaeger's vehicle whereby the engine was refilled with 5.1 quarts of 0W-20 "semi-synthetic" oil.  The engine oil dipstick was also marked for future inspections during the oil consumption test.

22.     After approximately 400 miles after beginning the oil consumption test, the low oil warning light in Plaintiff Yaeger's vehicle illuminated.  Plaintiff Yaeger brought the vehicle back to Barber where the engine required the addition of engine oil.  The vehicle required the addition of engine oil twice more during the oil consumption test.

23.     Plaintiff Yaeger's vehicle ultimately failed the oil consumption test. As a result, on or about February 18, 2014, Barber removed the engine from

Plaintiff Yaeger's vehicle and "replaced all piston oil rings as per TSB instructions" in addition to all related gaskets and seals.  This service took approximately 12.7 hours.

24.     Even after such attempted repair, Plaintiff Yaeger's Subaru continues to consume engine oil at an unacceptable rate.  As a result, Plaintiff Yaeger is forced to add engine oil to his vehicle between Subaru's recommended oil change intervals in order to avoid catastrophic engine failure.

25.     Plaintiff Yaeger has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Oil Consumption Defect, including, but not limited to, out of pocket loss associated with the Oil Consumption Defect and future attempted repairs and diminished value of his vehicle.

26.     None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of the existence of the Oil Consumption Defect and/or defective vehicle design prior to purchase.

**B.**     **Plaintiff Schuler**

27.     Plaintiff Michael Schuler ("Plaintiff Schuler") is a citizen of the State of Florida, residing at 8222 Spruce Lane, Lakeland, Florida, 33809.

28.     In or around December 2012, Plaintiff Schuler purchased a new 2013 Subaru Outback 2.5L from Fitzgerald Countryside Subaru ("Fitzgerald"), an authorized Subaru dealer and repair center located in Clearwater, Florida.

29.     Plaintiff Schuler purchased this vehicle for personal, family and/or household uses.  His vehicle bears Vehicle Identification Number 4S4BRCKC8D3242218.

30.     Shortly after the purchase of his vehicle, with only 2,200 approximate miles on the odometer, the low oil warning light illuminated while Plaintiff Schuler was driving the vehicle.[2]  As a result, Plaintiff Schuler was forced to add approximately ¾ quarts of oil to the vehicle's engine.

31.     On or about January 2, 2013, due to concerns of oil consumption, Plaintiff Schuler took his vehicle to Fitzgerald for first oil change and service in the vehicle.  At the time of this service, Plaintiff Schuler's vehicle had approximately 3,700 miles on the odometer.  Fitzgerald suggested that Plaintiff Schuler ignore Subaru's recommended oil change schedules of 7,500 miles and, instead, have the engine oil in his vehicle changed every 3,500 miles.

_____

[2] According to the Owner's Manual, in 2.5 L models, if the low oil warning light illuminates while driving then there are approximately 3.8 US quarts of oil remaining.  If the light illuminates with the ignition switch in the "ON" position, while the engine is not running, there are approximately 2.2 US quarts of oil remaining.

32.     Plaintiff Schuler continued to notice that his Subaru was consuming engine oil at an unacceptable rate.  As a result, Plaintiff Schuler was forced to add engine oil to his vehicle between Subaru's recommended engine oil change intervals in order to avoid catastrophic engine failure.

33.     On or about August 13, 2013, Plaintiff Schuler took his vehicle to Cannon Subaru ("Cannon"), an authorized Subaru dealer and repair center located in Lakeland, Florida, to begin an oil consumption test.  During this time, Cannon replaced the oil filter and engine oil with grade 0W-20 "full synthetic" engine oil.

34.     On or about September 25, 2013, the low oil warning light in Plaintiff Schuler's vehicle illuminated.  He brought the vehicle to Cannon whereby, according to repair orders, an employee discovered the vehicle was one (1) quart low on engine oil.

35.     At the conclusion of the oil consumption test, Plaintiff Schuler was informed by Subaru and/or its agents that the oil consumption he experienced in his vehicle was "normal" and it would not be repaired.

36.     Thereafter, Plaintiff Schuler's Subaru continued to consume engine oil at an unacceptable rate.  As a result, Plaintiff Schuler was forced to add engine oil to his vehicle between Subaru's recommended oil change intervals in order to avoid catastrophic engine failure.

37.     Due to the Oil Consumption Defect, Plaintiff Schuler traded his Subaru, at a loss, for a non-Subaru vehicle.

38.     Plaintiff Schuler has suffered an ascertainable loss as a result of Defendants' omissions and/or misrepresentations associated with the Oil Consumption Defect, including, but not limited to, out of pocket loss associated with the Oil Consumption Defect and diminished value of his vehicle.

39.     None of the Defendants, or any of their agents, dealers or other representatives informed Plaintiff of the existence of the Oil Consumption Defect and/or defective vehicle design prior to purchase.

**The Defendants**

40.     Defendant Fuji Heavy Industries Ltd. ("Fuji" or "FHI") is a Japanese corporation located at The Subaru Building, 1-7-2 Nishishinjuku, Shinjuku-ku, Tokyo, 160-8316, Japan.

41.     Defendant Fuji is responsible for the design, manufacturing, distribution, marketing sales and service of Subaru vehicles, including the Class Vehicles, around the world, including in the United States.

42.     Defendant Subaru of America, Inc. ("SOA") is a New Jersey corporation with its principal place of business located in Cherry Hill, New Jersey.

43.     SOA is the U.S. sales and marketing subsidiary of Fuji and wholly owned subsidiary responsible for distribution, marketing, sales and service of Subaru vehicles in the United States.

44.     Fuji and SOA (collectively "Subaru") have common leadership. Indeed, SOA's sales, marketing and distribution efforts in the United States are headed by corporate officers of Fuji.  For example, Takeshi Tacihmori, the chairman and CEO of SOA is also a Director and Corporate Executive Vice President for Fuji in charge of the Subaru Global Marketing Division, Subaru Japan Sales and Marketing Division and Subaru Overseas Sales and Marketing Divisions 1 and 2.  The incoming Chairman of SOA is also a Corporate Senior Vice President of Fuji who is Chief General Manager of Subaru Overseas and the Vice President in charge of Sales and Marketing, Division 1.

45.     Upon information and belief, Defendant Fuji communicates with Defendant SOA concerning virtually all aspects of the Subaru products it distributes within the United States.

46.     Upon information and belief, the design, manufacture, distribution, service, repair, modification, installation and decisions regarding the engines within the Class Vehicles were performed exclusively by Defendants.

47.     Upon information and belief, Defendants develop the owner's manuals, warranty booklets, and information included in maintenance

recommendations and/or schedules (including the oil change intervals) for the Class Vehicles.

48.     Defendants Fuji and SOA engage in continuous and substantial business in New Jersey.

## TOLLING OF STATUTES OF LIMITATION

49.     Any applicable statute(s) of limitations has been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and members of the Class could not have reasonably discovered the true, latent defective nature of the Oil Consumption Defect until shortly before this class action litigation was commenced.

50.     Defendants were and remain under a continuing duty to disclose to Plaintiffs and members of the Class the true character, quality and nature of the Class Vehicles, that the Oil Consumption Defect is based on a poor design, and that it will require costly repairs, poses a safety concern, and diminishes the resale value of the Class Vehicles.  As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FACTUAL ALLEGATIONS

### A.    The Oil Consumption Defect within the Class Vehicles.

51.    Subaru is engaged in the business of designing, manufacturing, warranting, marketing, advertising and selling vehicles under the "Subaru" brand name throughout the United States.

52.    Defendant Fuji is a Japanese multinational corporation and conglomerate, primarily involved in aerospace and ground transportation manufacturing, and is known for its line of Subaru automobiles.  Fuji's aerospace division serves as a defense contractor to the Japanese government, manufacturing Boeing and Lockheed Martin helicopters and airplanes under license along with being a global development and manufacturing partner to both companies.

53.    Founded in 1968, SOA is the U.S. Sales and Marketing subsidiary of Fuji and is responsible for the distribution, marketing, sales and service of Subaru vehicles in the United States.[3]

54.    Many automotive manufacturers utilize an internal combustion engine design with a "V" piston arrangement.  In this design, the cylinders and pistons are aligned in two separate planes so that they appear to be in a "V" when viewed along the axis of the crankshaft.  This configuration generally reduces the overall engine length, height and weight compared to an equivalent inline configuration.

---

[3] *See* http://subaru.com/company.html (last visited June 25, 2014).



**Example of a "V" piston design**

54.     Since approximately 1966, rather than use a conventional "V" configured engine design, Subaru has instead incorporated a flat engine design (or "Boxer") in which the pistons face away from each other in a 180º symmetrical layout.

55.     In or around September 2010, Subaru announced the release of a new generation of its Boxer engine known as the "FB".



56.     According to Subaru's website "*Subaru firmly believes that the Horizontally-Opposed Engine is the optimum design for driving enjoyment. The pistons face away from each other in a 180° symmetrical layout around the crankshaft and work to balance out each other's vibrations, delivering a smooth, shudder-free feel.  This is because the engine can rotate freely at any given speed, delivering heart-gripping response to the driver.  The length and height of this engine layout can be kept shorter than a traditional in-line engine, and it is also lighter.  The engine can be mounted lower in the vehicle than other engines, and weight balance on the left and right can be made almost exactly the same.  In this design, the low centre (sic) of gravity engine lowers the centre (sic) of gravity of the entire car.  Similarly, a symmetrically balanced engine increases the symmetrical balance of the entire car.  Both of these aspects combine to deliver a safer, more stable, and ultimately, more enjoyable experience on the road.*"[4]

57.     Subaru claimed the main motivation for launching the new FB engine was improved efficiency.  According to Subaru, the FB engines had a 28-percent reduction in friction losses within the engine, with the biggest contributors being lighter pistons and connecting rods, as well as a drop in piston-ring tension.  As a result, less engine friction equated to an increase in engine efficiency including a 10% improvement in fuel economy.

