## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEITH YAEGER, MICHAEL SCHULER, JOSEPH MONTGOMERY, BRYAN BAIR, THOMAS VANLAARHOVEN, LAURA HEGLE, KIM MARIE PAPA, ROBERT TEDESCO, JR., and NATALIA TUZOVSKAYA individually and on behalf of others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>SUBARU OF AMERICA, INC., a New Jersey Corporation, and FUJI HEAVY INDUSTRIES, LTD., a Japanese Corporation,<br><br>Defendants. | No. 1:14-cv-04490-JBS-KMW<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

### PLAINTIFFS' MASTER CONSOLIDATED COMPLAINT

Plaintiffs Keith Yaeger, Michael Schuler, Joseph Montgomery, Bryan Bair, Thomas Vanlaarhoven, Laura Hegle, Kim Marie Papa, Robert Tedesco, Jr., and Natalia Tuzovskaya ("Plaintiffs") bring this action against Defendants Subaru of America, Inc. ("SOA") and Fuji Heavy Industries, Ltd. ("Fuji") (collectively "Subaru") and allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this lawsuit on behalf of themselves and a proposed class of past and present owners and lessees of the following Subaru "Class Vehicles":  2011-2014 Forester, 2013 Legacy, 2013 Outback, 2012-2013 Impreza, and 2013 XV Crosstek.  Although Subaru sells and leases these vehicles as being "partial zero emission," the vehicles have defective engines that burn a substantial portion of their engine oil, leading to increased emissions, decreased fuel efficiency, and potentially significant damage to the engine, catalytic converter, and other components.

2.      Subaru discovered the defect years ago, but was unable to eliminate the problem.  Instead, Subaru told its dealerships (but not the public) that the defect existed, how to diagnose it, and what repairs to make.  And Subaru continued selling and leasing the vehicles without disclosing the defect to its customers. Specifically, drivers are not told that their vehicles may run out of oil between recommended changes or that their vehicles can shut down without warning as a result of the oil consumption defect.  Plaintiff Hegle, for example, was on a crowded freeway when her Subaru suddenly bucked violently, lost power, and then stalled because her vehicle's exhaust system had become clogged with engine oil.

3.      While Subaru is obligated to repair the defect under its warranties, it frequently denies coverage by telling drivers who complain of abnormal oil loss

that such is "normal" and that there is no known problem with their vehicle.  Many drivers are thus turned away without receiving warranty repairs, while the engine oil loss in their vehicle worsens over time.

4.      In late 2013, Subaru dealt with this growing problem by secretly expanding its warranty coverage.  Subaru told its dealerships they could perform free repairs for vehicles within 5 years and 60,000 miles if they were consuming at least 1/3 of a quart of engine oil per 1,200 miles (a rate that is three times lower than what Subaru publicly claims to be normal).  Even Subaru's expanded warranty coverage, however, is not enough to satisfy Subaru's state-mandated emissions warranty obligations (which require free repairs through 8 years and 100,000 miles) and, worse yet, Subaru has actively hidden the warranty expansion from drivers.  Thus, drivers previously turned down for warranty coverage are not told they can return for warranty-covered repairs.  And drivers who visit Subaru dealerships today are told neither of the defect nor about the new program, so they do not know they are entitled to a free repair under warranty.  As a result, drivers like Plaintiff Vanlaarhoven, are routinely turned away despite qualifying for free repairs.

5.      Subaru's conduct is in breach of its warranties and in violation of state law.  Subaru has and will continue to benefit from its unlawful conduct—by selling more vehicles, at a higher price, and avoiding warranty obligations—while

consumers are harmed at both the point of sale and as their vehicles quickly begin to fail. Had Plaintiffs and other proposed class members known about the defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles, or would have paid substantially less for them. The defect has also forced them to constantly pay to add engine oil in the Class Vehicles and to undergo oil consumption tests at Subaru dealerships.

6.     To remedy Subaru's unlawful conduct, Plaintiffs, on behalf of proposed class members, seek damages and restitution from Subaru, as well as notification to class members about not only the defect itself, but also the existence and parameters of Subaru's secret warranty program.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction of this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332, because: (i) there are 100 or more class members, (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because Defendants transact business in this district, are subject to personal jurisdiction in this district, and therefore are deemed to be citizens of this district. Additionally, Defendants have advertised in this district and have received

substantial revenue and profits from selling and leasing the Class Vehicles in this district; therefore, a substantial part of the events and omissions giving rise to the claims occurred within this district.

9.      This Court has personal jurisdiction over Defendants because they have conducted substantial business in this judicial district, and intentionally and purposefully placed Class Vehicles into the stream of commerce within New Jersey and throughout the United States.

<strong><u>THE PARTIES</u></strong>

**<u>The Plaintiffs</u>**

**A.      <u>Plaintiff Yaeger</u>**

10.      Plaintiff Keith Yaeger is a citizen of California, residing in San Diego County.

11.      In 2013, Plaintiff Yaeger purchased a new 2014 Subaru Forester 2.5L from Auto Nation Subaru, an authorized Subaru dealer and repair center located in Roseville, California.

12.      Plaintiff Yaeger purchased his vehicle for personal, family, or household use.  His vehicle bears Vehicle Identification Number JF2SJACC5EG402209 and is registered in California.

13.      In December 2013, with approximately 6,000 miles on the vehicle, Plaintiff Yaeger noticed his Subaru was consuming a substantial amount of engine oil, and Plaintiff Yaeger had to add engine oil between Subaru's recommended

engine oil change intervals.

14.     On December 2, 2013, Plaintiff Yaeger took his vehicle to Barber Subaru, an authorized Subaru dealer and repair center located in Ventura, California, and was quoted $100 for an oil consumption test.  The dealership changed the engine oil and filter, put 5.1 quarts of oil into the engine, and marked the engine oil dipstick for future inspections as part of the oil consumption test.

15.     Approximately 400 miles after beginning the oil consumption test, the low oil warning light in Plaintiff Yaeger's vehicle illuminated.  Plaintiff Yaeger brought the vehicle back to the dealership, where technicians added oil to the vehicle.  On this occasion, the Service Manager indicated to Plaintiff Yaeger that the oil consumption test had been performed improperly and Subaru had released a new procedure for conducting the test that required filling the engine with oil until the dipstick read "full".  The technicians again marked the oil dipstick in Plaintiff Yaeger's vehicle.

16.     Shortly thereafter, the low oil light in Plaintiff Yaeger's vehicle illuminated again.  Plaintiff Yaeger called the Service Manager who instructed Plaintiff Yaeger to add engine oil to his vehicle.  The vehicle required the addition of engine oil twice more during the oil consumption test.

17.     At the completion of the oil consumption test, on February 18, 2014, the dealership removed the engine from Plaintiff Yaeger's vehicle and "replaced

all piston oil rings as per TSB instructions" in addition to all related gaskets and seals.  This service took approximately 12.7 hours.

18.     Even after the repair, Plaintiff Yaeger's Subaru continues to consume excessive engine oil.  As a result, Plaintiff Yaeger is forced to add engine oil to his vehicle between Subaru's recommended oil change intervals to avoid catastrophic engine failure.

19.     Plaintiff Yaeger would not have purchased his vehicle, or would have paid substantially less for it, had the defect been disclosed to him.

**B.      <u>Plaintiff Schuler</u>**

20.     Plaintiff Michael Schuler is a citizen of Florida, residing in Polk County.

21.     In December 2012, Plaintiff Schuler purchased a new 2013 Subaru Outback 2.5L from Fitzgerald Countryside Subaru ("Fitzgerald"), an authorized Subaru dealer and repair center located in Clearwater, Florida.  The vehicle bears Vehicle Identification Number 4S4BRCKC8D3242218.

22.     Shortly after the purchase of his vehicle, with about 2,200 miles on the odometer, the low oil warning light illuminated while Plaintiff Schuler was driving the vehicle.  As a result, Plaintiff Schuler was forced to add approximately three-quarters of a quart of oil to the vehicle's engine.

23.     On January 2, 2013, with about 3,700 miles on his vehicle, Plaintiff

Schuler took his vehicle back to Fitzgerald to have the oil consumption evaluated by a dealership technician.  Fitzgerald suggested that Plaintiff Schuler ignore Subaru's recommended oil change schedules of 7,500 miles and, instead, change the engine oil in his vehicle every 3,500 miles.  Plaintiff Schuler's vehicle continued to consume a substantial amount of engine oil.  Plaintiff Schuler routinely added engine oil between Subaru's recommended engine oil change intervals to avoid catastrophic engine failure.

24.     On August 10, 2013, Plaintiff Schuler took his vehicle to Cannon Subaru, an authorized Subaru dealer and repair center located in Lakeland, Florida, to begin an oil consumption test.  Cannon replaced the oil filter and engine oil with grade 0W-20 "full synthetic" engine oil.

25.     On September 25, 2013, the low oil warning light in Plaintiff Schuler's vehicle illuminated.  He brought the vehicle to Cannon where a technician found the vehicle to be 1 quart low on engine oil.  At the conclusion of the oil consumption test, Plaintiff Schuler was informed by the dealership personnel that the oil consumption his vehicle experienced was "normal" and it would not be repaired under warranty.

26.     Thereafter, Plaintiff Schuler's Subaru continued to consume substantial engine oil, with Plaintiff Schuler continuing to regularly add engine oil to his vehicle between Subaru's recommended oil change intervals to avoid

catastrophic engine failure.  Frustrated and concerned, Plaintiff Schuler traded his

Subaru in, at a loss, for a non-Subaru vehicle.

27.    Plaintiff Schuler would not have purchased his vehicle, or would have

paid substantially less for it, had the defect been disclosed to him.

**C.    Plaintiff Montgomery**

28.    Plaintiff Joseph Montgomery is a citizen of California, residing in El

Dorado County.

29.    In February 2012, Plaintiff Montgomery purchased a new 2012

Subaru Impreza from Auto Nation Subaru ("Auto Nation"), an authorized Subaru

dealer and repair center located in Roseville, California.

30.    Plaintiff Montgomery purchased this vehicle for personal, family or

household use.  His vehicle bears Vehicle Identification Number

JFIGPAL64CG215897.

31.    In April 2012, with approximately 3,000 miles on his vehicle, Plaintiff

Montgomery noticed his vehicle's engine light was illuminated.  He took his

Subaru to Auto Nation where it was confirmed there were no external oil leaks.

Technicians at Auto Nation added oil to the vehicle and told Plaintiff Montgomery

the oil consumption issue would resolve itself after a "10,000 mile break-in

period."  Thereafter, Plaintiff Montgomery had to add 2-3 quarts of oil every 1,700

– 2,000 miles to avoid catastrophic engine failure.

32.    In June 2012, because the vehicle continued to consume substantial oil, Auto Nation recommended Plaintiff Montgomery not adhere to Subaru's recommended oil service at intervals of 7,500 miles and instead service the oil every 3,750 miles.

33.    In July 2012, after the alleged 10,000 mile break-in period, with 11,378 miles, his vehicle continued to consume substantial amounts of engine oil. Plaintiff Montgomery returned to Auto Nation for an oil consumption test.

34.    At approximately 14,000 miles, Auto Nation concluded that the engine oil in Plaintiff Montgomery's vehicle was escaping into two of the four cylinders and replaced the short block.[1]

35.    At 16,756 miles, the engine light in Plaintiff Montgomery's vehicle illuminated again.  He returned to Auto Nation, which on February 20, 2013, performed a buy-back of the Subaru Impreza and sold Plaintiff Montgomery a new 2013 Outback, Vehicle Identification Number 4S4BRBKC3D3241990, which is registered in California.  Plaintiff Montgomery did not know at the time that the oil consumption problems went beyond his 2012 Impreza.

36.    Plaintiff Montgomery had oil changes performed on his Outback at the recommended 7,500 and 15,000 mile service intervals.  However, the oil light

_____

[1] A "short block" is a term used in the automotive industry to refer to an engine sub-assembly.  This will usually include the engine block below the head gasket and above the oil pan.  A short block will not include items such as cylinder heads.

illuminated in his vehicle at approximately 20,000 miles, which was 2,500 miles before the next scheduled oil change.  Upon bringing this to the attention of Auto Nation, they recommended that Plaintiff Montgomery change the oil every 5,000 miles rather than the Subaru-recommended 7,500 miles.

37.    The oil light illuminated between oil changes again, this time at approximately 25,000 miles, and Auto Nation performed an oil consumption test. The dealership reported that the oil consumption rate was normal, that his vehicle was not using an unusual amount of oil, and that no warranty repairs would be performed.  Thereafter, Plaintiff Joseph Montgomery has been forced to add one quart of oil at approximately every 1,800 miles to avoid catastrophic engine failure.  Despite this practice, the low oil light in his vehicle still illuminates after approximately 4,000 miles of driving.

38.    Plaintiff Montgomery's Outback continues to consume substantial engine oil.  As a result, Plaintiff Montgomery is forced to add engine oil to his vehicle between Subaru's recommended oil change intervals in order to avoid catastrophic engine failure.

39.    Plaintiff Montgomery would not have purchased either vehicle, or would have paid substantially less for them, had the defect been disclosed to him.