---

[4] *See* http://www.subaru-global.com/tec_boxer.html (last visited June 25, 2014).

58.     The Class Vehicles incorporate two sizes of FB engines known as the "FB20" and the "FB25" with the same or similar design, components and function. The FB20 is a 2.0 liter displacement gasoline Boxer engine (1,995 cc) with a dual-overhead camshaft ("DOHC") and timing chain.  Subaru designed, manufactured and distributed the following Class Vehicles with the FB20 engine:

    i.      MY 2012-13 Impreza (2.0L)

    ii.     MY 2013 XV Crosstek (2.0L)

59.     The FB25 is a 2.5 liter displacement Boxer engine (2,498 cc), also with a dual-overhead camshaft ("DOHC") and timing chain.  Subaru designed, manufactured and distributed the following Class Vehicles with the FB25 engine:

    i.      MY 2013 Legacy (2.5L)

    ii.     MY 2013 Outback (2.5L)

    iii.    MY 2011-14 Forester (2.5L)

60.     The 20FB and 25FB engines in the Class Vehicles (collectively referred to as "FB Engines") have engine oil pans with fluid capacities of between 5.1 and 5.5 U.S. quarts.[5]  Furthermore, according to the Class Vehicle maintenance

---

[5] According to Subaru TSBs, engine oil capacities in the FB engines are 5.1 U.S. quarts in the ZX Crosstek, Legacy, Outback, Impreza and 2014 Forester and 5.5 U.S. quarts in the 2012-2013 Forester.

schedules, Subaru recommends the engine oil in the Class Vehicles be changed at intervals of 7,500 miles or 7.5 months.[6]

61.     As background, internal combustion engines, such as the FB, use reciprocating pistons to convert pressure into a rotating motion.  In the FB engines, as with conventional internal combustion gasoline engines, gasoline is mixed with air in the combustion chambers of the engine.  To generate the rotating motion, a four-step sequence is used (the "Combustion Cycle").  First, the "intake stroke" begins with the inlet valve opening and a vaporized fuel mixture is pulled into the combustion chamber by the downward motion of the piston.  Second, the "compression stroke" begins with the inlet valve closing and the piston beginning its movement upward, compressing the fuel mixture in the combustion chamber.  Third, the "power stroke" begins when the spark plug ignites the fuel mixture, expanding the gases and generating power that is transmitted to the crankshaft and ultimately to the wheels of the vehicle.  Fourth, the "exhaust stroke" begins with the exhaust valve opening and the piston moving back down, allowing the exhaust gases to escape the cylinder.  The exhaust valve then closes, the inlet valve opens, and the Combustion Cycle repeats itself.  A diagram of the Combustion Cycle sequence is below:

---

[6] *See* Subaru Warranty & Maintenance Booklet.



62.     During this process, engine oil is used to lubricate the piston and

cylinder wall as the piston moves up and down through the Combustion Cycle.

Engine oil is also necessary in this process to reduce wear on moving parts

throughout the engine, improve sealing within the combustion chamber, and to

cool the engine by carrying heat away from the moving parts.  If there is an

insufficient amount of engine oil, the engine will not have the necessary lubrication

or cooling, thereby causing premature wear of internal parts, inadequate

performance, and/or catastrophic engine failure.

63.     The top sidewall of each engine piston contains rings that, when

correctly sized and installed, prevent engine oil from entering the combustion

chamber, as well as optimizing compression.  On each of the four pistons, there are three rings: (1) the top compression ring, (2) the second compression ring, and (3) the oil control ring.

64.    The top compression ring is the top ring, or closest ring to the inlet and combustion gases, and is exposed to the greatest amount of chemical corrosion and the highest operating temperature.  The compression ring transfers approximately 70% of the combustion chamber heat from the piston to the cylinder wall.

65.    The second compression ring, also known as the wiper ring, is used to further seal the combustion chamber and to wipe the cylinder wall clean of excess oil.  Combustion gases that pass by the top compression ring are stopped by the second compression ring.

66.    The bottom ring, known as the oil control ring, is used to wipe excess oil from the cylinder wall during piston movement and return excess oil through the ring openings to the engine oil pan.  The oil control ring includes two thin rails or running surfaces.

67.    If engine oil is able to pass between any of these piston rings and the surface of the cylinder wall, then the engine oil will enter the combustion chamber of the engine.  Once engine oil is in the combustion chamber, it will not only cause a decrease in engine performance but the engine oil will also be burned off during

the Combustion Cycle sequence thereby reducing the overall amount of oil

contained in the engine.  Furthermore, engine oil in the combustion chamber will

also cause a decrease in fuel efficiency, cause carbon deposits to form within the

engine, and potentially damage the vehicle ignition and emission components.  An

exemplar diagram of a piston with these rings is shown on the following page:



68.     In September and December 2013, Subaru issued a total of four (4)

Technical Service Bulletins (referred to as the "Initial TSBs") to address

complaints of excessive engine oil consumption in the FB engines contained in the

Class Vehicles.[7]  TSBs are recommended repairs issued by automotive

manufacturers and directed only to automotive dealers.  TSBs are frequently issued

when a manufacturer receives widespread reports of a particular problem within its

vehicles.

69.     On or about May 27, 2014, Subaru issued revised versions of the

Initial TSBs previously issued regarding oil consumption in the FB engines

(collectively, the "Revised TSBs").[8]

70.     The Revised TSBs acknowledged the Class Vehicles were

experiencing abnormally high levels of engine oil consumption that warranted an

intricate repair process to properly remedy.  The Revised TSB repair procedure

identifies "unanticipated wear" of the oil control piston rings as the root cause of

the Oil Consumption Defect and, when repaired according to the TSB, with

redesigned oil piston rings incorporating "a change made to the surface treatment",

the abnormal and excessive engine oil consumption ceases.[9]  As explained above,

the pistons function as the heart of the engine, with the Compression Cycle

generating the power that is distributed and used throughout the entire vehicle.

---

[7] Subaru TSB numbers 02-143-13, 02-144-13, 02-145-13, and 02-147-13.

[8] Subaru TSB numbers 02-143-13R, 02-144-13R, 02-145-13R, and 02-147-13R.

[9] All Revised TSBs state "the change was made a result of some limited findings of unanticipated wear of these [oil control piston] rings."  TSB 02-147-13R incorporates additional language stating "the change was made a result of some limited findings of unanticipated wear of these [oil control piston] rings *resulting from variations in cylinder roughness / finish*". (emphasis added).

71.    Upon information and belief, the root cause of the Oil Consumption

Defect is, *inter alia*, the premature wear of the oil control ring, as shown below,

whereby the oil control ring is worn flush with the piston wall, allowing engine oil

to be consumed during the Compression Cycle.



**Piston from Subaru FB20 Engine**



**FB20 Piston with Worn Oil Control Ring**

72.      According to the Revised TSBs, "[i]f a customer inquiries about oil consumption and is close to their next service interval, and consumption has not exceeded 1 quart in that time, the consumption rate should not be considered unusual.  Consumption at a rate greater than this should be reviewed on a case by case basis after reviewing the vehicle's usage patterns/history."

73.      Regardless of Subaru's knowledge regarding the Oil Consumption Defect, and pursuant to the Revised TSBs, Subaru requires a customer to first undergo an oil consumption test.  Upon information and belief, the Class Vehicle must be taken to a Subaru dealership where the engine is filled with oil, the engine dipstick is marked and then the individual is instructed to drive for 1,200 miles and

to then return for inspection.  Some customers will even be forced to pay a fee, often between $80 and $100, to undergo such testing.

74.     Upon information and belief, if the engine consumes greater than one quart of oil in 1,200 miles then, according to Subaru, the relevant Revised TSB applies and the vehicle should be repaired under warranty.  Unfortunately, many Class Vehicles are still not being properly repaired despite undergoing and failing the required oil consumption test.

75.     If the engine consumes one quart of oil or less in 1,200 miles then Subaru considers this "normal" oil consumption and will not repair the Oil Consumption Defect under warranty despite affirmative knowledge of inadequate piston rings and surface treatment as described in the Revised TSBs.[10]

76.     According to the Class Vehicle Owners' Manuals, "[t]he engine oil consumption rate is not stabilized, and therefore cannot be determined until the vehicle has traveled at least several thousand miles (kilometers).  Even after break-in, when the vehicle is used under *severe driving conditions* such as those mentioned in the Warranty and Maintenance Booklet, engine oil is consumed or deteriorated more quickly than under normal driving conditions.  If you drive your

_____

[10] According to the Owner's Manual, "If the oil consumption rate seems abnormally high after the break-in period, for example more than 1 quart per 1,200 miles or 1 liter per 2,000 kilometers, we recommend that you contact your SUBARU dealer."  Upon information and belief, the Owner's Manuals – the only vehicle documentation discussing any oil consumption - are only provided to consumers *after* purchase of the Class Vehicles.

vehicle under these **severe conditions**, you should check the oil level at least every second fuel fill-up time, and change the oil more frequently.  Please refer to the Warranty and Maintenance Booklet for more details." (emphasis added).

77.     According to the Subaru Warranty & Maintenance Booklet referenced above, examples of "severe driving conditions" relevant to engine oil include:

- Repeated short distance driving.
- Driving on rough and/or muddy roads.
- Driving in extremely cold weather.
- Repeated trailer towing.