**D.    <u>Plaintiff Bair</u>**

40.    Plaintiff Bryan Bair is a citizen of Pennsylvania, residing in Dauphin

County.

41.     In April, 2013, Plaintiff Bair purchased a new 2014 Subaru Outback from Faulkner Subaru ("Faulkner"), an authorized Subaru dealer and repair center located in Harrisburg, Pennsylvania.  The vehicle bears Vehicle Identification Number 4S4BRBCC8D1295005 and is registered in Pennsylvania.

42.     After approximately 1,000 miles on the odometer, the low oil warning light illuminated in his vehicle.  Plaintiff Bair took the vehicle to Faulkner who added engine oil and informed him that there was no problem with his vehicle.  Since then, the low oil warning light in Plaintiff Bair's vehicle has illuminated every 900-1,500 miles.

43.     Each time the low oil warning light has illuminated, Plaintiff Bair has taken his Subaru to Faulkner for diagnosis.  During each visit, Faulkner either added or changed the engine oil.  In addition, Faulkner has twice conducted engine compression and leak tests — in one instance keeping the vehicle for nine days.  Faulkner confirmed with Plaintiff Bair that his vehicle does not contain any internal oil leaks and that it is consuming an expected and normal amount of engine oil.

44.     Plaintiff Bair also contacted Defendant SOA's customer service.  After Plaintiff Bair described the engine oil consumption in his vehicle, a SOA customer service representative told him that the rate of oil consumption in his

vehicle was "normal".  Plaintiff Bair's vehicle currently has approximately 10,000 miles on the odometer and continues to consume substantial amounts of engine oil.

45.    Plaintiff Bair would not have purchased the vehicle, or would have paid substantially less for it, had the defect been disclosed to him.

**E.    Plaintiff Vanlaarhoven**

46.    Plaintiff Thomas Vanlaarhoven is a citizen of New Jersey, residing in Monmouth County.

47.    In August 2011, Plaintiff Vanlaarhoven leased a new 2011 Subaru Forester from World Auto Group ("World Auto"), an authorized Subaru dealer and repair center located in Tinton Falls, New Jersey.  The vehicle bears Vehicle Identification Number JF2SHABC6BH768960 and is registered in New Jersey.

48.    Within the first 1,000 miles, Plaintiff Vanlaarhoven's vehicle lost nearly a half of a quart of engine oil.  Plaintiff Vanlaarhoven took his vehicle to World Auto for repair, where they told him that this was normal during the vehicle break-in period.

49.    Shortly thereafter, upon driving the vehicle another 3,000 miles, Plaintiff Vanlaarhoven returned to World Auto since his vehicle was still requiring additional oil approximately every 500 miles.  The dealership again told Plaintiff Vanlaarhoven this was normal even though his vehicle was no longer within the so-called break-in period.

50.     At approximately 7,300 miles, Plaintiff Vanlaarhoven again took his vehicle to World Auto and reported his vehicle regularly needed an additional half a quart of oil every 800 miles.  The dealership again said this was normal and continued to decline to provide a repair under warranty.

51.     With his vehicle's oil loss continuing and increasing, Plaintiff Vanlaarhoven returned to World Auto on July 5, 2012.  The dealership performed an oil consumption test and told Plaintiff Vanlaarhoven that his vehicle's oil consumption was normal, that there was no problem with his vehicle, and that he ***could not*** have a copy of the oil consumption test results.

52.     In November and December 2012, Plaintiff Vanlaarhoven returned to World Auto at least twice complaining that his vehicle was consuming engine oil at a rate of approximately half of a quart every 750 miles.  The dealership performed an oil consumption test and World Auto then discussed the results with Subaru, who concluded that the oil consumption was normal and that no warranty repairs should be performed.

53.     In December 2012, Plaintiff Vanlaarhoven contacted Defendant SOA directly for assistance with his vehicle's oil consumption.  Subaru's response was to offer Plaintiff Vanlaarhoven $1,000 towards the purchase of a new Subaru vehicle.

54.     The oil consumption in Plaintiff Vanlaarhoven's vehicle continues to

worsen.  With approximately 35,000 miles on his vehicle, Plaintiff Vanlaarhoven

is forced to add a quart of engine oil every 700 miles.

55.     Plaintiff Vanlaarhoven would not have purchased the vehicle, or

would have paid substantially less for it, had the defect been disclosed to him.

**F.     Plaintiff Hegle**

56.     Plaintiff Laura Hegle is a citizen of California, residing in Siskiyou

County.

57.     In or around October 2011, Plaintiff Hegle purchased a new 2011

Subaru Forester from Redding Kia-Subaru, an authorized Subaru dealer and repair

center located in Redding, California.

58.     Plaintiff Hegle purchased this vehicle for personal, family, or

household use.  Her vehicle bears Vehicle Identification Number

JF2SHAEC9BH779253.

59.     Plaintiff Hegle consistently maintained her vehicle's oil at an

authorized Subaru dealership.

60.     In November 2012, with approximately 38,000 miles on her vehicle,

Plaintiff Hegle noticed a knocking noise from her engine, and took her vehicle to

Redding Kia-Subaru.  Dealership personnel told her that that the engine oil in her

vehicle was dangerously low, which she had not realized sooner because the

vehicle does not have a low engine oil light.  Even though she took her vehicle for

regular servicing at Subaru dealerships, the Redding Kia-Subaru personnel told Ms. Hegle that she would not be having a problem if she had taken her vehicle for regular service.

61.    At the dealership's direction, Plaintiff Hegle's vehicle was given an oil consumption test to determine the rate at which her vehicle was consuming oil. As a condition of the test, she was required to pay for an engine oil and filter service.

62.    On January 29, 2013, Plaintiff Hegle began a second oil consumption test because she was told that the first test was not performed correctly.  During her oil consumption tests, Plaintiff Hegle told the dealership she was concerned that excess oil might contaminate her catalytic converters.  She pointed out that she did not see oil leaking from her vehicle and asked what happened to the excess oil. Her dealership told her that her catalytic converters were taking care of the oil that escaped into the combustion area.  Dealership personnel acknowledged this is not the purpose of the catalytic converters, but said the catalytic converters could handle the oil and would not fail.

63.    After the second oil consumption test, the dealership concluded that Plaintiff Hegle's vehicle was consuming more than 1 quart of oil every 871 miles. The dealership acknowledged that her vehicle was defective and replaced her vehicle's engine block.

64.     Within a week after the replacement of her vehicle's short block, Plaintiff Hegle was driving on the freeway in heavy traffic with a semi-truck behind her and a motor home driving alongside her when her vehicle bucked violently, lost power, and stalled.  Numerous gauges and warning lights, including the check engine light, suddenly came on.  The vehicle had to be towed to Redding Kia-Subaru, where the dealership discovered that the exhaust system had clogged with burnt excess engine oil.  After the incident, her dealership told her that engine oil caused the front catalytic converter to clog with oil, explode, and shoot parts through the exhaust system, covering the rear catalytic converter with debris.

65.     Plaintiff Hegle told the dealership that she would no longer drive the vehicle and asked the dealership to buy the vehicle back from her.  The dealership refused, but offered to have Plaintiff Hegle trade in her 2011 Forester for a 2014 Forester, assuring her that the 2014 Forester was improved and that it did not have the same problem.  Plaintiff Hegle traded her 2011 Subaru Forester in at the dealership at a loss for a new 2014 Subaru Forester.  Her 2014 Forster bears Vehicle Identification Number JF2SHAEC9BH779253 and is registered in California.

66.     On July 24, 2014, while Plaintiff Hegle was operating her 2014 Forester, the low oil warning light illuminated.  Plaintiff Hegle returned to the dealership, which performed a third oil consumption test.

67.     After conducting the oil consumption test, the dealership determined that Plaintiff Hegle's vehicle was burning half a quart of oil every 1,158 miles. The dealership told Plaintiff Hegle that her vehicle would need new piston rings, but later told her that a Subaru regional representative had directed the dealership to replace Plaintiff Hegle's entire engine block.

68.     Plaintiff Hegle would not have purchased either vehicle, or would have paid substantially less for them, had the defect been disclosed to her.

## F.     **Plaintiff Papa**

69.     Plaintiff Kim Marie Papa is a citizen of New York, residing in the village of Brewster.

70.     On or around August 12, 2013, Plaintiff Papa purchased a new 2014 Subaru Forester from Colonial Subaru, an authorized Subaru dealer and repair center located in Danbury, Connecticut.

71.     Plaintiff Papa purchased this vehicle for personal, family, or household use.  Her vehicle bears Vehicle Identification Number JF2SJAAC5EG447430.

72.     Plaintiff Papa consistently had her vehicle's oil maintained at an authorized Subaru dealership.

73.     With approximately 3,000 miles on her vehicle's odometer, the low oil light illuminated in Plaintiff Papa's vehicle.  Accordingly, on October 23, 2013

with 3,447 miles on her odometer, Plaintiff Papa brought her vehicle to Colonial Subaru for diagnosis.  Colonial Subaru performed an oil change and "set [the oil] level."   Plaintiff Papa was charged $73.52 for the service.

74.     In or around January 2014, while Plaintiff Papa was operating her 2014 Forester, the low oil light illuminated again.  On January 23, 2014, with only 7,483 miles on the vehicle's odometer, Plaintiff Papa took her vehicle to Colonial Subaru for diagnosis.  The technician noted that the vehicle was 1 quart low on engine oil.

75.     On February 27, 2014, Plaintiff Papa brought her vehicle back to Colonial because the low oil light came back on again. At the time of this visit, Plaintiff Papa's vehicle had 8,831 miles on it.  During this visit, Colonial initiated an oil consumption test.

76.     On June 16, 2014, Plaintiff Papa brought her vehicle to Colonial for service and to assess the results of the oil consumption test.  The vehicle had 14,050 miles on it at this time.  Colonial's notes from this visit reflect that its technician "found oil ½ QT low."  Plaintiff Papa was told to bring her car back again after she had driven at least 1,200 miles, the low engine oil warning lamp illuminated, and she observed that the oil had dropped to the "add" mark.

77.     On August 1, 2014, while traveling to South Carolina, the low oil light in Plaintiff Papa's vehicle came on again.  She took it to the Hadwin-White

local Subaru dealer in Conway, South Carolina.  The notes from the technician who examined Plaintiff Papa's car reflect that they checked the oil level and found it to be "3/4 quart low," and then added oil after checking for any leaks.

78.    On August 25, 2014, Papa bought her car back to Colonial because the low oil light came on again.  The technician checked the engine oil level, and added 3/4 of a quart to bring the engine oil to the "proper level."

79.    Plaintiff Papa would not have purchased the vehicle, or would have paid substantially less for it, had the defect been disclosed to her.

**G.    Plaintiff Tedesco**

80.    Plaintiff Robert Tedesco, Jr., is a citizen of Connecticut, residing in Fairfield County.

81.    On or around January 14, 2013, Plaintiff Tedesco purchased a new 2013 Subaru XV Crosstek 2.0L Premium from Dan Perkins Subaru ("Perkins Subaru"), an authorized Subaru dealer and repair center located in Milford, Connecticut.

82.    Plaintiff Tedesco purchased his vehicle for personal, family, or household use.  His vehicle bears Vehicle Identification Number JF2GPACC8D1817837 and is registered in Connecticut.

83.    On or before March 16, 2013, with approximately 3,500 miles on his vehicle, Plaintiff Tedesco observed that the low engine oil level light illuminated.

As a result, Plaintiff Tedesco took his vehicle to Perkins Subaru where they inspected the vehicle and determined that an oil consumption test would need to be performed.  The technicians at Perkins Subaru told Plaintiff Tedesco that "no problem [was] found" and suggested that the low engine oil level was due to "synthetic oil" or "breaking in" the new vehicle.

84.    As a result of the excessive oil consumption in his vehicle, Plaintiff Tedesco underwent two oil consumption tests and returned to Perkins Subaru on: (i) August 10, 2013, with approximately 13,301 miles; (ii) October 19, 2013, with approximately 17,175 miles (low engine oil light illuminated again and oil sensor was checked); (iii) December 21, 2013, with approximately 20,498 miles (after low oil light illuminated again); (iv) January 25, 2014, with approximately 22,434 miles (engine oil and filter changed); (v) June 9, 2014, with approximately 30,559 miles (low engine oil light illuminated and another oil consumption test was ordered); (vi) June 28, 2014, with approximately 31,610 miles (oil level checked per oil consumption test); and (vii) September 6, 2014, with approximately 35,047 miles (engine oil added after low engine oil light illuminated).

85.    Even after undergoing two oil consumption tests, Plaintiff Tedesco's Subaru continues to consume excessive engine oil.  As a result, Plaintiff Tedesco is forced to add engine oil to his vehicle between Subaru's recommended oil change intervals to avoid catastrophic engine failure.

86.     Plaintiff Tedesco would not have purchased his vehicle, or would have paid substantially less for it, had the defect been disclosed to him.

**H.     Plaintiff Tozovskaya**

87.     Plaintiff Natalia Tozovskaya, is a citizen of New Jersey, residing in Monmouth County.

88.     On November 14, 2012, Plaintiff Tozovskaya purchased a new 2013 Subaru Outback 2.5L from Freehold Dodge and Subaru Dealership, an authorized Subaru dealer and repair center located in Howell, New Jersey.