78.     According to the Revised TSBs, and in contrast to the Owners' Manuals and Warranty and Maintenance Booklet, "[s]ome engine oil will always be consumed as part of normal engine operation.  How much and when it is consumed varies according to manufacturing tolerances, wear, and vehicle usage." Furthermore, "[h]igher than expected oil consumption **may occur under any of the following conditions**:

- When the engine is new and within the break-in period (during the first 1000 miles of operation)
- When the engine oil being used is of a lower quality (other than "Energy or Resource Conserving" API Classification SM or SN or ILSAC, look for the starburst design with GF-4 or GF-5)
- When the incorrect oil viscosity is used (viscosity other than 0W-20 in the case of these specific vehicles)[11]

---

[11] According to Subaru's Owner's Manual, and in contrast to the Revised TSBs, "0W-20 synthetic is the required oil for optimum engine performance and protection.  **Conventional oil may be used if synthetic oil is unavailable**.  If 0W-20 synthetic oil is not available, 5W-30 or 5W-40 conventional oil may be used if

- When engine braking is employed (Downshifting to make use of the transmission's gear ranges and the engine to decelerate the vehicle)
- When the engine is operated at high engine speeds (Continually or under frequent and repetitive hard acceleration such as frequent freeway merging)
- When the engine is operated under heavy loads (Frequent carrying of cargo, multiple passengers or trailer towing)
- When the engine idles for long periods of time (Frequent use of a remote engine start system followed by some period of idling as an example)
- When the vehicle is operated in stop and go and/or heavy traffic situations
- When the vehicle is used under severe temperatures (Cold or hot)
- When the vehicle accelerates and decelerates frequently
- Frequent short trip driving where the engine may not reach full operating temperature

Under these or similar operating conditions, the oil level should be checked regularly. *The engine oil and filter may also need to be changed more often*." (emphasis added).

79.     Defendants have included every conceivable driving situation within the Revised TSBs as a factor for oil consumption so as to minimize its own responsibility and/or deflect blame onto consumers for the Oil Consumption Defect.

80.     Pursuant to the Class Vehicles' Warranty and Maintenance Booklet, Subaru's recommended oil change interval for the Class Vehicles is one oil change

---

replenishment is needed but should be changed to 0W-20 synthetic oil at the next oil change." (emphasis added).

every 7,500 miles or 7.5 months.[12]  If a consumer follows Subaru's recommended

maintenance schedule, a loss of one (1) quart of oil every 1,200 miles will result in

the consumption of the entire amount of oil contained in the Class Vehicle's engine

at between 6,120 and 6,600 miles.[13]  In essence, Subaru's assertion that consuming

oil at a rate of 1,200 miles is acceptable will result in the Class Vehicles running

out of oil before Subaru's recommend oil change interval of 7,500 miles, which

will cause premature wear of internal parts, inadequate performance, and/or

catastrophic engine failure.  The Oil Consumption Defect often results in the

consumption of engine oil at an even higher rate than one quart of oil every 1,200

miles.

81.    Subaru's proposed repair for the Oil Consumption Defect, according

to the Revised TSBs, is to replace the piston ring set contained in the FB engines.

The first step of this procedure is to remove the engine from the Class Vehicle.

Once removed from the vehicle, the FB engine is then completely disassembled to

reach the heart of the engine that houses the piston assembly.  The Revised TSBs

provide an estimated labor time of between 11.4 and 13.1 hours when performed

---

[12] Absent from both the Owner's Manual and Warranty and Maintenance Booklet
is any instruction to check the engine oil level between service intervals unless the
vehicle is driven under "severe conditions" such as those mentioned in the
Warranty and Maintenance Booklet and as described in paragraph 77.

[13] Calculations based on the 5.1 U.S. quart engine oil capacity for the ZX Crosstek,
Legacy, Outback, Impreza and 2014 Forester; 5.5 U.S. quart engine oil capacity for
the 2012-2013 Forester.

by a professional Subaru technician.   Upon information and belief, some Class

members have been quoted and/or paid over $8,000 to Subaru dealerships for this

repair.

82.     The Initial and Revised TSBs were issued only to authorized Subaru

dealers and were never issued to the general public or the owners and lessees of the

Class Vehicles.

83.     Subaru's failure to notify the general public and the owners and

lessees of the Class Vehicles regarding the Oil Consumption Defect is particularly

egregious since, once the Oil Consumption Defect manifests, owners and lessees of

the Class Vehicles may run out of engine oil before Subaru's recommended oil

change interval, thereby causing abrupt catastrophic engine damage and placing

the driver and its occupants at an increased risk of accident, injury, and death.

84.     Subaru's Powertrain Warranty is in effect for five (5) years or 60,000

miles, whichever occurs first.  According to the Warranty and Maintenance

Booklet, Powertrain Coverage Components include:

- Engine
- Engine block and ***all internal parts***
- Cylinder heads and valve trains
- Oil pump, oil pan
- Timing belts or gears and cover
- Water pump
- Flywheel
- Intake and exhaust manifolds
- ***Oil seals*** and gaskets

- 29 -

(emphasis added).

85.   Accordingly, since the piston rings are both "internal [engine] parts" and "oil seals," warranty and repair of the Oil Consumption Defect is covered under Subaru's Powertrain Warranty.

86.   The Class Vehicles are various makes and models of MYs 2011-2013 Subaru vehicles.  Based on the date the Initial TSBs were issued – September and December 2013 – Subaru both acknowledged the Oil Consumption Defect and suggested a repair that would fully remedy the Oil Consumption Defect while all, or nearly all, of the Class Vehicles should still be covered under Subaru's Powertrain Warranty.

87.   Despite Subaru's acknowledgement of the Oil Consumption Defect in the Class Vehicles during the warranty period for all or nearly all of the Class Vehicles, Subaru has declined to extend warranty coverage and free repairs to those owners and lessees of the Class Vehicles who have, and have not yet, experienced the Oil Consumption Defect.

88.   Subaru's Powertrain warranty purports to "cover[] repairs needed to correct defects in materials or workmanship of any" such covered component. Buyers, lessees, and other owners of the Class Vehicles were without access to the information concealed by Defendants as described herein, and therefore reasonably relied on Defendants' representations and warranties regarding the quality,

durability, and other material characteristics of their vehicles.  Had these buyers and lessees known of the defect and the potential danger, they would have taken steps to avoid that danger and/or would have paid less for their vehicles than the amounts they actually paid, or would not have purchased their vehicles.

89.     In many instances, consumers have incurred and will continue to incur expenses for the diagnosis of the Oil Consumption Defect, despite such defect having been contained in the Class Vehicles when manufactured by Defendants, repair and replacement of the FB engine, the cost of additional engine oil, the cost of additional fuel and reduced MPG, higher emissions and the unnecessary and premature replacement of vehicle emission components including, but not limited to, spark plugs, oxygen sensors and catalytic converters.

90.     The Oil Consumption Defect also causes damage, inaccurate functioning and premature failure of certain ignition and emission components contained in the Class Vehicles.

91.     The Class Vehicles were manufactured, designed and sold with two oxygen sensors (the "O2 Sensors") and two catalytic converters (the "Catalytic Converters") as part of the emissions and fuel management systems.  Both the O2

Sensors and the Catalytic Converters are located in the exhaust system as shown on the following page:[14]



92.     Optimum cylinder combustion in the Combustion Cycle depends on the correct air/fuel ratio for the engine operating conditions.  The O2 Sensors monitor unburned oxygen in the exhaust gases and sends this information to the vehicle's Engine Control Module ("ECM").[15]  The ECM then uses this information

---

[14] Front catalytic converter depicted at "(2)", rear catalytic converter depicted at "(4)", front O2 sensor depicted at "(5)" and rear O2 sensor depicted at "(6)".
[15] An engine control module (ECM) is a type of electronic control unit or computer that controls a series of actuators on an internal combustion engine to ensure

from the O2 Sensors to determine if the fuel mixture is rich (too much fuel) or lean (not enough fuel).  The ECM will then adjust the fuel mixture of the engine based on this information.  The O2 Sensors also measure oxygen levels after the exhaust has reacted with the catalytic converter.  The goal of the sensor is to help the engine run as efficiently as possible and also to produce as few emissions as possible.

93.     In the Class Vehicles, the Oil Consumption Defect will cause the O2 Sensors to prematurely fail and/or cause the engine to become less efficient, thereby requiring more fuel to operate, and/or cause the engine to produce higher emissions.  This is due to the contamination of the O2 Sensors by phosphorus and/or zinc contained in the vehicle's engine oil which, because of the Oil Consumption Defect, is burned or disposed of during the Combustion Cycle and incorporated into the vehicle's expelled exhaust gases.  As a result, this causes damage, inaccurate functioning and premature failure of the O2 Sensors contained in the Class Vehicles.

94.     The Catalytic Converters contained in the Class Vehicles are vehicle emissions control devices designed to convert toxic pollutants, contained in exhaust gases, to less toxic pollutants by catalyzing a redox reaction (oxidation or

---

optimal engine performance.  This is accomplished through the ECM reading values from a multitude of sensors within the engine compartment, interpreting that data using multidimensional performance maps and adjusting the engine actuators accordingly.

reduction).  In the Class Vehicles, the Oil Consumption Defect will cause the Catalytic Converters to become poisoned (described below), fail prematurely and/or cause the engine to become less efficient, and/or cause the engine to produce higher emissions.