89.     Plaintiff Tozovskaya purchased her vehicle for personal, family, or household use.  Her vehicle bears Vehicle Identification Number 4S4BRBCC3D1228120 and is registered in New Jersey.

90.     On or around December 2012, with approximately 3,000 miles on her vehicle, Plaintiff Tozovskaya observed her vehicle was consuming excessive amounts of engine oil.  The low oil light would appear on the dashboard and she always checked the level with the stick.  She added synthetic oil as recommended by the manufacturer.

91.     As a result, Plaintiff Tozovskaya is forced to add engine oil to her vehicle between Subaru's recommended oil change intervals to avoid catastrophic engine failure.

92.     Plaintiff Tozovskaya would not have purchased her vehicle, or would

have paid substantially less for it, had the defect been disclosed to her.

93.    Each of the Plaintiffs, and members of the Class, have been injured as a result of Defendants' failure to disclose this material information.

**The Defendants**

94.    Defendant Fuji Heavy Industries Ltd. is a Japanese corporation located at The Subaru Building, 1-7-2 Nishishinjuku, Shinjuku-ku, Tokyo, 160-8316, Japan.  Fuji is responsible for the design, manufacturing, distribution, marketing, sales, and service of Subaru vehicles, including the Class Vehicles, around the world, including in the United States.

95.    Defendant Subaru of America, Inc. is a New Jersey corporation with its principal place of business located in Cherry Hill, New Jersey.  SOA is the wholly owned U.S. sales and marketing subsidiary of Fuji, and distributes, markets, sells, and services Subaru vehicles in the United States.

96.    Fuji and SOA have common leadership: SOA's sales, marketing, and distribution efforts are headed by corporate officers of Fuji.  For example, Takeshi Tacihmori, the chairman and CEO of SOA is also a Director and Corporate Executive Vice President for Fuji in charge of the Subaru Global Marketing Division, Subaru Japan Sales and Marketing Division, and Subaru Overseas Sales and Marketing Divisions 1 and 2.  The incoming Chairman of SOA is also a Corporate Senior Vice President of Fuji who is Chief General Manager of Subaru

Overseas and the Vice President in charge of Sales and Marketing, Division 1.

97.     Fuji communicates with SOA concerning virtually all aspects of the Subaru vehicles sold and leased within the United States.  Defendants develop the owner's manuals, warranty booklets, and maintenance recommendations and schedules for the Class Vehicles.

## TOLLING OF STATUTES OF LIMITATION

98.     Any applicable statutes of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein.  Plaintiffs and proposed class members could not have reasonably discovered the true, defective nature of the proposed Class Vehicles until shortly before this litigation commenced.

## FACTUAL ALLEGATIONS

### A.     Background

99.     Many automotive manufacturers utilize an internal combustion engine design with a "V" piston arrangement.  In this design, the cylinders and pistons are aligned in two separate planes so that they appear to be in a "V" when viewed along the axis of the crankshaft.  This configuration generally reduces the overall engine length, height and weight compared to an equivalent inline configuration.



**Example of a "V" piston design**

100.   Since approximately 1966, rather than use a conventional "V" or inline configured engine design, Subaru has instead incorporated a flat engine, "Boxer" design in which the pistons face away from each other in a 180º symmetrical layout.

101.   In the fall of 2010, Subaru announced the release of a new generation of its Boxer engine known as the "FB."  Subaru said its main motivation for launching the new FB engine was improved "economy and performance."



102.   According to Subaru's website "*Subaru firmly believes that the Horizontally-Opposed Engine is the optimum design for driving enjoyment.  The pistons face away from each other in a 180º symmetrical layout around the crankshaft and work to balance out each other's vibrations, delivering a smooth, shudder-free feel.  This is because the engine can rotate freely at any given speed, delivering heart-gripping response to the driver.  The length and height of this engine layout can be kept shorter than a traditional in-line engine, and it is also lighter.  The engine can be mounted lower in the vehicle than other engines, and weight balance on the left and right can be made almost exactly the same.  In this design, the low centre (sic) of gravity engine lowers the centre (sic) of gravity of the entire car.  Similarly, a symmetrically balanced engine increases the symmetrical balance of the entire car.  Both of these aspects combine to deliver a safer, more stable, and ultimately, more enjoyable experience on the road.*"[2]

---

[2] *See* http://www.subaru-global.com/tec_boxer.html (last visited June 25, 2014).

103.   FB engines use reciprocating pistons to convert pressure into a rotating motion.  To generate the rotating motion, a four-step sequence is used.  First, the "intake stroke" begins with the inlet valve opening and a vaporized fuel mixture pulled into the combustion chamber by the downward motion of the piston.  Second, the "compression stroke" begins with the inlet valve closing and the piston beginning its movement upward, compressing the fuel mixture in the combustion chamber.  Third, the "power stroke" begins when the spark plug ignites the fuel mixture, expanding the gases and generating power that is transmitted to the crankshaft and ultimately to the wheels of the vehicle.  Fourth, the "exhaust stroke" begins with the exhaust valve opening and the piston moving back up, allowing the exhaust gases to escape the cylinder.  The exhaust valve then closes, the inlet valve opens, and this combustion cycle repeats itself.  A diagram of the combustion cycle sequence appears below:



**B.**     **Class Vehicles**

104.   This lawsuit concerns the following Subaru vehicles equipped with the FB engine, referred to throughout the complaint as "Class Vehicles":

- 2011-2014 Forester (2.5L)

- 2013 Legacy (2.5L)

- 2013 Outback (2.5L)

- 2012-13 Impreza (2.0L)

- 2013 XV Crosstrek (2.0L)

105.   The Class Vehicles incorporate FB engines known as the "FB20" and the "FB25."  The two engines have the same design and components, differing

only in size (also known as displacement):  The FB20 displacement is 2.0 liters, and the FB25 displacement is 2.5 liters.  The FB20 and FB25 engines hold 5.1 and 5.5 quarts of oil respectively.

106.   Subaru certifies the Class Vehicles as "PZEV" rated.  Under the California Air Resources Board's regulations, this designation can only be given to vehicles that meet certain low emissions standards.  PZEVs are considered the cleanest gasoline powered vehicles because they have efficient engines and a unique exhaust emissions system.  As a result, these special rated vehicles meet the strictest requirements applicable to internal combustion engine vehicles and achieve near-zero evaporative emissions from the fuel system.  Vehicles with a PZEV rating are also required to be sold with a 15 year/150,000-mile warranty on emission components.

## C.   The Oil Control Strategy in Class Vehicles

107.   During the four-step sequence described above, engine oil is used to lubricate the piston and cylinder wall as the piston moves up and down.  Engine oil is necessary to reduce wear on moving parts throughout the engine, improve sealing within the combustion chamber, and to cool the engine by carrying heat away from the moving parts.  If there is insufficient engine oil, the engine will not have the necessary lubrication or cooling, causing premature wear of internal parts, inadequate performance, and catastrophic engine failure.

108.   The top sidewall of each engine piston contains rings that prevent engine oil from entering the combustion chamber, as well as optimizing compression.  On each of the four pistons, there are three rings: (1) the top compression ring, (2) the second compression ring, and (3) the oil control ring.

109.   The oil control ring is responsible for wiping excess oil from the cylinder wall and returning excess oil through the ring openings to the engine oil pan.  The oil control ring includes two thin rails or running surfaces.

110.   An exemplar diagram of a piston with these rings is shown below:



111.   The oil control strategy in the Class Vehicles does not work as intended, allowing engine oil to escape past the oil control ring and into the

combustion area.  This is the result of oil control rings that do not integrate properly with the cylinders in which they operate.  Although oil control rings do not require maintenance, and are lifetime parts, the rings in Class Vehicles wear down, as shown below, whereby the oil control ring is worn flush with the piston wall, allowing engine oil to be consumed during the compression cycle.



**Piston from Subaru FB20 Engine**



**FB20 Piston with Worn Oil Control Ring**

112.   When the oil control ring fails to wipe excess oil form the cylinder

wall, engine oil can enter the combustion chamber of the engine.  Once in the

combustion chamber, oil is burned off rather than returned to the engine oil pan for

further lubrication.  This not only causes a decrease in engine performance but also

decreases fuel efficiency, causes carbon deposits to form, and can damage the

engine and various ignition and emission components.

113.   In September and December 2013, Subaru issued four Technical

Service Bulletins ("TSBs") to address the defect.  (TSBs are documents used by

automotive manufacturers to inform dealership technicians about new information,

including vehicle problems, new repair procedures, and improved parts

recommended repairs issued.)  Subaru revised the four TSBs in May 2014.

114.  The TSBs acknowledge the Class Vehicles experience abnormally
high levels of engine oil consumption and advise technicians about the lengthy and
expensive repair process.  Among other details, the TSBs note that

- The change was made as a result of findings of unanticipated wear of the oil control rings.

- Because of the ring wear, Subaru anticipated engine oil consumption would be consistently higher than normal and would remain that way.

- Subaru updated the oil control rings, changing the surface treatment applied to the rings.

- Once the wear occurs, the condition will remain until repaired.

115.  In the TSBs, Subaru recommends repairing the defect by replacing the
FB engine's piston ring set.  This requires removal and complete disassembly of
the engine, and the TSBs estimate a labor time of between 11.4 and 13.1 hours
when performed by a Subaru technician.  Some drivers have been charged over
$8,000 for the repair.

116.  As a result of the defect, and oil consumption rates in the Class
Vehicles that are consistently higher than normal, the "partial zero emission"
vehicles suffer from excessive carbon deposits, decreased fuel efficiency, and

damage to the vehicle ignition and emission systems, including those discussed below.

117.   The Class Vehicle have four spark plugs, which deliver electric current from the ignition system to the combustion chamber to ignite the mixture of compressed fuel and air during the power stroke of the combustion cycle. Properly functioning spark plugs help the engine run efficiently, minimizing emissions.

118.   Class Vehicles were also manufactured with two oxygen sensors and two catalytic converters.  Optimum cylinder combustion depends on the correct air to fuel ratio in order to provide a near stoichiometric mixture.  The oxygen sensors monitor unburned oxygen in the exhaust gases and send this information to the vehicle's engine control module, which then uses this information to determine if the fuel mixture is rich (too much fuel) or lean (not enough fuel) and thereby adjusts the air/fuel mixture accordingly.  The oxygen sensors also measure oxygen levels after the exhaust reacts with the catalytic converter, to help the engine run efficiently and to minimize emissions.  The catalytic converters are emissions control devices designed to convert toxic pollutants, contained in exhaust gases, to less toxic pollutants by catalyzing a redox reaction (oxidation or reduction).  Both

the oxygen sensors and the catalytic converters are located in the exhaust system as shown below:[3]



119.   The defect can contaminate Class Vehicles' oxygen sensors, catalytic converters, and spark plugs, damaging and causing inefficiency of those parts, and leading to less efficient engines and increased emissions.  Contamination can impair the oxygen sensors' accuracy, for example, hampering the catalytic

---

[3] Front catalytic converter depicted at "(2)", rear catalytic converter depicted at "(4)", front O2 sensor depicted at "(5)" and rear O2 sensor depicted at "(6)."

converters and leading the engine to not properly detect emission issues.  Likewise,

the catalytic converters can become poisoned after engine oil is burned during the

combustion cycle.  The burnt oil is incorporated into the vehicle's expelled exhaust

gases, with the exhaust containing substances that coat the working surfaces of the

catalytic converters (encapsulating the catalyst so that it cannot contact and treat

the exhaust).

120.   The increased oil consumption can also cause Class Vehicles to run

dangerously low on engine oil far earlier than a driver might reasonably expect.

Many Class Vehicles do not have oil lights or other detection or alert systems to

warn drivers about low engine oil levels.  When the vehicles' engine oil level falls

too low, the vehicles can suffer abrupt and total failure of the engine, among other

things.  Even when Class Vehicles do not run out of engine oil, the defect can

cause parts like the catalytic converters to fail, which—like engine failure—can

cause the vehicles to suddenly buck, stall, and shut down when traveling at high

speeds, risking the lives of drivers, their passengers, and others on the road.

**D.**     **Defendants Concealed the Defect**

121.   Defendants have known for years about the defect and its

consequences.

122.   Subaru is experienced in the design and manufacture of consumer

vehicles.  Subaru conducts extensive pre-release testing on batches of components,

including the FB engines, to verify the parts are free from defects and comply with Subaru's specifications.  Given the speed and frequency with which the defect typically becomes apparent, it is not plausible that Subaru's preproduction testing would not have alerted Subaru to the existence of the defect.  Only Subaru, however, has access to its prerelease testing data.

123.   Subaru also receives data about how its vehicles are performing in the days, weeks, and months after they are sold.  Subaru collects information from both drivers and dealerships, including through complaints, warranty claims, repair and replacement parts data, and other aggregated data sources.  Subaru has exclusive access to this information too.