95.    Catalyst poisoning occurs when the Catalytic Converters in the Class Vehicles are exposed to exhaust containing substances that coat the working surfaces, encapsulating the catalyst so that it cannot contact and treat the exhaust. As with the O2 Sensors, the Catalytic Converters become contaminated with phosphorus and/or zinc contained in the vehicle's engine oil which, because of the Oil Consumption Defect, is burned or disposed of during the Combustion Cycle and incorporated into the vehicle's expelled exhaust gases.  As a result, this causes damage, inaccurate functioning and premature failure of the Catalytic Converters contained in the Class Vehicles.

96.    Each Class Vehicle was manufactured, designed and sold with four (4) spark plugs ("Spark Plugs") and associated components as part of the ignition system.  As background, a spark plug is a device for delivering electric current from the ignition system to the combustion chamber in order to ignite the compressed fuel/air mixture during the power stroke of the Combustion Cycle.  A properly functioning spark plug will help the engine run as efficiently as possible, thereby allowing the engine to produce as few emissions as possible.

97.     In the Class Vehicles, the Oil Consumption Defect will cause the Spark Plugs and related ignition components to fail prematurely and/or cause the engine to become less efficient, thereby requiring more fuel to operate, and/or cause the engine to produce higher emissions.  This is due to the contamination of the Spark Plugs and related ignition components by the vehicle's engine oil which, because of the Oil Consumption Defect, is burned or disposed of during the Combustion Cycle.  As a result, this causes damage, inaccurate functioning and premature failure of the Spark Plugs and related ignition components contained in the Class Vehicles.

98.     Pursuant to the Subaru Warranty and Maintenance Booklet, the Catalytic Converters contained on the Class Vehicles are warrantied for 7 years/70,000 miles under the California Extended Emission Defect Warranty and 8 years/80,000 miles under the Federal Emission Control Systems Warranty.

99.     Pursuant to the Subaru Warranty and Maintenance Booklet, the O2 Sensors and Spark Plugs contained on the Class Vehicles are warrantied for 3 years/50,000 miles under the California Emissions Defect Warranty and 3 years/36,000 miles under the Federal Emissions Defect Warranty.

100.    Car engines are designed to function for periods (and mileages) substantially in excess of those specified in Subaru's warranties, and given past experience, consumers legitimately expect to enjoy the use of an automobile

without worry that the engine will catastrophically fail for significantly longer than the limited times and mileages identified in Defendants' warranties.

101.   Automobiles must incorporate designs that are able to withstand foreseeable usage conditions such as the operation of the vehicle without excessive engine oil consumption.  A vehicle can suffer catastrophic damage and costly repairs from customary environmental and usage conditions when an insufficient vehicle design is implemented.

102.   The Class Vehicles were manufactured with defective FB engines, materials and components.  This defect renders the Class Vehicles prone to the Oil Consumption Defect, costly repairs and catastrophic engine failure.  The Oil Consumption Defect poses serious safety and security issues for operators and occupants of the Class Vehicles.

103.   Upon information and belief, Defendants, through (1) their own records of customers' complaints, (2) dealership repair records, (3) records from the National Highway Traffic Safety Administration ("NHTSA"), (4) warranty and post-warranty claims, (5) internal durability testing, and (6) other various sources, were well aware of the Oil Consumption Defect but failed to notify consumers of the nature and extent of the problems with the Class Vehicle FB engines or provide any adequate remedy.

104.   Defendants failed to adequately research, design, test and/or manufacture the Class Vehicles before warranting, advertising, promoting, marketing, and selling the Class Vehicles as suitable and safe for use in an intended and/or reasonably foreseeable manner.

**B.      Complaints by Other Class Members.**

105.   Plaintiffs' experiences are by no means isolated or outlying occurrences.  Indeed, the internet is replete with examples of blogs and other websites where consumers have complained of the exact same Oil Consumption Defect within the Class Vehicles.[16]

---

[16]  Forester MY 2011-14 forums:
http://www.subaruforester.org/vbulletin/f151/has-oil-consumption-problem-been-fixed-140849/
http://www.edmunds.com/subaru/forester/2014/consumer-reviews/2014-forester-burns-oil.html?style=200460195&sub=&reviewId=286803830262366208
http://www.carcomplaints.com/Subaru/Forester/2014/engine/high_oil_consumption.shtml

Outback MY 2013 forums:
http://www.subaruoutback.org/forums/89-oil-fuel-discussion/62289-2013-ob-2-5-cvt-ltd-oil-usage.html
http://www.subaruoutback.org/forums/104-gen-4-2010-2014/51334-2013-outback-leaking-burning-oil.html
http://www.subaruoutback.org/forums/89-oil-fuel-discussion/48400-low-oil-level-new-subaru.html
http://www.subaruoutback.org/forums/104-gen-4-2010-2014/102282-added-dreaded-quart-oil-today.html

Legacy MY 2013 forums:

106.   Owners and lessees of the Class Vehicles have publicly complained to the United States government about the Oil Consumption Defect in Class Vehicles. The Office of Defects Investigation (ODI) is an office within the National Highway Traffic Safety Administration (NHTSA).  ODI conducts defect investigations and administers safety recalls to support the NHTSA's mission to improve safety on the Nation's highways.  The following are some of the complaints submitted to ODI by Class Vehicle owners.

---

http://legacygt.com/forums/showthread.php/2013-2-5-low-oil-indicator-198209.html
http://legacygt.com/forums/showthread.php/2013-legacy-check-out-if-you-consuming-oil-207306.html
http://joeboulay.com/?p=749

Impreza MY 2012-13 forums:
http://subaru-of-america.pissedconsumer.com/soa-says-its-ok-to-consume-quarts-of-oil-20121218368248.html
http://www.subaruxvforum.com/forum/problems-maintenance-warranty/4794-xv-high-oil-consumption-2.html
http://community.cartalk.com/discussion/2287014/2012-subaru-impreza-oil-usage-is-it-a-generic-design-flaw
http://boards.straightdope.com/sdmb/showthread.php?t=663208
http://www.edmunds.com/subaru/impreza/2012/consumer-reviews.html
http://www.productreview.com.au/r/subaru-xv/471589.html

Crosstrek MY 2013 forums:
http://www.subaruxvforum.com/forum/problems-maintenance-warranty/28490-oil-consuption-mpg-improvement.html
http://clubcrosstrek.com/index.php?topic=527.0

**DATE OF INCIDENT:** October 14, 2013
**DATE COMPLAINT FILED:** November 19, 2013
**NHTSA/ODI ID:** 10552849
**MODEL:** 2013 Subaru Impreza
**SUMMARY:**
I WAS DRIVING INTO WORK IN THE MORNING AND AS I
ENTERED THE PARKING AREA I NOTICED MY OIL LIGHT
COME ON. I PARKED THE CAR AND CHECKED THE OIL, AND
TO MY SURPRISE THERE WAS NOTHING ON THE STICK. I HAD
JUST CHANGED THE OIL LESS THAN 2000 MILES PRIOR TO
THIS AND I WAS CONCERNED. I PROCEEDED TO CHECK FOR
LEAKS AND FOUND NONE. I TOOK THE CAR IN TO THE
DEALER AND WAS INFORMED THAT MY ENGINE IS A QUART
LOW ON MOTOR OIL (0W20), AND THAT THIS IS NORMAL
BECAUSE 2.0I FB ENGINES BURN A QUART OF OIL EVERY 1200
MILES AT THE MOST. THIS IS ABSURD, I AM A FORMER ASE
CERTIFIED MECHANIC AND THIS WAS NOT SOMETHING I
THOUGHT TO BE NORMAL. THIS CARS IS RATED TO GO 7500
MILES BETWEEN OIL CHANGES, AND IF I AM BURNING A QRT
OF OIL EVERY 1200 MILE THEN I AM ESSENTIALLY
CHANGING THE OIL IN BETWEEN OIL CHANGES. TO CALL
THIS A COMMON/NORMAL OCCURRENCE IS LIKE SAYING
THAT THEY CARE NOTHING ABOUT THERE CUSTOMERS. THE
DEALER ESSENTIALLY TOPED OFF MY OIL, PUT A STICKER IN
THE WINDOW AND SAID IN 1200 MILE COME BACK AND WE
WILL START AN OIL CONSUMPTION TEST, BUT NOT AT THE
COST OF THE DEALER OR SUBARU. THIS INITIAL COST
WOULD BE CHARGED TO ME THE CUSTOMER AT A COST OF
ALMOST $100.00 DOLLARS WHICH I FIND RIDICULOUS SINCE
THE CAR IS UNDER WARRANTY AND THIS IS A DIAGNOSTIC
OF A FAILURE NOT A NORMAL OIL CHANGE. WHEN I
CONTACTED SUBARU OF NORTH AMERICA I STILL GOT THE
RUN AROUND, AND I FEEL AS IF THEY ARE HIDING THE FACT
THAT THEY HAVE A WHOLE FLEET OF VEHICLES OUT ON THE
ROAD READY TO BLOW ENGINES AND THEY ARE GOING TO
DO THE SAME THING THEY DID IN THE PAST WITH THE 2.5
AND BLAME THE CUSTOMER. *TR

**DATE OF INCIDENT:** April 10, 2013
**DATE COMPLAINT FILED:** August 22, 2013
**NHTSA/ODI ID:** 10536829
**MODEL:** 2013 Subaru Impreza
**SUMMARY:**
I BOUGHT MY 2013 SUBARU IMPREZA AND WITH APPROX
10,000 MILES I GOT A LOW OIL LIGHT ON. I FOUND OUT MY
SUBARU BURNS A QUART OF OIL EVERY 2500-3000 MILES.
THAT IS UNACCEPTABLE FOR A BRAND NEW CAR. SUBARU IS
SELLING A LEMON. *TR

**DATE OF INCIDENT:** June 5, 2014
**DATE COMPLAINT FILED:** June 5, 2014
**NHTSA/ODI ID:** 10596359
**MODEL:** 2012 Subaru Impreza
**SUMMARY:**
I HAVE BEEN HAVING CONTINUOUS ISSUES WITH OIL
CONSUMPTION IN MY 2012 IMPREZA 2.0I. I HAVE ONLY
DRIVEN 2500 MILES SINCE MY OIL CHANGE AND MY LOW OIL
LIGHT IS ON. THIS IS THE THIRD TIME I'VE HAD TO TOP UP
THE OIL AND THE PROBLEM IS ONLY GETTING WORSE!