124.   Defendants' Quality Assurance Group interacts with Subaru-authorized service technicians in order to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues.  Subaru's Quality Assurance Group also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

125.   Defendants' National Warranty Department similarly reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles.  Defendants dictate that when a repair

is made under warranty (or warranty coverage is requested), service centers must provide Defendants with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case Defendants later determine to audit the dealership or otherwise verify the warranty repair.  For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to Defendants because they will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

126.   Defendants were also aware of the high number of replacement parts ordered.  All Subaru service centers are required to order replacement parts, including engines, piston assemblies, and piston rings directly from Defendants. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from Defendants.  Defendants routinely monitor part sales reports, and Subaru has designated internal teams that are responsible for actually shipping parts requested by dealerships and technicians.  Thus, Defendants have detailed, accurate, and real-time data regarding the number and frequency of replacement part orders.  The sudden increase in orders for FB engines and engine components used in the Class Vehicles was known to Defendants, and alerted them (or should have) to the scope and severity of the defect.

127.    Subaru monitors drivers' safety-related reports to the National Highway Transportation Safety Administration ("NHTSA"), which can be viewed on the NHTSA's website.  Dating back to at least March 2012, drivers of Class Vehicles began contacting the NHTSA to complain about their vehicles experiencing oil loss, the resultant engine failure, the inherent dangers, and the high repair costs.

128.    Subaru's Customer Relations departments routinely monitor the internet for customer complaints and have retained the services of third-parties to do the same.  Further, the Customer Relations division regularly receives and responds to driver calls concerning vehicle problems.

129.    Many owners and lessees of the Class Vehicles have publicly complained online, or to the Office of Defects Investigation (ODI) within the NHTSA.  ODI conducts defect investigations and administers safety recalls to support the NHTSA's mission to improve safety on the nation's highways.  The following are just a few examples of the complaints submitted to ODI concerning Class Vehicles:[4]

**DATE OF INCIDENT:** October 14, 2013
**DATE COMPLAINT FILED:** November 19, 2013

---

[4] The foregoing complaints are reproduced as they appear on the NHTSA website.  Any typographical errors are attributable to the original author of the complaint.

**NHTSA/ODI ID:** 10552849
**MODEL:** 2013 Subaru Impreza
**SUMMARY:**
I WAS DRIVING INTO WORK IN THE MORNING AND AS I
ENTERED THE PARKING AREA I NOTICED MY OIL LIGHT
COME ON. I PARKED THE CAR AND CHECKED THE OIL, AND
TO MY SURPRISE THERE WAS NOTHING ON THE STICK. I HAD
JUST CHANGED THE OIL LESS THAN 2000 MILES PRIOR TO
THIS AND I WAS CONCERNED. I PROCEEDED TO CHECK FOR
LEAKS AND FOUND NONE. I TOOK THE CAR IN TO THE
DEALER AND WAS INFORMED THAT MY ENGINE IS A QUART
LOW ON MOTOR OIL (0W20), AND THAT THIS IS NORMAL
BECAUSE 2.0I FB ENGINES BURN A QUART OF OIL EVERY 1200
MILES AT THE MOST. THIS IS ABSURD, I AM A FORMER ASE
CERTIFIED MECHANIC AND THIS WAS NOT SOMETHING I
THOUGHT TO BE NORMAL. THIS CARS IS RATED TO GO 7500
MILES BETWEEN OIL CHANGES, AND IF I AM BURNING A QRT
OF OIL EVERY 1200 MILE THEN I AM ESSENTIALLY
CHANGING THE OIL IN BETWEEN OIL CHANGES. TO CALL
THIS A COMMON/NORMAL OCCURRENCE IS LIKE SAYING
THAT THEY CARE NOTHING ABOUT THERE CUSTOMERS. THE
DEALER ESSENTIALLY TOPED OFF MY OIL, PUT A STICKER IN
THE WINDOW AND SAID IN 1200 MILE COME BACK AND WE
WILL START AN OIL CONSUMPTION TEST, BUT NOT AT THE
COST OF THE DEALER OR SUBARU. THIS INITIAL COST
WOULD BE CHARGED TO ME THE CUSTOMER AT A COST OF
ALMOST $100.00 DOLLARS WHICH I FIND RIDICULOUS SINCE
THE CAR IS UNDER WARRANTY AND THIS IS A DIAGNOSTIC
OF A FAILURE NOT A NORMAL OIL CHANGE. WHEN I
CONTACTED SUBARU OF NORTH AMERICA I STILL GOT THE
RUN AROUND, AND I FEEL AS IF THEY ARE HIDING THE FACT
THAT THEY HAVE A WHOLE FLEET OF VEHICLES OUT ON THE
ROAD READY TO BLOW ENGINES AND THEY ARE GOING TO
DO THE SAME THING THEY DID IN THE PAST WITH THE 2.5
AND BLAME THE CUSTOMER. *TR

**DATE OF INCIDENT:** April 10, 2013
**DATE COMPLAINT FILED:** August 22, 2013
**NHTSA/ODI ID:** 10536829
**MODEL:** 2013 Subaru Impreza

**SUMMARY:**
I BOUGHT MY 2013 SUBARU IMPREZA AND WITH APPROX
10,000 MILES I GOT A LOW OIL LIGHT ON. I FOUND OUT MY
SUBARU BURNS A QUART OF OIL EVERY 2500-3000 MILES.
THAT IS UNACCEPTABLE FOR A BRAND NEW CAR. SUBARU IS
SELLING A LEMON. *TR

**DATE OF INCIDENT:** June 5, 2014
**DATE COMPLAINT FILED:** June 5, 2014
**NHTSA/ODI ID:** 10596359
**MODEL:** 2012 Subaru Impreza
**SUMMARY:**
I HAVE BEEN HAVING CONTINUOUS ISSUES WITH OIL
CONSUMPTION IN MY 2012 IMPREZA 2.0I. I HAVE ONLY
DRIVEN 2500 MILES SINCE MY OIL CHANGE AND MY LOW OIL
LIGHT IS ON. THIS IS THE THIRD TIME I'VE HAD TO TOP UP
THE OIL AND THE PROBLEM IS ONLY GETTING WORSE!

**DATE OF INCIDENT:** January 1, 2014
**DATE COMPLAINT FILED:** January 8, 2014
**NHTSA/ODI ID:** 10559037
**MODEL:** 2012 Subaru Impreza
**SUMMARY:**
ADDENDUM TO 12/30/13 COMPLAINT: IN ADDITION TO THE
PREVIOUSLY OUTLINED PROBLEMS: 1. CAR IS NOW LOOSING
OIL. AT 26,500 MILES THE LOW OIL LEVEL LIGHT CAME ON.
CHECKED OIL LEVEL AND REVEALED CAR HAD LOST
APPROX 1.5-2 QT SINCE LAST REGULARLY SCHEDULED OIL
CHANGE. 2. BRAKES SQUEAL WHEN YOU FIRST COMPRESS
THE PEDAL. I HAD THE BRAKES INSPECTED AND WAS TOLD
NOTHING WAS WRONG WITH THEM OR THE BRAKE PAD. I DO
NOT THINK THIS IS NORMAL TO OCCUR EVERY TIME YOU
TOUCH THE BRAKES UNLESS SOMETHING IS WRONG.
BRAKES DID NOT START MAKING NOISE UNTIL 25,000 MILES.
**NO CONFIDENCE THIS CAR IS TRUSTWORTHY. SERIOUSLY
WORRIED ABOUT ITS RELIABILITY/ COST TO REPAIR AFTER
WARRANTY EXPIRES.** *TR

**DATE OF INCIDENT:** June 9, 2013

**DATE COMPLAINT FILED:** December 9, 2013
**NHTSA/ODI ID:** 10555266
**MODEL:** 2012 Subaru Impreza
**SUMMARY:**
TL* THE CONTACT OWNS A 2012 SUBARU IMPREZA. THE
CONTACT STATED THAT HE THE VEHICLE EXHIBITED
EXCESSIVE OIL CONSUMPTION. THE CONTACT ADDED ONE
QUART OF OIL TO THE VEHICLE, WHICH ONLY LASTED
APPROXIMATELY 900 MILES. THE VEHICLE WAS INSPECTED.
THE MANUFACTURER WAS NOTIFIED OF THE ISSUE. THE
FAILURE MILEAGE WAS 7,500 UPDATED 01/14/14 *BF

**DATE OF INCIDENT:** June 9, 2013
**DATE COMPLAINT FILED:** December 9, 2013
**NHTSA/ODI ID:** 10554701
**MODEL:** 2012 Subaru Impreza
**SUMMARY:**
MY SUBARU IMPRERA'S LOW ENGINE OIL LIGHT HAS BEEN
ON MULTIPLE TIMES SINCE APRIL OF THIS YEAR AND HAS
BEEN BROUGHT TO THE ATTENTION OF SUBARU DEALER TO
NO AVAIL. THOUGH THE OIL CONSUMPTION RATE IS
ABNORMAL AND THE PROBLEM APPEARS TO BE COMMON
AMONG CERTAIN SUBARU MODELS, SUBARU OF AMERICA
HAS BEEN ASSERTING THAT IT IS NORMAL FOR AN
AUTOMOBILE TO CONSUME A QUART OF OIL ABOUT EVERY
THOUSAND MILES. *TR

**DATE OF INCIDENT:** March 18, 2013
**DATE COMPLAINT FILED:** October 28, 2013
**NHTSA/ODI ID:** 10549874
**MODEL:** 2012 Subaru Impreza
**SUMMARY:**
LOW OIL WARNING LIGHT ON DASH. BROUGHT TO DEALER.
NO ACTION. OIL WARNING LIGHT ON 3 TIMES SINCE THEN.
STILL NO ACTION TAKEN BY DEALER. SUBARU DEALER DOES
NOT DENY OIL IS BEING BURNED BUT STATES THAT THIS IS
NORMAL FOR A NEW CAR. WE HAVE BEGUN AN OIL
CONSUMPTION TEST BUT THE CAR CONTINUES TO BURN OIL.
WE WILL HAVE TO DRIVE ANOTHER 2400 MILES TO GET THE
RESULTS OF THE TEST. THE CAR ONLY HAS 17,000 MILES BUT

OIL WARNING LIGHT COMES ON INDICATING LOW OIL EVERY 1,200 TO 1,500 MILES. STILL AWAITING RESPONSE FROM SUBARU. *TR

**DATE OF INCIDENT:** August 19, 2012
**DATE COMPLAINT FILED:** August 19, 2012
**NHTSA/ODI ID:** 10471412
**MODEL:** 2012 Subaru Impreza
**SUMMARY:**
I PURCHASED MY 2012 SUBARU IMPREZA SPORT PREMIUM ON 12/24/2011. IT HAD LESS THAN 100 MILES WHEN PURCHASED FROM THE DEALER. AT 1200 MILES, THE OIL LIGHT CAME ON. I CHECKED THE OIL LEVEL AND IT WAS VERY LOW. I CALLED BROADWAY SUBARU IN OAKLAND,CA ABOUT THE PROBLEM. I EXPLAINED, HOW CAN A BRAND NEW CAR HAVE LOW OIL? THEY SAID THIS IS COMMON AND TO ADD OIL. ADDED OIL AND THE LIGHT WENT OFF. TODAY, THE LIGHT APPEARED AGAIN AT 5560 MILES. OIL AGAIN IS LOW BUT WITHIN NORMAL LEVELS. I CALLED BROADWAY SUBARU AND TOLD THEM THE PROBLEM. AGAIN, THE GUY EXPLAINED THIS IS NORMAL FOR ALL CARS TO BURN OIL, WHETHER IT'S AN AMERICAN CAR, JAPANESE, OR ANYTHING ELSE. IS HE SERIOUS? I HONDAS FOR CLOSE TO 20 YEARS AND NEVER EVER DID AN OIL LIGHT COME ON, LET ALONE ON A NEW ENGINE WHICH IS NOT DUE FOR ITS FIRST OIL CHANGE UNTIL 7500 MILES. I MADE AN APPT FOR 8/24/2012. *TR

**DATE OF INCIDENT:** July 12, 2011
**DATE COMPLAINT FILED:** May 9, 2013
**NHTSA/ODI ID:** 10511334
**MODEL:** 2011 Subaru Forester
**SUMMARY:**
AFTER OWNING 3 OTHER SUBARUS, WE FIGURED IT WAS A GREAT IDEA TO BUY A 4TH. WELL, SUBARU HAS CHANGED THE ENGINE DESIGN ENOUGH WHERE AS THE OIL NEEDED IS A SUPER LIGHT WEIGHT SYNTHETIC 0W20. AFTER ABOUT 2000 MILES CONSISTENTLY, THE CAR WILL ALWAYS NEED OIL. WE HAVE 40,000 ON IT NOW AND AFTER MULTIPLE OIL CHANGES THE CAR STILL USES WAY TOO MUCH OIL. NOT A GREAT CHOICE OF A CAR IS WHAT I AM THINKING NOW.