**DATE OF INCIDENT:** January 1, 2014
**DATE COMPLAINT FILED:** January 8, 2014
**NHTSA/ODI ID:** 10559037
**MODEL:** 2012 Subaru Impreza
**SUMMARY:**
ADDENDUM TO 12/30/13 COMPLAINT: IN ADDITION TO THE
PREVIOUSLY OUTLINED PROBLEMS: 1. CAR IS NOW LOOSING
OIL. AT 26,500 MILES THE LOW OIL LEVEL LIGHT CAME ON.
CHECKED OIL LEVEL AND REVEALED CAR HAD LOST
APPROX 1.5-2 QT SINCE LAST REGULARLY SCHEDULED OIL
CHANGE. 2. BRAKES SQUEAL WHEN YOU FIRST COMPRESS
THE PEDAL. I HAD THE BRAKES INSPECTED AND WAS TOLD
NOTHING WAS WRONG WITH THEM OR THE BRAKE PAD. I DO
NOT THINK THIS IS NORMAL TO OCCUR EVERY TIME YOU
TOUCH THE BRAKES UNLESS SOMETHING IS WRONG.
BRAKES DID NOT START MAKING NOISE UNTIL 25,000 MILES.
**NO CONFIDENCE THIS CAR IS TRUSTWORTHY. SERIOUSLY

WORRIED ABOUT ITS RELIABILITY/ COST TO REPAIR AFTER
WARRANTY EXPIRES.** *TR

**DATE OF INCIDENT:** June 9, 2013
**DATE COMPLAINT FILED:** December 9, 2013
**NHTSA/ODI ID:** 10555266
**MODEL:** 2012 Subaru Impreza
**SUMMARY:**
TL* THE CONTACT OWNS A 2012 SUBARU IMPREZA. THE
CONTACT STATED THAT HE THE VEHICLE EXHIBITED
EXCESSIVE OIL CONSUMPTION. THE CONTACT ADDED ONE
QUART OF OIL TO THE VEHICLE, WHICH ONLY LASTED
APPROXIMATELY 900 MILES. THE VEHICLE WAS INSPECTED.
THE MANUFACTURER WAS NOTIFIED OF THE ISSUE. THE
FAILURE MILEAGE WAS 7,500 UPDATED 01/14/14 *BF

**DATE OF INCIDENT:** June 9, 2013
**DATE COMPLAINT FILED:** December 9, 2013
**NHTSA/ODI ID:** 10554701
**MODEL:** 2012 Subaru Impreza
**SUMMARY:**
MY SUBARU IMPRERA'S LOW ENGINE OIL LIGHT HAS BEEN
ON MULTIPLE TIMES SINCE APRIL OF THIS YEAR AND HAS
BEEN BROUGHT TO THE ATTENTION OF SUBARU DEALER TO
NO AVAIL. THOUGH THE OIL CONSUMPTION RATE IS
ABNORMAL AND THE PROBLEM APPEARS TO BE COMMON
AMONG CERTAIN SUBARU MODELS, SUBARU OF AMERICA
HAS BEEN ASSERTING THAT IT IS NORMAL FOR AN
AUTOMOBILE TO CONSUME A QUART OF OIL ABOUT EVERY
THOUSAND MILES. *TR

**DATE OF INCIDENT:** March 18, 2013
**DATE COMPLAINT FILED:** October 28, 2013
**NHTSA/ODI ID:** 10549874
**MODEL:** 2012 Subaru Impreza
**SUMMARY:**
LOW OIL WARNING LIGHT ON DASH. BROUGHT TO DEALER.
NO ACTION. OIL WARNING LIGHT ON 3 TIMES SINCE THEN.
STILL NO ACTION TAKEN BY DEALER. SUBARU DEALER DOES
NOT DENY OIL IS BEING BURNED BUT STATES THAT THIS IS

NORMAL FOR A NEW CAR. WE HAVE BEGUN AN OIL
CONSUMPTION TEST BUT THE CAR CONTINUES TO BURN OIL.
WE WILL HAVE TO DRIVE ANOTHER 2400 MILES TO GET THE
RESULTS OF THE TEST. THE CAR ONLY HAS 17,000 MILES BUT
OIL WARNING LIGHT COMES ON INDICATING LOW OIL EVERY
1,200 TO 1,500 MILES. STILL AWAITING RESPONSE FROM
SUBARU. *TR

**DATE OF INCIDENT:** August 19, 2012
**DATE COMPLAINT FILED:** August 19, 2012
**NHTSA/ODI ID:** 10471412
**MODEL:** 2012 Subaru Impreza
**SUMMARY:**
I PURCHASED MY 2012 SUBARU IMPREZA SPORT PREMIUM ON
12/24/2011. IT HAD LESS THAN 100 MILES WHEN PURCHASED
FROM THE DEALER. AT 1200 MILES, THE OIL LIGHT CAME ON.
I CHECKED THE OIL LEVEL AND IT WAS VERY LOW. I CALLED
BROADWAY SUBARU IN OAKLAND,CA ABOUT THE PROBLEM.
I EXPLAINED, HOW CAN A BRAND NEW CAR HAVE LOW OIL?
THEY SAID THIS IS COMMON AND TO ADD OIL. ADDED OIL
AND THE LIGHT WENT OFF. TODAY, THE LIGHT APPEARED
AGAIN AT 5560 MILES. OIL AGAIN IS LOW BUT WITHIN
NORMAL LEVELS. I CALLED BROADWAY SUBARU AND TOLD
THEM THE PROBLEM. AGAIN, THE GUY EXPLAINED THIS IS
NORMAL FOR ALL CARS TO BURN OIL, WHETHER IT'S AN
AMERICAN CAR, JAPANESE, OR ANYTHING ELSE. IS HE
SERIOUS? I HONDAS FOR CLOSE TO 20 YEARS AND NEVER
EVER DID AN OIL LIGHT COME ON, LET ALONE ON A NEW
ENGINE WHICH IS NOT DUE FOR ITS FIRST OIL CHANGE
UNTIL 7500 MILES. I MADE AN APPT FOR 8/24/2012. *TR

**DATE OF INCIDENT:** July 12, 2011
**DATE COMPLAINT FILED:** May 9, 2013
**NHTSA/ODI ID:** 10511334
**MODEL:** 2011 Subaru Forester
**SUMMARY:**
AFTER OWNING 3 OTHER SUBARUS, WE FIGURED IT WAS A
GREAT IDEA TO BUY A 4TH. WELL, SUBARU HAS CHANGED
THE ENGINE DESIGN ENOUGH WHERE AS THE OIL NEEDED IS
A SUPER LIGHT WEIGHT SYNTHETIC 0W20. AFTER ABOUT

2000 MILES CONSISTENTLY, THE CAR WILL ALWAYS NEED OIL. WE HAVE 40,000 ON IT NOW AND AFTER MULTIPLE OIL CHANGES THE CAR STILL USES WAY TOO MUCH OIL. NOT A GREAT CHOICE OF A CAR IS WHAT I AM THINKING NOW. SOMEONE NEEDS TO STEP IN FROM THE NHTSA AND DETERMINE WHY A NEW CAR WOULD BE LOSING OIL AS FAST AS THE SUBARU DOES. I HAVE READ OTHER SIMILAR COMPLAINTS. MAYBE IT IS TIME TO START AN ONLINE PETITION TO HELP NUDGE NHTSA AND SUBARU. *TR

**DATE OF INCIDENT:** March 4, 2011
**DATE COMPLAINT FILED:** October 11, 2012
**NHTSA/ODI ID:** 10479777
**MODEL:** 2011 Subaru Forester
**SUMMARY:**
PURCHASED CAR NEW 12/2010, DEALER TOLD ME IT USED SYN OIL AND ONLY NEEDED TO BE CHANGED EVERY 7500 MILES. 03/2011 THE CAR HAD 4300 MILES AND WHEN I CHECKED THE OIL IT WAS NOT SHOWING ON THE DIPSTICK. DEALER DID NOT TELL ME THAT THE FORESTERS USE OIL. IT WAS OVER 2 QUARTS LOW. IT HAS BEEN TWO YEARS NOW AND SUBARU HAS STILL DONE NOTHING FOR MY CAR. ALL THEY TOLD ME WAS IT'S IN YOUR OWNERS MANUAL AND THEY USE A QT EVERY 1200 MILES. THIS IS CRAZY FOR A NEW CAR. 6 QTS FOR AN OIL CHANGE AND 5 QTS IN BETWEEN. CAN'T DEPEND ON THIS CAR. NOT SAFE TO DRIVE ON LONG TRIPS. ENGINE IS VERY NOISY. SUBARU DECEIVED ME AT TIME OF PURCHASE, I WOULD NEVER BOUGHT A CAR THAT USES OIL LIKE THIS. *TR