SOMEONE NEEDS TO STEP IN FROM THE NHTSA AND
DETERMINE WHY A NEW CAR WOULD BE LOSING OIL AS
FAST AS THE SUBARU DOES. I HAVE READ OTHER SIMILAR
COMPLAINTS. MAYBE IT IS TIME TO START AN ONLINE
PETITION TO HELP NUDGE NHTSA AND SUBARU. *TR

**DATE OF INCIDENT:** March 4, 2011
**DATE COMPLAINT FILED:** October 11, 2012
**NHTSA/ODI ID:** 10479777
**MODEL:** 2011 Subaru Forester
**SUMMARY:**
PURCHASED CAR NEW 12/2010, DEALER TOLD ME IT USED
SYN OIL AND ONLY NEEDED TO BE CHANGED EVERY 7500
MILES. 03/2011 THE CAR HAD 4300 MILES AND WHEN I
CHECKED THE OIL IT WAS NOT SHOWING ON THE DIPSTICK.
DEALER DID NOT TELL ME THAT THE FORESTERS USE OIL. IT
WAS OVER 2 QUARTS LOW. IT HAS BEEN TWO YEARS NOW
AND SUBARU HAS STILL DONE NOTHING FOR MY CAR. ALL
THEY TOLD ME WAS IT'S IN YOUR OWNERS MANUAL AND
THEY USE A QT EVERY 1200 MILES. THIS IS CRAZY FOR A
NEW CAR. 6 QTS FOR AN OIL CHANGE AND 5 QTS IN
BETWEEN. CAN'T DEPEND ON THIS CAR. NOT SAFE TO DRIVE
ON LONG TRIPS. ENGINE IS VERY NOISY. SUBARU DECEIVED
ME AT TIME OF PURCHASE, I WOULD NEVER BOUGHT A CAR
THAT USES OIL LIKE THIS. *TR

**DATE OF INCIDENT:** January 2, 2013
**DATE COMPLAINT FILED:** January 4, 2014
**NHTSA/ODI ID:** 10558426
**MODEL:** 2012 Subaru Forester
**SUMMARY:**
THE ENGINE CONSUMES TOO MUCH OIL FOR SUCH A
RELATIVELY NEW & LOW MILEAGE VEHICLE. THIS IS THE
2ND COMPLAINT TO THE DEALER ABOUT THIS CONCERN.
EACH TIME THE ENGINE OIL IS CHECKED THE DIPSTICK
WOULD NOT REGISTER ANY OIL READING. ON THE SECOND
VISIT, THE DEALER CHANGED THE OIL & FILTER UNDER
WARRANTY AS PER BULLETIN 02-144-13R & HAVING ME
RETURN AFTER AN ADDITIONAL 1200 MILES OF DRIVING.
THIS ENGINE IS DEFECTIVE FOR HAVING OIL USAGE AT SUCH

LOW MILEAGE AND BEGIN RELATIVELY NEW. I HAVE
OWNED MANY CARS IN MY TIME AND UNDERSTAND ALL
CARS CONSUME OIL AT SOME POINT OR ANOTHER BUT NOT
WHEN THE CAR IS STILL PRACTICALLY NEW. DID RESEARCH
ONLINE AND HAVE SEEN MANY OTHER OWNERS WITH
SIMILAR COMPLAINTS, MOST WITH NO RESOLUTION. THIS
POSES A SAFETY HAZARD MAINLY FOR THE OWNERS WHO
ARE NOT AS SAVVY WITH VEHICLES. THE ENGINE OIL COULD
RUN OUT & SEIZE THE MOTOR OF WHICH CAN HAPPEN
WHILE DRIVING DURING HIGHWAY SPEEDS. *TR

130.   It is apparent from Subaru's actions that it discovered the defect in

Class Vehicles early on.  For the 2012 model year Forester vehicles, Subaru altered

the design via a mid-production engine change to try to eliminate the defect.  After

observing the ring wear and resultant oil consumption, Subaru changed the

vehicles' cylinder finish in an attempt to minimize roughness where the oil control

ring contacts the cylinders.  The change did not fix the vehicles.

131.   Neither then, nor in the years that followed, have Defendants

disclosed the defect to drivers or potential customers.  Likewise, Subaru has never

instructed its dealerships to disclose the defect.  The TSBs discussed above were

issued only to authorized Subaru dealers and were never issued to the general

public or the owners and lessees of Class Vehicles.

132.   As a result of Subaru's inaction and silence, consumers were unaware

they were buying or leasing defective vehicles, and many drivers do not discover

the defect until after their lives have been jeopardized or various components in

their vehicles have been damaged.

133.   As Subaru knows, a reasonable person would consider the defect important and would not purchase or lease a vehicle equipped with the defect, or, were the defect disclosed in advance, would pay substantially less for the vehicle. Yet the defect was not known to or reasonably discoverable by Plaintiffs and proposed class members before purchase or lease, or without experiencing the defect firsthand.

134.   Even now, years after Subaru first learned about the defect, it has not notified customers of the nature and extent of the defect and the defect's economic, environmental, and safety consequences.  Subaru has remained silent even as it discovered the problem internally, issued service bulletins, and heard numerous complaints.

135.   Subaru continues to actively conceal the defect from consumers. Even when drivers specifically ask whether the vehicles suffer from a known problem, Subaru (and its authorized dealerships) deny that there is a known problem and tell the customer that the oil consumption is normal.

**E.**   **Subaru's Warranty-Related Practices**

136.   Subaru issued three relevant warranties with each Class Vehicle: a "New Vehicle Limited Warranty," a "Powertrain Limited Warranty," and an "Emissions Warranty."

137.   Under the New Vehicle Limited Warranty, Subaru agreed to repair

defects reported within the earlier of 3 years or 36,000 miles.

138.   Under the Powertrain Limited Warranty, Subaru agreed to repair

defects affecting various powertrain components through 5 years and 60,000 miles.

According to the Warranty and Maintenance Booklet, Powertrain Coverage

Components include:

- Engine
- Engine block and ***all internal parts***
- Cylinder heads and valve trains
- Oil pump, oil pan
- Timing belts or gears and cover
- Water pump
- Flywheel
- Intake and exhaust manifolds
- ***Oil seals*** and gaskets

(emphasis added).  The piston rings, including the oil control rings, are both

"internal [engine] parts" and "oil seals," bringing them within the scope of

Subaru's Powertrain Limited Warranty.

139.   Under the Emissions Warranty that covers Class Vehicles, which is

mandated by California, New Jersey, and other states' laws, Subaru is obligated to

repair any defective emissions related part over a certain cost threshold—including

catalytic converters and oil control rings—through the earlier of 8 years and

100,000 miles.

140.   As Subaru knows, some level of piston ring wear and oil loss manifests in all or substantially all of the proposed Class Vehicles, typically soon after the vehicles are first sold or leased.  Subaru is obligated by its warranties to repair Class Vehicles free of charge.

141.   Subaru instructs vehicle owners and lessees to bring their vehicles to a Subaru dealership for the warranty repairs.  Many owners and lessees have presented Class Vehicles to Subaru dealerships with complaints related to piston ring wear, including that their vehicles are consuming too much oil.

142.   Subaru has evaded its warranty obligations by failing to tell consumers that their vehicles are defective and by claiming that the loss of engine oil is acceptable, and not indicative of a defect requiring warranty repairs or replacements (even though Subaru knows that the defect is present in every Class Vehicle).

143.   Consistent with that approach, the above-referenced TSBs state, "If a customer inquires about oil consumption and is close to their next service interval, and consumption has not exceeded 1 quart in that time, the consumption rate should not be considered unusual.  Consumption at a rate greater than this should be reviewed on a case by case basis after reviewing the vehicle's usage patterns/history."

144.    The case-by-case review consists of performing what Subaru calls an oil consumption test at the driver's expense.  The test consists of changing the oil and filter (usually at the driver's expense), confirming that the oil level was full, and then instructing the customer to drive 1,200 miles and then return to the dealership for an inspection.

145.    If the engine consumed *more* than one quart of oil in 1,200 miles, the technician was supposed to conduct a diagnostic analysis, beginning with a compression test.

146.    If the engine consumes *less* than one quart of oil in 1,200 miles, on the other hand, drivers are told the level of oil consumption they are experiencing is "normal" and denied repairs under warranty.

147.    Subaru recommends that the engine oil in all Class Vehicles be changed at intervals of 7,500 miles or 7.5 months—although for 2015 model year vehicles (which are not included as Class Vehicles in this complaint) Subaru increased the frequency of oil changes to every 6,000 miles or 6 months.

148.    Thus, if a consumer follows Subaru's recommended maintenance schedule, a loss of one (1) quart of oil every 1,200 miles will result in the consumption of the entire amount of oil contained in the Class Vehicle's engine at

between 6,120 and 6,600 miles.[5]  In essence, Subaru's assertion that consistently

consuming oil at a rate of one quart per 1,200 miles is acceptable will result in the

Class Vehicles running out of oil before Subaru's recommend oil change interval

of 7,500 miles—an implausible suggestion since this would cause either

catastrophic engine failure or, at the very least, sustained, high costs for drivers

who would need to be constantly purchasing additional oil for their vehicles.

149.   Subaru's failure to notify the general public and the owners and

lessees of the Class Vehicles regarding the defect is particularly egregious since

drivers may run out of engine oil before Subaru's recommended oil change

intervals, which would lead to abrupt catastrophic engine damage and place the

driver, passengers, and others on the road at risk of accident, injury, and death

since the vehicles can buck, stall, and lose power.

150.   In many instances, consumers have incurred and will continue to incur

expenses for the diagnosis of the defect, repair and replacement of the FB engine,

the cost of additional engine oil, the cost of additional fuel and reduced MPG,

higher emissions and the unnecessary and premature replacement of vehicle

emission components including, but not limited to, spark plugs, oxygen sensors

---

[5] Calculations based on the 5.1 U.S. quart engine oil capacity for the ZX
Crosstek, Legacy, Outback, Impreza and 2014 Forester; 5.5 U.S. quart engine oil
capacity for the 2012-2013 Forester.

and catalytic converters, despite such defect having been contained in the Class Vehicles when manufactured by Defendants.

151.   As a result, a number of drivers who presented their Class Vehicles at Subaru dealerships because they were suffering engine oil loss were denied warranty repairs and instead told there was nothing wrong with their vehicles.  If and when the oil loss worsened after the expiration of the warranty period, the customer would be left to foot the cost of repair on his or her own, often having to pay thousands of dollars for the repair.

152.   On November 5, 2013, Subaru adjusted the scope of its warranty coverage.  Pursuant to the adjusted scope, Subaru would perform a piston ring system repair for vehicles that: (i) are still within 5 years and 60,000 miles, and (ii) are experiencing oil loss of at least 1/3 of a quart per 1,200 miles.  When that amount of oil (or more) is being consumed by a Class Vehicle within the 5-year, 60,000-mile powertrain warranty period, no further diagnostics are required and piston ring system repairs are provided for free.

153.   As part of the warranty adjustment program, Subaru implemented a modified oil consumption test.  The new test first asks the technician to answer the following questions:

| REQUIRED INFORMATION TO INITIATE OIL CONSUMPTION TEST- COMPLETE ALL QUESTIONS | YES | NO | UNSURE | ADDED* |
|---|---|---|---|---|
| Customer checked oil level and found it low?  How much? | | | | |
| Customer reports that low oil level lamp illuminated? | | | | |
| Customer added oil at that time?  How much? | | | | |
| Technician found low oil level lamp illuminated? | | | | |
| Technician inspected and found oil level low?  How much? | | | | |

ONCE YOU HAVE COMPLETED THIS SECTION AND FOUND UNUSUAL OIL CONSUMPTION, FAX THIS FORM TO 856-488-3199 AND BEGIN TEST

*1 quart = 1.0 qt = 32 fluid ounces (fl oz), 0.5 qt = 16 fl oz, 0.1qt = 3.2 fl oz. Indicate the unit of measurement and do not round any values up or down. Precision is required.

154.   The new test consists of changing the engine oil and filter, confirming that the oil is full, and telling the customer to return when any of the following occurs: (i) a minimum of 1,200 miles have elapsed; (ii) the low engine oil lamp illuminates; or, (iii) the customer determines that the engine oil level has dropped to the add mark.  Once the vehicle returns to the repair facility, the technician is to determine the oil consumption rate according to the following formula: oil consumed every 1,200 miles = (oil added ÷ miles driven) x 1200.  The test instructions then inform the technician that the repair should be performed according to the applicable service bulletin "If there is oil consumption of 1/3 of a quart (10.7 oz) in 1200 miles observed and calculated as part of this test."

155.   Subaru, however, has not told members of the putative Class about its expansion of its warranty coverage and Subaru's secrecy has prevented many drivers from obtaining repairs under warranty.  A number of drivers had come to Subaru dealerships before the warranty expansion and were informed that no warranty repairs were available.  To date, Subaru has not sent out notice that would

alert these drivers that warranty repairs are available to them under the new warranty policy.  Likewise, drivers who are not aware of Subaru's warranty adjustment program are not able to assert their warranty rights when they were not provided prompt repairs at Subaru dealerships.

## THE COURT SHOULD APPLY NEW JERSEY LAW

156.   The  substantive laws of New Jersey should apply to the proposed nationwide Class, as defined below, because Plaintiffs properly brought suit in this District.