**DATE OF INCIDENT:** January 2, 2013
**DATE COMPLAINT FILED:** January 4, 2014
**NHTSA/ODI ID:** 10558426
**MODEL:** 2012 Subaru Forester
**SUMMARY:**
THE ENGINE CONSUMES TOO MUCH OIL FOR SUCH A RELATIVELY NEW & LOW MILEAGE VEHICLE. THIS IS THE 2ND COMPLAINT TO THE DEALER ABOUT THIS CONCERN. EACH TIME THE ENGINE OIL IS CHECKED THE DIPSTICK WOULD NOT REGISTER ANY OIL READING. ON THE SECOND

VISIT, THE DEALER CHANGED THE OIL & FILTER UNDER
WARRANTY AS PER BULLETIN 02-144-13R & HAVING ME
RETURN AFTER AN ADDITIONAL 1200 MILES OF DRIVING.
THIS ENGINE IS DEFECTIVE FOR HAVING OIL USAGE AT SUCH
LOW MILEAGE AND BEGIN RELATIVELY NEW. I HAVE
OWNED MANY CARS IN MY TIME AND UNDERSTAND ALL
CARS CONSUME OIL AT SOME POINT OR ANOTHER BUT NOT
WHEN THE CAR IS STILL PRACTICALLY NEW. DID RESEARCH
ONLINE AND HAVE SEEN MANY OTHER OWNERS WITH
SIMILAR COMPLAINTS, MOST WITH NO RESOLUTION. THIS
POSES A SAFETY HAZARD MAINLY FOR THE OWNERS WHO
ARE NOT AS SAVVY WITH VEHICLES. THE ENGINE OIL COULD
RUN OUT & SEIZE THE MOTOR OF WHICH CAN HAPPEN
WHILE DRIVING DURING HIGHWAY SPEEDS. *TR

## **THE COURT SHOULD APPLY NEW JERSEY LAW**

107.   The  substantive laws of New Jersey should apply to the proposed

nationwide Class, as defined herein, because Plaintiffs properly bring this

Complaint in this District.

108.   New Jersey's substantive laws may be constitutionally applied to the

claims of Plaintiffs and the Class under the Due Process Clause, 14th Amend., § 1,

and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution.  New

Jersey has significant contact, or significant aggregation of contacts, to the claims

asserted by Plaintiffs and all Class members, thereby creating state interests that

ensure that the choice of New Jersey state law is not arbitrary or unfair.

109.   Specifically, Defendants' North American headquarters and principal

place of business is located in New Jersey.  According to its website, SOA

occupies an $18 million, 115,000 square-foot, seven-story structure in Cherry Hill, New Jersey where it serves as the company's national headquarters housing approximately 300 people in Finance, IT, Marketing, Sales and Product Planning.[17] Furthermore, Subaru has an Operations Center located in Pennsauken, New Jersey housing nearly 200 employees from Customer Loyalty, Government Relations, Parts, Service, Training, Customer Dealer Service and Subaru Financial Services.[18]

110.   Defendants own property and conduct substantial business in New Jersey and, therefore, New Jersey has an interest in regulating Defendants' conduct under its laws.  Defendants' decision to reside in New Jersey and avail themselves of New Jersey's laws renders the application of New Jersey law to the claims herein constitutionally permissible.

111.   A substantial number of members of the Class also reside in New Jersey and purchased their vehicles in New Jersey.

112.   Upon information and belief, Defendants' misconduct emanated from New Jersey.  This conduct similarly injured and affected all Plaintiffs and Class members residing in the United States.  For instance, Defendants' marketing and advertising efforts were likely created in and orchestrated from the location of Defendant SOA's present headquarters in New Jersey.  As a result, New Jersey is

---

[17] *See* http://www.subaru.com/company.html (last visited June 25, 2014).
[18] *Id.*

the locus where the conduct causing injury to the Plaintiffs and Class members occurred and emanated.

113.   The application of New Jersey's laws to the Nationwide Class is also appropriate under New Jersey's choice of law rules because New Jersey has significant contacts to the claims of the Plaintiffs and the proposed Nationwide Class, and New Jersey has a greater interest in applying its laws here than any other interested state.

## CLASS ACTION ALLEGATIONS

114.   Plaintiffs bring this action on their own behalf, and on behalf of a nationwide class pursuant to FED. R. CIV. P. 23(a), 23(b)(2), and/or 23(b)(3). Specifically, the nationwide class consists of:

> All persons or entities in the United States who are current or former owners and/or lessees of a Class Vehicle (the "Nationwide Class").

115.   In the alternative to the Nationwide Class, and pursuant to FED. R. CIV. P. 23(c)(5), Plaintiffs seek to represent the following state classes only in the event that the Court declines to certify the Nationwide Class above:

> **California Class:**
> All persons in California who are current or former owners and/or lessees of a Class Vehicle for primarily personal, family or household purposes, as defined by California Civil Code § 1791(a).
>
> **Florida Class**:
> All persons or entities in Florida who are current or former owners and/or lessees of a Class Vehicle.

**New Jersey Class**:
All persons or entities in New Jersey who are current or former owners and/or lessees of a Class Vehicle.

116.   Together, the New Jersey Class, California Class and Florida Class, shall be collectively referred to herein as the "State Sub-Classes."  Excluded from the Nationwide Class and State Sub-Classes are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case.  Plaintiffs reserve the right to modify, change, or expand the Nationwide Class and State Sub-Class definitions if discovery and/or further investigation reveals that they should be expanded or otherwise modified.

117.   <u>Numerosity</u>:  Upon information and belief, each of the Classes are so numerous that joinder of all members is impracticable.  While the exact number and identities of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that hundreds of thousands of Class Vehicles have been sold and leased in each of the States that are the subject of the Classes.

118.   <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Classes.  These

questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to:

a.   whether the FB engines in the Class Vehicles are predisposed to the Oil Consumption Defect;

b.   whether the FB engines in the Class Vehicles contain a design defect and/or defect in materials;

c.   whether the defective engine design and/or defect in materials is common to all or some of the Class Vehicles;

d.   if so, whether the Oil Consumption Defect causes the excessive oil consumption in the Class Vehicles;

e.   whether Defendants knowingly failed to disclose the existence and cause of the Oil Consumption Defect in the Class Vehicles;

f.   whether Defendants' conduct violates the New Jersey Consumer Fraud Act and the other statutes asserted herein;

g.    whether, as a result of Defendants' omissions and/or misrepresentations of material facts related to the Oil Consumption Defect, Plaintiffs and members of the Classes have suffered an ascertainable loss of monies and/or property and/or value; and

h.     whether Plaintiffs and Class members are entitled to monetary

damages and/or other remedies, and, if so, the nature of any

such relief.

119.   Typicality:  Both of the Plaintiffs' claims are typical of the claims of

the Classes since each Plaintiff purchased or leased a Class Vehicle containing the

Oil Consumption Defect, defective vehicle design, defective materials, and

defective engine, as did each member of the Classes.  Furthermore, Plaintiffs and

all members of the Classes sustained monetary and economic injuries including,

but not limited to, ascertainable losses arising out of Defendants' wrongful

conduct.  Plaintiffs are advancing the same claims and legal theories on behalf of

themselves and all absent Class members.

120.   Adequacy:  All of the Plaintiffs are adequate representatives because

their interests do not conflict with the interests of the Classes that they seek to

represent, they have retained counsel competent and highly experienced in

complex class action litigation, and they intend to prosecute this action vigorously.

The interests of the Classes will be fairly and adequately protected by Plaintiffs

and their counsel.

121.   Superiority:  A class action is superior to all other available means of

fair and efficient adjudication of the claims of Plaintiffs and members of the

Classes.  The injury suffered by each individual Class member is relatively small

in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Classes can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and database of complaints.

122.   Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## VIOLATIONS ALLEGED

### COUNT I
### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
**(N.J. STAT. ANN. § 56:8-1, *et seq.*)**
**(On Behalf of the Nationwide Class or,**
**Alternatively, the New Jersey Sub-Class)**

123.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth and length herein.

124.   The New Jersey Consumer Fraud Act, N.J. STAT. ANN. §§ 56:8-1, *et seq.* ("NJCFA") protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise…"  N.J.S.A. 56:8-2.

125.   Plaintiffs and members of the Class are consumers who purchased and/or leased Class Vehicles for personal, family or household use.

126.   In the course of Subaru's business, it willfully failed to disclose and actively concealed the dangerous risk of the Oil Consumption Defect in the Class Vehicles as described above.  Accordingly, Subaru has engaged in unfair and deceptive trade practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not;

advertising Class Vehicles with the intent to not sell them as advertised; and otherwise engaging in conduct likely to deceive.  Further, Subaru's acts and practices described herein offend established public policy because of the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Subaru fraudulently concealed the defective nature of the Class Vehicles from consumers.

127.   Subaru's actions as set forth above occurred in the conduct of trade or commerce.

128.   Defendants' conduct caused Plaintiffs and Class members to suffer an ascertainable loss.  In addition to direct monetary losses, Plaintiffs and Class members have suffered an ascertainable loss by receiving less than what was promised.

129.   Plaintiff and the other Class members were injured as a result of Subaru's conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.

130.   A causal relationship exists between Defendants' unlawful conduct and the ascertainable losses suffered by Plaintiff and the Class.  Had the defective vehicle design in the Class vehicles been disclosed, consumers would not have

purchased them or would have paid less for the Class vehicles had they decided to purchase them.

131.   Pursuant to N.J. STAT. ANN. § 56:8-20, Plaintiff will serve the New Jersey Attorney General with a copy of this Complaint.