157.   New Jersey's substantive laws may be constitutionally applied to the claims of Plaintiffs and the Class under the Due Process Clause, 14th Amend., § 1, and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution.  New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all Class members, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

158.   Specifically, Defendants' North American headquarters and principal place of business are located in New Jersey.  According to its website, SOA occupies an $18 million, 115,000 square-foot, seven-story structure in Cherry Hill, New Jersey where it serves as the company's national headquarters housing

approximately 300 people in Finance, IT, Marketing, Sales and Product Planning.[6]

Furthermore, Subaru has an Operations Center located in Pennsauken, New Jersey

housing nearly 200 employees from Customer Loyalty, Government Relations,

Parts, Service, Training, Customer Dealer Service and Subaru Financial Services.[7]

159.   Defendants own property and conduct substantial business in New

Jersey and, therefore, New Jersey has an interest in regulating Defendants' conduct

under its laws.  Defendants' decision to reside in New Jersey and avail themselves

of New Jersey's laws renders the application of New Jersey law to the claims

herein constitutionally permissible.

160.   A substantial number of members of the Class also reside in New

Jersey and purchased their vehicles in New Jersey.

161.   Upon information and belief, Defendants' misconduct emanated from

New Jersey.  This conduct similarly injured and affected all Plaintiffs and Class

members residing in the United States.  For instance, Defendants' marketing and

advertising efforts were likely created in and orchestrated from the location of

Defendant SOA's present headquarters in New Jersey.  As a result, New Jersey is

the locus where the conduct causing injury to the Plaintiffs and Class members

occurred and emanated.

---

[6] *See* http://www.subaru.com/company.html (last visited June 25, 2014).
[7] *Id.*

162.   The application of New Jersey's laws to the Nationwide Class is also appropriate under New Jersey's choice of law rules because New Jersey has significant contacts to the claims of the Plaintiffs and the proposed Nationwide Class, and New Jersey has a greater interest in applying its laws here than any other interested state.

## CLASS ACTION ALLEGATIONS

163.   Plaintiffs bring this action on their own behalf, and on behalf of the two nationwide classes pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and/or 23(b)(3).

**Nationwide Class:**

All persons or entities in the United States who bought or leased a Class Vehicle (the "Nationwide Class").

**Emissions Warranty Class:**

All persons or entities who bought or leased a Class Vehicle that is registered in California, Connecticut, Maine, Maryland, Massachusetts, New Jersey, Oregon, Pennsylvania, Rhode Island, Vermont, or Washington, and that required or will require an engine block or piston ring repair or replacement within the 8-year, 100,000-mile warranty (the "Emissions Warranty Class").

164.   Pursuant to FED. R. CIV. P. 23(c)(5), Plaintiffs seek to represent the following state classes only in the event that the Court declines to certify the Nationwide Class:

**California Class:**

All persons in California who bought or leased a Class Vehicle.

- 55 -

**Florida Class**:
All persons or entities in Florida who bought or leased a Class Vehicle.

**New Jersey Class**:
All persons or entities in New Jersey who bought or leased a Class Vehicle.

**Pennsylvania Class**:
All persons or entities in Pennsylvania who bought or leased a Class Vehicle.

**New York Class:**
All persons or entities in New York who bought or leased a Class Vehicle.

**Connecticut Class:**
All persons or entities in Connecticut who bought or leased a Class Vehicle.

165.   Together, the New Jersey Class, California Class, Florida Class, Pennsylvania Class, New York Class, and Connecticut Class shall be collectively referred to herein as the "State Sub-Classes."  Excluded from the Nationwide Class, Emissions Warranty Class, and State Sub-Classes are Defendants, their affiliates, employees, officers and directors, persons or entities that purchased the Class Vehicles for resale, and the Judge(s) assigned to this case.  Plaintiffs reserve the right to modify, change, or expand the Nationwide Class, Emissions Warranty Class, and State Sub-Class definitions based on discovery and further investigation.

166.  <u>Numerosity</u>:  Upon information and belief, each of the Classes are so numerous that joinder of all members is impracticable.  While the exact number and identities of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiffs only through the discovery process, Plaintiffs believe, and on that basis allege, that hundreds of thousands of Class Vehicles have been sold and leased in each of the States that are the subject of the Classes.

167.  <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Classes.  These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to whether:

    a.    The Class Vehicles were sold with a defect;

    b.    Subaru knew about the defect but failed to disclose the problem and its consequences to its customers;

    c.    A reasonable consumer would consider the defect or its consequences to be material information;

    d.    The engine block and piston rings qualify as high-priced emissions parts under the applicable statutory emissions warranties;

e.     Subaru has failed to provide free repairs as required by its new vehicle limited warranty, powertrain limited warranty, and/or emissions warranty;

f.     Subaru's 2013 expansion of its warranty coverage constitutes an adjustment program under California's secret warranty law;

g.     Subaru should be required to disclose the existence of the defect and its warranty expansion; and

h.     Defendants' conduct violates the New Jersey Consumer Fraud Act and the other statutes asserted herein;

168.   <u>Typicality</u>:  The Plaintiffs' claims are typical of the claims of the Classes since each Plaintiff purchased or leased a defective Class Vehicle, as did each member of the Classes.  Furthermore, Plaintiffs and all members of the Classes sustained economic injuries arising out of Defendants' wrongful conduct. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all absent Class members.

169.   <u>Adequacy</u>:  All of the Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Classes that they seek to represent, they have retained counsel competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously.

The interests of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

170.  Superiority:  A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and members of the Classes.  The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct.  It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them.  Even if the members of the Class could afford such individual litigation, the court system could not.  Individualized litigation presents a potential for inconsistent or contradictory judgments.  Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court.  Upon information and belief, members of the Classes can be readily identified and notified based on, *inter alia*, Defendants' vehicle identification numbers, warranty claims, registration records, and database of complaints.

171.   Defendants have acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## VIOLATIONS ALLEGED

### COUNT I
### VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT
(N.J. STAT. ANN. § 56:8-1, *et seq.*)
(On Behalf of the Nationwide Class or,
Alternatively, the New Jersey Class)

172.   Plaintiffs and the Nationwide Class (or, in the alternative, the New Jersey Class) incorporate by reference each preceding and succeeding paragraph as though fully set forth and length herein.

173.   The New Jersey Consumer Fraud Act, N.J. STAT. ANN. §§ 56:8-1, *et seq.* ("NJCFA") protects consumers against "any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise..."  N.J. STAT. ANN. 56:8-2.

174.   Plaintiffs and Class members are consumers who purchased and leased Class Vehicles.

175.   In the course of Defendants' business, they knowingly concealed, suppressed, and omitted the fact that the Class Vehicles are defective, with the

intent that Plaintiff and the proposed class rely upon that concealment, suppression, and omission when purchasing or leasing Class Vehicles.  The existence of the defect, which manifests in all or substantially all Class Vehicles, is material to a reasonable consumer in that it poses an unreasonable risk to their safety, may lead to thousands of dollars in repair expenses, negatively affects Class Vehicles' emissions, requires expensive and inconvenient maintenance efforts, and causes the Class Vehicles to be worth substantially less than they would otherwise be valued.

176.   Subaru has engaged in unfair and deceptive trade practices, including representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that the Class Vehicles are of a particular standard and quality when they are not; advertising Class Vehicles with the intent to not sell them as advertised; and otherwise engaging in conduct likely to deceive.  Further, Subaru's acts and practices described herein offend established public policy because of the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Subaru fraudulently concealed the defective nature of the Class Vehicles from consumers.

177.   Subaru's actions as set forth above occurred in the conduct of trade or commerce.

178.   Defendants' conduct caused Plaintiffs and Class members to suffer an ascertainable loss.  Plaintiffs and the other Class members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.  Plaintiffs and Class members have also incurred and will continue to incur costs for oil and oil consumption tests.

179.   Plaintiffs' and other class members' damages are the direct and foreseeable result of Defendants' unlawful conduct.  Had the defect in the Class vehicles been disclosed, consumers would not have purchased or would have paid less for the Class Vehicles and would have been spared the subsequent expenses.

180.   Pursuant to N.J. STAT. ANN. § 56:8-20, Plaintiff will serve the New Jersey Attorney General with a copy of this Complaint.

## COUNT II
## BREACH OF EXPRESS WARRANTY
### (On Behalf of the Nationwide Class or,
### Alternatively, each of the State Sub-Classes)

181.   Plaintiffs and the Nationwide Class (or, in the alternative, each of the State Sub-Classes) incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

182.   Defendants provided all purchasers and lessees of the Class Vehicles with the express warranties described herein, which became part of the basis of the

bargain. Accordingly, Defendants' warranties are express warranties under state law.

183. The parts affected by the defect, including the pistons, piston rings, engine block, oxygen sensors, and catalytic converters were manufactured and distributed by Defendants in the Class Vehicles and are covered by the warranties Defendants provided all purchasers and lessors of Class Vehicles.

184. Defendants breached these warranties by selling and leasing Class Vehicles with the defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

185. Plaintiffs notified Defendants of the breach within a reasonable time, and/or were not required to do so because affording Defendants a reasonable opportunity to cure its breach of written warranty would have been futile. Defendants also know of the defect and yet have chosen to conceal it and to fail to comply with their warranty obligations.

186. As a direct and proximate cause of Defendants' breach, Plaintiffs and the other Class members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiffs and Class members

have also incurred and will continue to incur costs for oil and oil consumption tests.

187.   Defendants' attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here.  Specifically, Defendants' warranty limitation is unenforceable because they knowingly sold a defective product without informing consumers about the defect.

188.   The time limits contained in Defendants' warranty period were also unconscionable and inadequate to protect Plaintiffs and members of the Class. Among other things, Plaintiffs and Class members had no meaningful choice in determining these time limitations the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Subaru and the Class members, and Subaru knew or should have known that the Class Vehicles were defective at the time of sale and would fail well before their useful lives.

189.   Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

190.   Plaintiffs and the other proposed class members are entitled to legal and equitable relief against Defendants, including damages, consequential damages, specific performance, attorney fees, costs of suit, and other relief as appropriate.

**COUNT III**
**BREACH OF THE IMPLIED**
**WARRANTY OF MERCHANTABILITY**
**(On Behalf of the Nationwide Class or,**
**Alternatively, each of the State Sub-Classes)**

191.   Plaintiffs and the Nationwide Class (or, in the alternative, each of the State Sub-Classes) incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

192.   Defendant Subaru is a "merchant" as defined under the Uniform Commercial Code ("UCC").

193.   The Class Vehicles are "goods" as defined under the UCC.

194.   With the sale and lease of each Class Vehicle, Defendants impliedly warranted that the Class Vehicles were of a merchantable quality.

195.   Class Vehicles are not of merchantable quality due to the defect, which causes all or substantially all of the vehicles to consume excess oil, and to not operate as intended, posing an unreasonable risk to driver safety, and potentially leading to thousands of dollars in repair expenses, increased emissions, and expensive and inconvenient maintenance.

196.   Defendants' attempt to limit the duration of the applicable warranty period is unconscionable.  Among other things, Plaintiffs and members of the Class had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power

existed between Subaru and Class members, and Subaru knew that the Class Vehicles were defective at the time of sale and would fail well before their useful lives, yet chose to conceal that information, depriving Plaintiffs and Class members of the ability to make an informed decision with respect to their purchase or lease decision.

197.   As a direct and proximate cause of Subaru's breach of implied warranty, Plaintiffs and the other Class members bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value. Plaintiffs and Class members have also incurred and will continue to incur costs for oil and oil consumption tests.

198.   Plaintiffs and Class members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Defendants' conduct described herein.

## COUNT IV
## BREACH OF THE DUTY OF GOOD FAITH
## AND FAIR DEALING
### (On Behalf of the Nationwide Class or,
### Alternatively, each of the State Sub-Classes)

199.   Plaintiffs and the Nationwide Class (or, in the alternative, each of the State Sub-Classes) incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

200.   Every contract in New Jersey, California, Pennsylvania, Florida, New York and Connecticut contains an implied covenant of good faith and fair dealing. The implied covenant of good faith and fair dealing is an independent duty and may be breached even if there is no breach of a contract's express terms.

201.   Defendants breached the covenant of good faith and fair dealing by, *inter alia*, failing to notify Plaintiffs and Class members of the defect in the Class Vehicles, and failing to fully and properly repair this defect.

202.   Defendants acted in bad faith and/or with a malicious motive to deny Plaintiffs and the Class members some benefit of the bargain originally intended by the parties, thereby causing them injuries in an amount to be determined at trial.

## COUNT V
### VIOLATIONS OF CALIFORNIA'S CONSUMER LEGAL REMEDIES ACT ("CLRA") (CAL. CIV. CODE § 1750, *et seq*.)
### (On Behalf of the California Class)

203.   Plaintiffs and the California Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

204.   Plaintiffs Yaeger and Montgomery ("Plaintiffs" for the purposes of this Count) bring this claim on behalf of themselves and on behalf of the members of the California Class against Defendants.

205.   Defendants violated the Consumers Legal Remedies Act (CLRA), California Civil Code sections 1770(a)(5), (7), (9), (14), and (16), by engaging in

unfair methods of competition and unfair and deceptive acts and practices in connection with transactions—namely, the sale of Class Vehicles to Plaintiffs and the proposed California Class—that were intended to, and did, result in the sale and lease of goods to consumers.