## COUNT II
## BREACH OF EXPRESS WARRANTY
### (On Behalf of the Nationwide Class or,
### Alternatively, each of the State Sub-Classes)

132.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

133.   Defendants expressly warranted that the Class Vehicles were of high quality and, at minimum, would actually work properly.  Defendants also expressly warranted that they would repair and/or replace defects in material and/or workmanship free of charge that occurred during the new vehicle and certified pre-owned ("CPO") warranty periods.

134.   Plaintiffs relied on Subaru's express warranties when purchasing their Class Vehicles.

135.   Defendants breached this warranty by selling to Plaintiffs and the Class members the Class Vehicles with known engine oil consumption problems, which are not of high quality, and which are predisposed to fail prematurely and/or fail to function properly.

136.   As a result of Defendants' actions, Plaintiffs and the Class members have suffered economic damages including, but not limited to, costly repairs, loss of vehicle use, substantial loss in value and resale value of the vehicles, and other related damage.

137.   Defendants' attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.  Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

138.   The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and Class members had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Subaru and the Class members, and Subaru knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

139.   Plaintiffs and the Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

## COUNT III
## BREACH OF THE IMPLIED
## WARRANTY OF MERCHANTABILITY
### (On Behalf of the Nationwide Class or,
### Alternatively, each of the State Sub-Classes)

140.   Plaintiffs and the Classes incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

141.   Defendant Subaru is a "merchant" as defined under the Uniform Commercial Code ("UCC").

142.   The Class Vehicles are "goods" as defined under the UCC.

143.   Defendants impliedly warranted that the Class Vehicles were of a merchantable quality.

144.   Defendants breached the implied warranty of merchantability, as the Class Vehicles were not of a merchantable quality due to the Oil Consumption Defect.

145.   As a direct and proximate result of the breach of said warranties, Plaintiffs and Class members were injured, and are entitled to damages.

146.   Defendants' attempt to disclaim or limit the implied warranty of merchantability vis-à-vis consumers is unconscionable and unenforceable here. Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

147.   The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and member of the Class. Among other things, Plaintiffs and members of the Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Subaru and Class members, and Subaru knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

148.   Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

## COUNT IV
## COMMON LAW FRAUD
## (On Behalf of the Nationwide Class or,
## Alternatively, the New Jersey Class)

149.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

150.   Defendants made material omissions concerning a presently existing or past fact.  For example, Defendants did not fully and truthfully disclose to its customers the true nature of the inherent design defect with the FB engines that cause the Oil Consumption Defect, which was not readily discoverable until after purchase and/or lease of the Class Vehicles, in some cases after the warranty has expired.  As a result, Plaintiffs and the other Class members were fraudulently

induced to lease and/or purchase the Class Vehicles with the said design defects and all of the resultant problems.

151.   These omissions were made by Defendants with knowledge of their falsity, and with the intent that Plaintiffs and the Class members rely on them.

152.   Plaintiffs and the Class members reasonably relied on these omissions, and suffered damages as a result.

**COUNT V**
**BREACH OF THE DUTY OF GOOD FAITH**
**AND FAIR DEALING**
**(On Behalf of the Nationwide Class or,**
**Alternatively, the New Jersey Sub-Class)**

153.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

154.   Every contract in New Jersey, California and Florida contains an implied covenant of good faith and fair dealing.  The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

155.   Defendants breached the covenant of good faith and fair dealing by, *inter alia*, failing to notify Plaintiffs and Class members of the Oil Consumption Defect in the Class Vehicles, and failing to fully and properly repair this defect.

156.   Defendants acted in bad faith and/or with a malicious motive to deny Plaintiffs and the Class members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

## COUNT VI
## VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA") (CAL. CIV. CODE § 1750, *et seq.*)
### (On Behalf of the California Class)

157.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

158.   Plaintiff Yaeger ("Plaintiff" for the purposes of this Count) bring this claim on behalf of himself and on behalf of the members of the California Class against all Defendants.

159.   Defendants are "persons" as that term is defined in CAL. CIV. CODE § 1761(c).

160.   Plaintiff and the Class are "consumers" as that term is defined in CAL. CIV. CODE §1761(d).

161.   Defendants engaged in unfair and deceptive acts in violation of the CLRA by the practices described above, and by knowingly and intentionally concealing from Plaintiff and Class members that the Class Vehicles suffer from a design defect (and the costs, risks, and diminished value of the vehicles as a result

of this problem). These acts and practices violate, at a minimum, the following sections of the CLRA:

> (a)(2) Misrepresenting the source, sponsorship, approval or certification of goods or services;
>
> (a)(5) Representing that goods or services have sponsorships, characteristics, uses, benefits or quantities which they do not have, or that a person has a sponsorship, approval, status, affiliation or connection which he or she does not have;
>
> (a)(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and
>
> (a)(9) Advertising goods and services with the intent not to sell them as advertised.

162. Defendants' unfair or deceptive acts or practices occurred repeatedly in Defendants' trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

163. Defendants knew that their Class Vehicles and their engines were defectively designed or manufactured, would fail prematurely, would consume excessive oil and were not suitable for their intended use.

164. Defendants were under a duty to Plaintiff and the Class members to disclose the defective nature of the Class Vehicles and the Oil Consumption Defect because:

a.    Defendants were in a superior position to know the true state of facts about the safety defect and associated repair costs in the Class Vehicles and their engines;

b.    Plaintiff and the Class members could not reasonably have been expected to learn or discover that the Class Vehicles and their engine had a dangerous safety defect until manifestation of the defect; and

c.    Defendant knew that Plaintiffs and the Class members could not reasonably have been expected to learn or discover the safety and security defect and the associated repair costs that it causes until the manifestation of the defect.

165.   In failing to disclose the Oil Consumption Defect and the associated safety risks and repair costs that result from it, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

166.   The facts concealed or not disclosed by Defendants to Plaintiff and the Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase Defendants' Class Vehicles or pay a lesser price.  Had Plaintiff and the Class known about the defective nature of the Class Vehicles and their engines, they would not have purchased the Class Vehicles or would have paid less for them.

167.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff and the Class members have suffered and will continue to suffer actual damages.

168.   Plaintiffs seek all relief available under the CLRA.

**COUNT VII**
**VIOLATIONS OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE (CAL. BUS. & PROF. CODE § 17200)**
**(On Behalf of the California Class)**

169.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

170.   Plaintiffs Yaeger ("Plaintiff" for purposes of this Count) bring this claim on behalf of himself and on behalf of the members of the California Class against all Defendants.

171.   The California Unfair Competition Law ("UCL") prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."  CAL. BUS. & PROF. CODE § 17200.

172.   Defendants have engaged in unfair competition and unfair, unlawful or fraudulent business practices by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff and the Class members that the Class Vehicles suffer from a design defect (and the

costs, safety risks, and diminished value of the vehicles as a result of this problem). Defendants should have disclosed this information because they were in a superior position to know the true facts related to this design defect, and Plaintiffs and Class members could not reasonably be expected to learn or discover the true facts related to this defect.

173.   The Oil Consumption Defect constitutes a safety issue that triggered Subaru's duty to disclose the safety issue to consumers.

174.   These acts and practices have deceived Plaintiff and are likely to deceive the public.  In failing to disclose the design defect and suppressing other material facts from Plaintiff and the Class members, Defendants breached their duties to disclose these facts, violated the UCL, and caused injuries to Plaintiff and the Class members.  The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiff and Class members, as it would have been to all reasonable consumers.

175.   The injuries suffered by Plaintiff and the Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiff and the Class members should have reasonably avoided.

176.   Defendants' acts and practices are unlawful because they violate CAL. CIV. CODE §§ 1668, 1709, 1710, and 1750 *et seq.*, and CAL. COMM. CODE § 2313.

177.   Plaintiffs seek to enjoin further unlawful, unfair and/or fraudulent acts or practices by Defendants, to obtain restitutionary disgorgement of all monies and revenues generated as a result of such practices, and all other relief allowed under CAL. BUS. & PROF. CODE § 17200.

## COUNT VIII
### VIOLATIONS OF THE FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT (FLA. STAT. § 501.201, *et seq.*) (On Behalf of the Florida Class)

178.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

179.   Plaintiff Schuler ("Plaintiff" for purposes of this Count) brings this claim on behalf of himself and the Florida Class.

180.   Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1).

181.   In the course of Subaru's business, it willfully failed to disclose and actively concealed the dangerous risk of the Oil Consumption Defect in the Class Vehicles as described above. Accordingly, Subaru engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices as defined in FLA. STAT. § 501.204(1), including representing that Class

Vehicles have characteristics, uses, benefits, and qualities which they do not have; advertising Class Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

182.   Subaru's actions set forth above occurred in the conduct of trade or commerce.

183.   Subaru's conduct proximately caused injuries to Plaintiff and other Class members.

184.   Subaru, by the conduct, statements, and omissions described above, and by knowingly and intentionally concealing from Plaintiff and the Class members that the Class Vehicles suffer from a design defect (and the costs, safety risks, and diminished value of the vehicles as a result of this problem).  Defendants should have disclosed this information because they were in a superior position to know the true facts related to this design defect, and Plaintiff and Class members could not reasonably be expected to learn or discover the true facts related to this defect.

185.   The Oil Consumption Defect constitutes a safety issue that triggered Subaru's duty to disclose the safety issue to consumers.

186.   These acts and practices have deceived Plaintiff and is likely to deceive the public.  In failing to disclose the design defect and suppressing other material facts from Plaintiff and the Class members, Defendants breached their

duties to disclose these facts, violated the UCL, and caused injuries to Plaintiff and the Class members.  The omissions and acts of concealment by Defendants pertained to information that was material to Plaintiff and Class members, as it would have been to all reasonable consumers.