206.   In connection with the sale of Class Vehicles to Plaintiffs and California Class members, Defendants knowingly concealed and failed to disclose the fact that the Class Vehicles are defective, with the intent that Plaintiffs and the proposed class rely upon that concealment, suppression, or omission when purchasing or leasing Class Vehicles.  The existence of the defect, which manifests in all or substantially all Class Vehicles, is material to a reasonable consumer in that it poses an unreasonable risk to their safety, may lead to thousands of dollars in repair expenses, negatively affects Class Vehicles' emissions, requires expensive and inconvenient maintenance efforts, and causes the Class Vehicles to be worth substantially less than they would otherwise be valued.

207.   Following Plaintiffs' and proposed class members' purchase and lease of Class Vehicles, Defendants have continued to conceal and fail to disclose the defect.

208.   As a direct and proximate result of Defendants' conduct, Plaintiffs and California Class members have been harmed.  Plaintiffs and the other California Class members bought or leased Class Vehicles they otherwise would

not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.  Plaintiffs and California Class members have also incurred and will continue to incur costs for additional engine oil and oil consumption tests.  Meanwhile, Defendants have sold more Class Vehicles than they otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching themselves thereby.

209.   Plaintiffs Yaeger, Montgomery, and Hegle, on behalf of themselves and California Class members, notified Subaru in writing of the CLRA violations in September 2014, requesting that Subaru cure its violations.

210.   Subaru did not respond to Plaintiffs' notice within thirty days of receipt.

211.   Pursuant to California Civil Code § 1780, Plaintiffs seek all relief available under the CLRA, including a declaration that Defendants' conduct violates the Consumer Legal Remedies Act, an award of damages, and an order requiring Defendants to adequately disclose and repair the defect, as well attorney fees and costs.

**COUNT VI**
**VIOLATIONS OF THE CALIFORNIA BUSINESS AND PROFESSIONS CODE (CAL. BUS. & PROF. CODE § 17200)**
**(On Behalf of the California Class)**

212.   Plaintiffs and the California Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

213.   Plaintiffs Yaeger, Montgomery and Hegle ("Plaintiffs" for purposes of this Count) bring this claim on behalf of themselves and on behalf of the members of the California Class against all Defendants.

214.   Defendants' acts and practices, as alleged in this complaint, constitute unlawful, unfair, and fraudulent business practices, in violation of the Unfair Competition Law, CAL. BUS & PROF. CODE § 17200, *et seq.*

215.   Defendants' acts and practices constitute unlawful business practices, as discussed elsewhere in this Complaint, in that they violate the Magnuson Moss Warranty Act, California's Consumers Legal Remedies Act, California's Song-Beverly Consumer Warranty Act, California's emissions warranty statute and underlying regulations, and breach Subaru's warranties.

216.   Defendants' acts and practices constitute unfair practices in that (i) they are unethical, unscrupulous, and substantially injurious to consumers; (ii) any legitimate utility of Defendants' conduct is outweighed by the harm to consumers; (iii) the injury is not one that consumers reasonably could have avoided; and/or (iv) the conduct runs afoul of the public policies underlying the Magnuson Moss Warranty Act, California's Consumers Legal Remedies Act, California's Song-Beverly Consumer Warranty Act, and California's emissions warranty statute and

underlying regulations, which seek to protect consumers against unfair and sharp business practices and to promote a basic level of honesty and reliability in the marketplace, and thus provide a sufficient predicate for Plaintiffs' claims for unfair business practices.

217.   Defendants' acts and practices constitute fraudulent practices in that they are likely to deceive a reasonable consumer, who would not have purchased a Class Vehicle had Subaru had adequately disclosed the defect and its ramifications.

218.   As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices, Plaintiffs and the proposed California Class have suffered injury in fact and lost money or property, in that they bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.  Plaintiffs and California Class members have also incurred and will continue to incur costs for additional engine oil and oil consumption tests.  Meanwhile, Defendants have sold more Class Vehicles than they otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching themselves thereby.

219.   Plaintiffs and the proposed California Class are entitled to equitable relief, including restitutionary disgorgement of all profits accruing to Defendants

because of their deceptive practices and an order requiring Subaru to adequately

disclose and repair the defect.

## COUNT VII
### VIOLATIONS OF THE FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT (FLA. STAT. § 501.201, *et seq.*)
### (On Behalf of the Florida Class)

220.   Plaintiffs and the Florida Class incorporate by reference each

preceding and succeeding paragraph as though fully set forth at length herein.

221.   Plaintiff Schuler ("Plaintiff" for purposes of this Count) brings this

claim on behalf of himself and the Florida Class.

222.   Plaintiff and the Florida class members are "consumers" within the

meaning of FLA. STAT. §501.203(7).

223.   At all relevant times, Subaru was engaged in trade or commerce

within the meaning of FLA. STAT. §501.203(8).

224.   The purpose of the Florida Deceptive and Unfair Trade Practices Act,

FLA. STAT. § 501.201, *et seq.*, is to "protect the consuming public…from those

who engage in unfair methods of competition, or unconscionable, deceptive or

unfair acts or practice in the conduct of any trade or commerce."  FLA. STAT. §

501.202(2).

225.   Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair

methods of competition, unconscionable acts or practices, and unfair or deceptive

acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1).

226.   Subaru has violated Florida's Deceptive and Unfair Trade Practices Act by failing to disclose, at the point of sale or otherwise, that the Class Vehicles are defective.  The existence of the defect, which manifests in all or substantially all Class Vehicles, is material to a reasonable consumer in that it poses an unreasonable risk to their safety, may lead to thousands of dollars in repair expenses, negatively affects Class Vehicles' emissions, requires expensive and inconvenient maintenance efforts, and causes the Class Vehicles to be worth substantially less than they would otherwise be valued.  Subaru's failure to disclose the defect and its ramifications offends public policy and is unethical, unscrupulous, and substantially injurious to consumers.

227.   As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the proposed Florida Class have suffered harm in that they bought or leased Class Vehicles they otherwise would not have, overpaid for their vehicles, did not receive the benefit of their bargain, and their Class Vehicles suffered a diminution in value.  Plaintiff and Florida Class members have also incurred and will continue to incur costs for oil and oil consumption tests.  Meanwhile, Defendants have sold more Class Vehicles than they otherwise could have, charged inflated prices for Class Vehicles, unjustly enriching themselves thereby.

228.   Pursuant to FLA. STAT. §501.211, Plaintiff and the Florida Class are entitled to damages, declaratory judgment, and equitable relief, including restitutionary disgorgement of all profits accruing to Defendants because of their deceptive practices and an order requiring Subaru to adequately disclose and repair the defect.

**COUNT VIII**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. GEN. BUS. LAW. § 349)**
**(On Behalf of the New York Class)**

229.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

230.   Plaintiff Papa ("Plaintiff" for the purposes of this Count) brings this claim on behalf of herself and the New York Class.

231.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

232.   In the course of Subaru's business, it willfully failed to disclose and actively concealed that the Class Vehicles are defective.  The existence of the defect, which manifests in all or substantially all Class Vehicles, is material to a reasonable consumer in that it poses an unreasonable risk to their safety, may lead to thousands of dollars in repair expenses, negatively affects Class Vehicles' emissions, requires expensive and inconvenient maintenance efforts, and causes the Class Vehicles to be worth substantially less than they would otherwise be

valued.  Subaru's failure to disclose the defect and its ramifications offends public policy and is unethical, unscrupulous, and substantially injurious to consumers.  It also made affirmative misstatements, as set forth above.

233.   Accordingly, Subaru engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; advertising Class Vehicles with the intent not to sell them as advertised; and otherwise engaging in conduct likely to deceive.

234.   Subaru's actions set forth above occurred in the conduct of trade or commerce.

235.   Because Subaru's deception takes place in the context of automobile safety, its deception affects the public interest.  Further, Subaru's unlawful conduct constitutes unfair acts or practices that have the capacity to deceive consumers, and that have a broad impact on consumers at large.

236.   Subaru's conduct proximately caused injuries to Plaintiff and the other Class members.

237.   Plaintiff and the other Class members were injured as a result of Subaru's conduct in that Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class

Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Subaru's misrepresentations and omissions.

**COUNT IX**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 350**
**(N.Y. GEN. BUS. LAW § 350)**
**(On Behalf of the New York Class)**

238.   Plaintiffs and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

239.   Plaintiff Papa ("Plaintiff" for the purposes of this Count) brings this claim on behalf of herself and the New York Class.  New York's General Business Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]"  False advertising includes "advertising, including labeling, of a commodity … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of …representations [made] with respect to the commodity…." N.Y. GEN. BUS. LAW § 350-a.

240.   Subaru caused to be made or disseminated through New York, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Subaru, to be untrue and misleading to consumers, including Plaintiff and the other Class members.

241.   Toyota has violated N.Y. GEN. BUS. LAW § 350 because the misrepresentations and omissions regarding the dangerous risk of oil consumption in the Class Vehicles as described above which was material and likely to deceive a reasonable consumer.

242.   Plaintiff and the other Class members have suffered injury, including the loss of money or property, as a result of Subaru's false advertising.  In purchasing or leasing their Class Vehicles, Plaintiff and the other Class members relied on the misrepresentations and/or omissions of Subaru with respect to the safety, quality, functionality, and reliability of the Class Vehicles.  Subaru's representations turned out to be untrue because the defects described within renders the Class Vehicles prone to causing premature wear of internal parts, inadequate performance, and/or catastrophic engine failure, and other failures as described hereinabove.  Had Plaintiff and the other Class members known this, they would not have purchased or leased their Class Vehicles and/or paid as much for them.

243.   Accordingly, Plaintiff and the other Class members overpaid for their Class Vehicles and did not receive the benefit of the bargain for their Class Vehicles, which have also suffered diminution in value.

244.   Plaintiff, individually and on behalf of the other Class members, requests that this Court enter such orders or judgments as may be necessary to

enjoin Subaru from continuing its unfair, unlawful and/or deceptive practices.

Plaintiff and the other Class members are also entitled to recover their actual

damages or $500, whichever is greater.  Because Subaru acted willfully or

knowingly, Plaintiff and the other Class members are entitled to recover three

times actual damages, up to $10,000.

## COUNT X
### VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT
### (C.G.S.A. § 42-110A ET SEQ.)
### (On Behalf of the Connecticut Class)

245.   Plaintiffs and the Connecticut Class incorporate by reference all

allegations of the preceding paragraphs as though fully set forth herein.

246.   Plaintiff Tedesco and the members of the Connecticut Class are

persons under C.G.S.A. § 42-110a(3).

247.   Subaru's actions as set forth above occurred in the conduct of trade or

commerce under C.G.S.A. § 42-110a(4), and do not fall within any of the

exemptions of C.G.S.A. § 42-110c.

248.   In the course of Subaru's business, it failed to disclose and actively

concealed the dangerous risk of the above defect contained in the Class Vehicles.

Accordingly, Subaru has engaged in unfair and/or deceptive acts or practices in the

conduct of trade or commerce, including representing that the Class Vehicles have

characteristics, uses, benefits, and qualities which they do not have; representing

that the Vehicles are of a particular standard and quality when they are not; advertising the Class Vehicles with the intent to not sell them as advertised; and otherwise engaging in conduct likely to deceive.

249.   Further, Subaru's acts and practices, as described herein, offend public policy, and/or are immoral, oppressive, or unscrupulous because of the harm they cause to consumers, motorists, and pedestrians outweighs any benefit associated with such practices, and because Subaru concealed the defective nature of the Class Vehicles from consumers.

250.   As a result of Defendants' violations of the Connecticut Unfair Trade Practices Act, Plaintiff Tedesco and members of the Connecticut Class suffered an ascertainable loss of money or property, including, but not limited to, diminution in the value of the Class Vehicles.  This diminution in value is measurable by financial and economic analyses, and therefore, is a loss that is capable of being discovered, observed or established.

## COUNT XI
## VIOLATION OF SONG-BEVERLY CONSUMER WARRANTY ACT
## FOR BREACH OF EXPRESS WARRANTIES
## (CAL. CIV. CODE §§ 1791.2 & 1793.2(D))
## (On Behalf of the California Class)

251.   Plaintiffs and the California Class incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

252.   Plaintiffs Yaeger, Montgomery and Hegle ("Plaintiffs" for purposes of this Count) bring this Count on behalf of the California Class.

253.   Plaintiffs and the other California Class members who purchased or leased the Class Vehicles in California are "buyers" within the meaning of CAL. CIV. CODE § 1791(b).

254.   The Class Vehicles are "consumer goods" within the meaning of CAL. CIV. CODE § 1791(a).

255.   Subaru is a "manufacturer" of the Class Vehicles within the meaning of CAL. CIV. CODE § 1791(j).

256.   Subaru made express warranties to Plaintiffs and the other California Class members within the meaning of CAL. CIV. CODE §§ 1791.2 and 1793.2, as described above.

257.   Defendants breached these warranties by selling and leasing Class Vehicles with the defect, requiring repair or replacement within the applicable warranty periods, and refusing to honor the warranties by providing free repairs or replacements during the applicable warranty periods.