187.   The injuries suffered by Plaintiff and the Class members are greatly outweighed by any potential countervailing benefit to consumers or to competition, nor are they injuries that Plaintiffs and the Class members should have reasonably avoided.

188.   Plaintiff and the other Class members were injured as a result of Subaru's conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Subaru's misrepresentations and omissions.

## COUNT IX
### VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES
### (CAL. CIV. CODE §§ 1791.2 & 1793.2(D))
### (On Behalf of the California Class)

189.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

190.   Plaintiffs bring this Count on behalf of the California Class.

191.   Plaintiffs and the other Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

192.   The Class Vehicles are "consumer goods" within the meaning of CAL. CIV. CODE § 1791(a).

193.   Subaru is a "manufacturer" of the Class Vehicles within the meaning of CAL. CIV. CODE § 1791(j).

194.   Plaintiffs and the other Class members bought/leased new motor vehicles manufactured by Subaru.

195.   Subaru made express warranties to Plaintiffs and the other Class members within the meaning of CAL. CIV. CODE §§ 1791.2 and 1793.2, as described above.

196.   As set forth above in detail, the Class Vehicles are inherently defective in that the Oil Consumption Defect in the Class Vehicles substantially impairs the use, value, and safety of the Class Vehicles to reasonable consumers like Plaintiffs and the other Class members.

197.   As a result of Subaru's breach of its express warranties, Plaintiffs and the other Class members received goods whose dangerous condition substantially impairs their value to Plaintiffs and the other Class members.  Plaintiffs and the other Class members have been damaged as a result of, *inter alia,* the diminished

value of Subaru's products, the products' malfunctioning, and the nonuse of their Class Vehicles.

198.   Pursuant to CAL. CIV. CODE §§ 1793.2 & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

199.   Pursuant to CAL. CIV. CODE § 1794, Plaintiffs and the other Class members are entitled to costs and attorneys' fees.

**COUNT X**
**THE SONG-BEVERLY ACT – BREACH OF IMPLIED**
**WARRANTY VIOLATIONS OF CALIFORNIA CIVIL**
**CODE §§ 1792, 1791.1, *et seq.***
**(On Behalf of the California Class)**

200.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

201.   Plaintiff Yaeger ("Plaintiff" for purposes of this Count) bring this claim on behalf of himself and the California Class.

202.   At all relevant times hereto, Defendants were the manufacturers, distributors, warrantors, and/or sellers of the Class Vehicles.  Defendants knew or should have known of the specific use for which the Class Vehicles were purchased.

203.    Defendants provided Plaintiff and the Class Members with an implied warranty that the Class Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold.  The Class Vehicles, however, are not fit for their ordinary purpose because, *inter alia*, the Class Vehicles and their engines suffered from an inherent defect at the time of sale that causes the Class Vehicles to consume an abnormal and excessive amount of oil.

204.    The Class Vehicles are not fit for the purpose of providing safe and reliable transportation because of the Oil Consumption Defect.

205.    Defendants impliedly warranted that the Class Vehicles were of merchantable quality and fit for such use.  This implied warranty included, *inter alia*, the following: (i) a warranty that the Class Vehicles and their engines were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation and would not consume abnormal and excessive amounts of oil between scheduled oil changes; and (ii) a warranty that the Class Vehicles and their engines would be fit for their intended use – providing safe and reliable transportation – while the Class Vehicles were being operated.

206.    Contrary to the applicable implied warranties, the Class Vehicles and their engines at the time of sale and thereafter were not fit for their ordinary and intended purpose.  Instead, the Class Vehicles are defective, including, but not

limited to, the defective design and/or manufacture of the FB engines that contain the Oil Consumption Defect.

207.   Defendants' actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of CAL. CIV. CODE §§ 1792 and 1791.1.

**COUNT XI**
**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW**
**(CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ*.)**
**(On Behalf of the California Class)**

208.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

209.   Plaintiff brings this Count on behalf of the California Class.

210.   California Bus. & Prof. Code § 17500 states:  "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

211.   Subaru caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Subaru, to be untrue and misleading to consumers, including Plaintiffs and the other Class members.

212.   Subaru has violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of its Class Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

213.   Plaintiffs and the other Class members have suffered an injury in fact, including the loss of money or property, as a result of Subaru's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiffs and the other Class members relied on the misrepresentations and/or omissions of Subaru with respect to the safety and reliability of the Class Vehicles.  Subaru's representations were untrue because the Class Vehicles are distributed with the Oil Consumption Defect.  Had Plaintiffs and the other Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.  Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

214.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Subaru's business.  Subaru's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

215.   Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Subaru from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the other Class members any money Subaru acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT XII
## VIOLATION OF CALIFORNIA CIVIL CODE SECTION 1795.92
### (On Behalf of the California Class)

216.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

217.   CAL. CIV. CODE § 1795.90, *et seq.*, sets forth what is commonly known as the Secret Warranty Law. CAL. CIV. CODE § 1795.92 requires notification by manufacturers to purchasers and lessees of their products of an "adjustment program."

218.   CAL. CIV. CODE § 1795.90 defines an "adjustment program" as a program where the original warranty is expanded or extended, or where a

manufacturer offers to pay or reimburse for repairs to a condition affecting durability or reliability of a vehicle.

219.   As set forth herein, Subaru issued Technical Service Bulletins relating to the Oil Consumption Defect.  Plaintiffs are informed and believe, and thereon allege, that these Technical Services Bulletins were part of a program set forth by Subaru where Subaru's dealers would repair the defective vehicles free of charge only when certain undisclosed conditions were met.  Plaintiffs are informed and believe, and thereon allege, that this program expanded and/or extended the original warranty, and therefore constitutes an "adjustment program" within the meaning of CAL. CIV. CODE § 1795.90.

220.   As set forth herein, Plaintiffs are informed and believe, and thereon allege, that, in some situations, Subaru agreed to pay or give reimbursements for repairs to the FB engines as a result of the Oil Consumption Defect.  This practice constitutes an "adjustment program" within the meaning of Cal. Civ. Code § 1795.90.

221.   As the manufacturer of the Subaru Vehicles, Subaru had a duty to notify all owners or lessees of the Subaru Vehicles eligible under the adjustment program described above of the terms and conditions of the program within ninety (90) days of the program's implementation.  Plaintiffs are informed and believe, and thereon allege, that Subaru failed to provide this required notification.

222.   As the manufacturer of the Subaru Vehicles, Subaru had a duty to notify the California Department of Motor Vehicles and its own dealers of the terms and conditions of the above described adjustment program.  Plaintiffs are informed and believe, and thereon allege, that Subaru failed to provide this required notification.

223.   As the manufacturer of the Subaru Vehicles, Subaru had a duty to ensure that Plaintiffs and other Class members who incurred an expense for repair of the Oil Consumption Defect prior to acquiring knowledge of the program would be reimbursed.  Plaintiffs are informed and believe, and thereon allege, that Subaru failed to provide this reimbursement.

224.   As a result of the aforementioned conduct by Subaru with regard to its secret warranty, Plaintiffs and the other Class members have suffered damages in an amount to be proven at trial.

**COUNT XIII**
**VIOLATION OF MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301, *ET SEQ.*)**
**(On Behalf of the Nationwide Class or,**
**Alternatively, each of the State Sub-Classes)**

225.   Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

226.   Plaintiffs bring this Count on behalf of the Nationwide Class or, alternatively, on behalf of each of the statewide classes.

227.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

228.   Subaru is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

229.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

230.   15 U.S.C. § 2301(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

231.   Subaru's express warranties are written warranties within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6).  The Class Vehicles' implied warranties are covered under 15 U.S.C. § 2301(7).

232.   Subaru breached these warranties as described in more detail above. Without limitation, the Class Vehicles contain the Oil Consumption Defect.  The Class Vehicles share a common design defect in that the FB engines fail to operate as represented by Subaru.

233.   Plaintiffs and the other Nationwide Class members have had sufficient direct dealings with either Subaru or its agents (dealerships and technical support) to establish privity of contract between Subaru, on one hand, and Plaintiffs and each of the other Nationwide Class members on the other hand.  Nonetheless,

privity is not required here because Plaintiffs and each of the other Nationwide Class members are intended third-party beneficiaries of contracts between Subaru and its dealers, and specifically, of Subaru's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only.

234. Affording Subaru a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Plaintiffs have already done so, and Subaru has failed, after numerous attempts, to cure the defects. At the time of sale or lease of each Class Vehicle, Subaru knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Subaru a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

235. Plaintiffs and the other Nationwide Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the

return of all payments made by them.  Because Subaru is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Nationwide Class members have not re-accepted their Class Vehicles by retaining them.

236.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

237.   Plaintiffs, individually and on behalf of the other Nationwide Class members, seek all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs, on behalf of themselves and members of the Class, respectfully requests that this Court:

A.   determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B.   appoint Plaintiffs as the representatives of the Class and their counsel as Class counsel;

C.   award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and the Class members are entitled;

D.   award pre-judgment and post-judgment interest on such monetary relief;

E.   grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the design defect;

F.   award reasonable attorneys' fees and costs; and

G.   grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

Dated:  July 16, 2014                    Respectfully submitted,

By:   *//s// Matthew D. Schelkopf*
Joseph G. Sauder
Matthew D. Schelkopf
Benjamin F. Johns
CHIMICLES & TIKELLIS LLP
One Haverford Centre

361 West Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500
Facsimile: (610) 649-3633
E-mail: JGS@chimicles.com
MDS@chimicles.com
BFJ@chimicles.com

***Proposed Lead Attorneys for
Plaintiffs and the Class***