258.   Defendants did not promptly replace or buy back the vehicles of Plaintiffs and proposed California Class Members.

259.   As a direct and proximate result of Subaru's breach of its express warranties, Plaintiffs and the other California Class members received goods

whose condition substantially impairs their value to Plaintiffs and the other Class members.  Plaintiffs and the other Class members have been damaged as a result of, *inter alia,* the diminished value of Subaru's products, the products' malfunctioning, and actual and potential increased maintenance and repair costs.

260.   Pursuant to CAL. CIV. CODE §§ 1793.2 & 1794, Plaintiffs and the other Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

261.   Pursuant to CAL. CIV. CODE § 1794, Plaintiffs and the other California Class members are entitled to costs and attorney fees.

<u>**COUNT XII**</u>
**THE SONG-BEVERLY ACT – BREACH OF IMPLIED WARRANTY VIOLATIONS OF CALIFORNIA CIVIL CODE §§ 1792, 1791.1, *et seq.***
**(On Behalf of the California Class)**

262.   Plaintiffs and the California Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

263.   Plaintiffs Yaeger, Montgomery and Hegle ("Plaintiffs" for purposes of this Count) bring this claim on behalf of themselves and the California Class.

264.   Class Vehicles are "consumer goods" within the meaning of CAL. CIV. CODE § 1791(a).

265.   Subaru is a "manufacturer" within the meaning of CAL. CIV. CODE § 1791(j).

266.   Subaru impliedly warranted to Plaintiffs and the California Class that Class Vehicles were "merchantable" within the meaning of CAL. CIV. CODE §§ 1791.1(a) & 1792.

267.   CAL. CIV. CODE § 1791.1(a) states:  "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1) Pass without objection in the trade under the contract description.

(2) Are fit for the ordinary purposes for which such goods are used.

(3) Are adequately contained, packaged, and labeled.

(4) Conform to the promises or affirmations of fact made on the container or label.

268.   Class Vehicles would not pass without objection in the automotive trade because the defect causes all or substantially all of the vehicles to consume excessive engine oil, and to not operate as intended, posing an unreasonable risk to driver safety, and potentially leading to thousands of dollars in repair expenses, increased emissions, and expensive and inconvenient maintenance requirements.

269.   Because the defect poses an unreasonable risk to driver safety and materially reduces the reliability and dependability of the vehicles, the Class Vehicles are not fit for ordinary purposes for which such goods are used.

270.   Class Vehicles are not adequately labeled because the labeling fails to disclose the defect and does not advise proposed California Class members of the defect or to take extra care to monitor their vehicle's oil levels as a result.

271.   The defect deprived Plaintiffs and the proposed California Class of the benefit of their bargain and have caused Class Vehicles to be worth less than what Plaintiffs and other proposed California Class members paid.

272.   As a direct and proximate result of Subaru's breach of its duties, proposed California Class members received goods whose condition substantially impairs their value.  Plaintiffs and the proposed California Class have been damaged by the diminished value of the vehicles, the vehicles' malfunctioning, and actual and potential increased maintenance and repair costs.

273.   Under CAL. CIV. CODE §§ 1791.1(d) & 1794, Plaintiffs and proposed California Class members are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles, and are also entitled to their attorney fees and costs.

## COUNT XIII
### VIOLATION OF CALIFORNIA'S SECRET WARRANTY LAW UNDER CAL. BUS. & PROF. CODE § 17200, *et seq.*
### (On Behalf of the California Class)

274.    Plaintiffs Yaeger, Montgomery and Hegle and the California Class incorporate by reference each of the preceding paragraphs as though fully set forth herein.

275.    Defendants' acts and practices, as alleged in this complaint, violate California's Secret Warranty Law, CAL. CIV. CODE § 1795.90, *et seq.*, and thereby constitute an unlawful business practice in violation of the Unfair Competition Law, CAL. BUS. & PROF. CODE § 17200, *et seq.*

276.    Plaintiffs Yaeger, Montgomery and Hegle ("Plaintiffs" for purposes of this Count) are "consumers" under CAL. CIV. CODE § 1795.90 because they purchased their vehicles for purposes other than for resale.

277.    Subaru is a "manufacturer" because it manufactures vehicles for distribution within California.

278.    Subaru's warranty expansion constitutes an "adjustment program" under CAL. CIV. CODE § 1795.90 because Subaru offers to pay for the cost of repairing the defect, which may substantially affect Class Vehicle durability, reliability, or performance.  Subaru's program is not limited to ad hoc adjustments made on a case-by-case basis and is not part of a safety or emissions recall.

279.   Although many owners and lessees have presented Class Vehicles to Subaru dealerships with complaints that the vehicles are consuming too much oil, Subaru failed to tell drivers that their vehicles are defective and claimed the oil loss was acceptable, and not indicative of a defect requiring warranty repairs or replacements.  As a result, a number of drivers who presented their Class Vehicles at Subaru dealerships, because they were suffering engine oil loss, were denied warranty repairs and instead told there was nothing wrong with their vehicles.

280.   On November 5, 2013, Subaru adjusted the scope of its warranty coverage.  Pursuant to the adjusted scope, Subaru would repair Class Vehicles' engine blocks and/or piston rings if the vehicles were (i) still within 5 years and 60,000 miles, and (ii) experiencing oil loss of at least 1/3 of a quart per 1,200 miles.  When that amount of oil or more is being lost by a Class Vehicle within the 5-year, 60,000-mile powertrain warranty period, no further diagnostics are required, and piston ring system repairs are provided for free.

281.   Subaru had a duty to notify all owners or lessees of the Class Vehicles eligible under the adjustment program described above of the terms and conditions of the program within ninety (90) days of the program's implementation.  Subaru failed to provide this notification.  Many drivers still do not know there is a defect, do not know Subaru will repair it for free under warranty, and are thus unable to make informed decisions or knowledgably assert their rights.

282.   As a result of the above conduct in violation of California's secret warranty law, Plaintiffs and the other California Class members have been harmed in that they have been unable to obtain the repairs to which they are entitled and/or have continued to incur repair and/or maintenance costs.  Plaintiffs seek all available equitable relief, including an injunction requiring Defendants to comply with California's secret warranty statute by, among other things, adequately disclosing the warranty expansion to drivers of Class Vehicles.

**COUNT XIV**
**VIOLATIONS OF THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2301,** *et seq.***)**
**(On Behalf of the Emissions Warranty Class)**

283.   Plaintiffs and the Emissions Warranty Class incorporate by reference each preceding paragraph as though fully set forth herein.

284.   Plaintiffs Keith Yaeger, Michael Schuler, Joseph Montgomery, Bryan Bair, Thomas Vanlaarhoven, Laura Hegle, Kim Marie Papa, Robert Tedesco, Jr., and Natalia Tuzovskaya ("Plaintiffs" for purposes of this Count) bring this Count on behalf of the Emissions Warranty Class.

285.   The Class Vehicles are "consumer products" under 15 U.S.C. § 2301(1).

286.   Plaintiffs and the members of the putative Class are "consumers" under 15 U.S.C. § 2301(3).

287.    Defendants are "suppliers" and "warrantors" within the meaning of 15 U.S.C. § 2301(4)-(5).

288.    Defendants provided all purchasers and lessors of Class Vehicles written warranties as defined by 15 U.S.C. § 2301(6).

289.    Under the emissions warranty, which is mandated by California, New Jersey, Washington, and other states' laws, Subaru is obligated to repair any defective emissions related part over a certain cost threshold through the earlier of 7 years and 70,000 miles.  CAL. HEALTH & SAFETY CODE § 43205; 13 CAL. CODE REGS. § 2035, *et seq.*; REGS. CONN. STATE AGENCIES § 22a-174-36b; 06-096 CMR Ch. 127, § 5; MD. CODE REGS. § 26-11-34; 310 CODE MASS. REGS. § 7:40; N.J. ADMIN. CODE § 7:27-29.10; OR. ADMIN. RULES 340-257-0050; 25 PA. ADMIN. CODE § 126.431; R.I. ADMIN. CODE § 25-4-37:37.6; VT. ADMIN. CODE 16-3-100:5-1102 & 1104; VT. ADMIN. CODE 16-3-100: Appendix F; WASH. ADMIN. CODE 173-423-070.

290.    The engine block, pistons and piston rings in the Class Vehicles are "warranted parts," under 13 CAL. CODE REGS.§ 2035 and the laws of the states that have incorporated California's emissions warranty law, because the parts affect vehicle emissions.  The parts are "High Priced" emissions-related parts under 13 CAL. CODE REGS. § 2037 and the laws of the states that have incorporated

California law because the cost of replacing them, including labor and diagnosis, has consistently exceeded $550.

291.   Defendants breached this warranty by selling and leasing Class Vehicles with the Oil Consumption Defect, requiring repair or replacement within the applicable warranty period, and refusing to honor the warranty by repairing or replacing the defective parts free of charge during the applicable warranty period.

292.   Subaru's TSBs state Subaru's intent not to honor its emissions warranty obligations and perform repairs within the 7-year/70,000 mile duration of that warranty.

293.   Subaru's breach of warranty has deprived Plaintiffs and other Emissions Warranty Class members of the benefit of their bargain.

294.   The amount in controversy of the Plaintiffs' individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

295.   Plaintiffs Yaeger, Montgomery, and Hegle notified Subaru in writing of its Magnuson-Moss violations in September 2014, requesting that Subaru cure its violvations.

296.   Subaru did not respond to Plaintiffs' notice by curing its violations as described in 15 U.S.C. § 2310(e).

297.   Plaintiffs have thus afforded Defendants a reasonable opportunity to cure the breaches of written warranty, and resorting to any informal dispute settlement procedure would be unnecessary and futile.  At the time of sale to Plaintiffs, Defendants knew, should have known, or were reckless in not knowing of the defect but nevertheless failed to rectify the situation or disclose it to Plaintiffs.  Moreover, the remedies available through any informal dispute settlement procedure would be wholly inadequate under the circumstances. Accordingly, any requirement under the Magnuson-Moss Warranty Act or otherwise that Plaintiffs resort to any informal dispute settlement procedure and/or afford Defendants a reasonable opportunity to cure its breach of written warranty to Plaintiffs is excused and thereby deemed satisfied.

298.   As a direct and proximate result of Defendants' conduct, Plaintiffs and other Emissions Warranty Class members have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease, that is, the difference between the value of the vehicle as promised and the value of the vehicle as delivered.  Additionally, Plaintiffs and other class members either have incurred or will incur economic damages tied to repair and maintenance costs. Plaintiffs and members of the Emissions Warranty Class are entitled to legal and equitable relief against Defendants, including damages, specific performance, attorney fees, costs, and other relief as appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all proposed Class members, respectfully requests that this Court:

A.      determine that the claims alleged herein may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying one or more Classes as defined above;

B.      appoint Plaintiffs as the representatives of the Classes and their counsel as Class counsel;

C.      award all actual, general, special, incidental, statutory, punitive, treble, and consequential damages to which Plaintiffs and the Class members are entitled;

D.      award pre-judgment and post-judgment interest on such monetary relief;

E.      grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendants to repair, recall, and/or replace the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiffs and Class members with appropriate curative notice regarding the existence and cause of the defect;

F.      award reasonable attorneys' fees and costs; and

G.      grant such further relief that this Court deems appropriate.

## JURY DEMAND

Plaintiffs, on behalf of themselves and the putative Class, demand a trial by jury on all issues so triable.

Dated:  November 14, 2014                    Respectfully submitted,

By:     *//s// Matthew D. Schelkopf*
        Joseph G. Sauder
        Matthew D. Schelkopf
        Benjamin F. Johns
        **CHIMICLES & TIKELLIS LLP**
        One Haverford Centre
        361 West Lancaster Avenue
        Haverford, PA 19041
        Telephone: (610) 642-8500
        Facsimile: (610) 649-3633
        E-mail: JGS@chimicles.com
        MDS@chimicles.com
        BFJ@chimicles.com

        Richard D. McCune
        Jae K. Kim
        Michele M. Vercoski
        **MCCUNEWRIGHT, LLP**
        2068 Orange Tree Lane, Ste. 216
        Redlands, CA  92374
        Telephone: (909) 557-1250
        Facsimile: (909) 557-1275
        E-mail: rdm@mccunewright.com
        jkk@mccunewright.com
        mmv@mccunewright.com

Eric H. Gibbs
Dylan Hughes
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: ehg@girardgibbs.com
dsh@girardgibbs.com

Matthew R. Mendelsohn
**MAZIE SLATER KATZ &
FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone:  (973) 228-9898
Email: mmendelsohn@mskf.net

Sherrie R. Savett
Eric Lechtzin
**BERGER & MONTAGUE, P.C.**
1622 Locust Street
Philadelphia, PA 19103
Telephone:  (215) 875-3038
Facsimile: (215) 875-4613
Email: ssavett@bm.net
elechtzin@bm.net

J. Gordon Rudd
**ZIMMERMAN REED, PLLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone:  (612) 341-0400
Facsimile: (612) 341-0844
Gordon.Rudd@zimmreed.com

*Attorneys for Plaintiffs and the Class*