# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| KEITH YAEGER, MICHAEL SCHULER, JOSEPH MONTGOMERY, BRYAN BAIR, THOMAS VANLAARHOVEN, LAURA HEGLE, KIM MARIE PAPA, ROBERT TEDESCO, and NATALIE TUZOVSKAYA, individually and on behalf of all others similarly situated, | Consolidated Action Nos. 1:14-cv-4490-JBS-KMW and 1:14-cv-6317-JBS-KMW |
| Plaintiffs, | **CLASS ACTION** |
| v. | **DOCUMENT ELECTRONICALLY FILED** |
| SUBARU OF AMERICA, INC., a New Jersey Corporation, and FUJI HEAVY INDUSTRIES, LTD., a Japanese Corporation, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT SUBARU OF AMERICA, INC.'S MOTION TO DISMISS PLAINTIFFS' MASTER CONSOLIDATED COMPLAINT

H0041280.3

# TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................1

II.   STATEMENT OF FACTS .......................................................................3

III.  STANDARD OF REVIEW ......................................................................7

IV.   ARGUMENT ............................................................................................7

    A.   Plaintiffs' Request For Injunctive Relief Is Not Preempted ................7

        1.   An Injunction Need Not Resemble A NHTSA Recall ..............7

        2.   Recall-Related Injunctive Relief Is Not Preempted..................8

    B.   Plaintiffs' Demand For Injunctive Relief Should Not Be
       Dismissed On Primary Jurisdiction Grounds ......................................12

    C.   Plaintiffs Allege Plausible Claims for Breach of the Emissions
       Warranty Under the Magnuson-Moss Warranty Act ..........................14

    D.   The New Jersey Claims Asserted by the Non-New Jersey
       Plaintiffs Should Not be Dismissed. ...................................................18

    E.   Plaintiffs' Claim For Violation of California's Secret
       Warranty Law Should Not be Dismissed.............................................21

    F.   Plaintiffs' New York Consumer Protection
       Claims May Be Dismissed ..................................................................23

    G.   The Implied Warranty Claims Should Not be Dismissed...................23

    H.   Plaintiff Hegle's Warranty Claims Should Not Be Dismissed ..........26

I.      Plaintiffs Have Sufficiently Alleged Their Claim for
        Breach of the Covenant of Good Faith and Fair Dealing ...................27

        1.      New Jersey ............................................................28

        2.      California  ...........................................................30

        3.      Connecticut .........................................................32

        4.      New York ............................................................32

        5.      Pennsylvania and Florida ...........................................33

V.      CONCLUSION...............................................................33

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alin v. Am. Honda Motor Co.*,
No. 08-4825, 2010 WL 1372308 (D.N.J. Mar. 31, 2010) .....................28, 29, 30

*Arthur v. Maersk, Inc.*,
434 F.3d 196 (3d Cir. 2006) ...............................................................33

*Baykeeper v. NL Industries*,
660 F.3d 686 (3d Cir. 2011) ...............................................................12

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)...........................................................................7

*Brown v. Grass*,
544 Fed. Appx. 81 (3d Cir. 2013).........................................................27

*Bruesewitz v. Wyeth Inc.*,
561 F.3d 233 (3d Cir. 2009) ...............................................................10

*Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Associates*,
182 N.J. 210, 864 A.2d 387 (2005) .......................................................30

*Bussian v. DaimlerChrysler Corp.*,
411 F. Supp. 2d 614 (M.D.N.C. 2006) ..............................................12, 13

*Carma Developers (Cal.), Inc. v. Marathon Development Cal., Inc.*,
2 Cal.4th 342 (1992) .........................................................................31

*Chamberlan v. Ford Motor Co.*,
314 F.Supp.2d 953 (N.D. Cal. 2004).............................................*passim*

*Coba v. Ford Motor Co.*,
No.12-1622, 2013 WL 244687 (D.N.J. Jan. 22, 2013) ..................................29

*Ehrlich v. BMW of N. Am., LLC*,
801 F. Supp. 2d 908 (C.D. Cal. 2010) ....................................................22

*Farina v. Nokia Inc.*,
625 F.3d 97 (3d Cir. 2010) ..................................................................11

*Foman v. Davis*,
371 U.S. 178 (1962)....................................................................................33

*In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*,
No. CIV. A. 03-4558, 2010 WL 2813788 (D.N.J. July 9, 2010) .......................24

*In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig.*,
1993 WL 204116 (E.D. Pa. June 10, 1993)........................................................12

*Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga*,
175 Cal. App. 4th 1306 (2009) .........................................................................30

*Harper v. LG Elecs. USA, Inc.*,
595 F. Supp. 2d 486 (D.N.J. 2009)....................................................................19

*Henderson v. Volvo Cars of N. Am., LLC*,
No. 09-4146, 2010 WL 2925913 (D.N.J. July 21, 2010) ............................25, 26

*Holk v. Snapple Beverage Corp.*,
575 F.3d 329 (3d Cir. 2009) ..............................................................................10

*Hubbard v. Gen. Motors Corp.*,
No. 95 CIV. 4362, 1996 WL 274018 (S.D.N.Y. May 22, 1996) .......................24

*Johnson v. McCrackin-Sturman Ford, Inc.*,
527 F. 2d 257 (3d Cir. 1975) .............................................................................16

*Kost v. Kozakiewicz*,
1 F.3d 176 (3d Cir. 1993) ....................................................................................7

*Landmark Inv. Grp., LLC v. Chung Family Realty P'ship, LLC*,
10 A.3d 61 (Conn. App. 2010) ..........................................................................32

*Majdipour v. Jaguar Land Rover N. Am., LLC*,
No. 2:12-CV-07849, 2013 WL 5574626 (D.N.J. Oct. 9, 2013)........................29

*Maniscalco v. Brother Int'l (USA) Corp.*,
709 F.3d 202 (3d Cir. 2013) ........................................................................19, 20

*Marsikian v. Mercedes Benz USA*,
No. 08-04876, 2009 WL 8379784 (C.D. Cal. May 4, 2009)..........................9, 22

*McClain v. Octagon Plaza, LLC*,
  159 Cal.App.4th 784 (2008) ...............................................................................31

*McKinney v. Bayer Corp.*,
  744 F. Supp. 2d 733 (N.D. Ohio 2010) ...........................................................27

*McQueen v. BMW of N. Am., LLC*,
  No. 12-6674, 2013 WL 4607353 (D.N.J. Aug. 29, 2013).............................12, 13

*Montich v. Miele USA, Inc.*,
  849 F. Supp. 2d 439 (D.N.J. 2012) ...................................................................19

*Morris v. BMW of N. Am., LLC*,
  No. C 07-02827, 2007 WL 3342612 (N.D. Cal. Nov. 7, 2007) ........................26

*In re MyFord Touch Consumer Litig.*,
  --- F. Supp. 2d ----, No. C-13-3072 EMC, 2014 WL 2451291 (N.D.
  Cal. May 30, 2014) ...........................................................................................23

*O'Keefe v. Mercedes-Benz USA*,
  No. 01CV2902, 2002 WL 377122 (E.D. Pa. Jan. 31, 2002) ............................12

*People v. Gipson*,
  117 Cal. App. 4th 1065 (2004) .........................................................................16

*Pokorny v. Ford Motor Co.*,
  902 F.2d 1116 (3d Cir. 1990) ...........................................................................10

*Praxair, Inc. v. Gen. Insulation Co.*,
  611 F. Supp. 2d 318 (W.D.N.Y. 2009)..............................................................24

*Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*,
  No. 12-6590, 2013 WL 1431680 (D.N.J. Apr. 9, 2013) ...................................20

*Rosen v. J.M. Auto*,
  No. 07-61234, 2008 WL 9901501 (S.D. Fla. Mar. 6, 2008) .........................9, 13

*In re Samsung DLP TV Class Action Litig.*,
  No. 07-2141 (GEB), 2009 WL 3584352 (D.N.J. Oct. 27, 2009) ................19, 20

*Sanchez-Knutson v. Ford Motor Co.*,
  No. 14-61344-CIV, --- F.Supp.3d .....................................................................24

*Seidenberg v. Summit Bank*,
348 N.J. Super. 243 (App. Div. 2002) ........................................................28, 30

*Sons of Thunder v. Borden, Inc.*,
148 N.J. 396 (1997) ...............................................................................28

*Starbucks Corp. v. Wellshire Farms, Inc.*,
No. 14-0041, 2014 WL 6611308 (D.N.J. Nov. 21, 2014) ...................................19

*Stroderd v. Yamaha Motor Corp., U.S.A.*,
No. 04–3040, 2005 WL 2037419 (E.D. La. 2005) ...........................................10

*In re Toyota Hybrid Brake Mktg., Sales, Practices and Prods. Liab. Litig.*,
890 F. Supp. 2d 1210 (C.D. Cal. 2011) ...........................................................13

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*,
754 F. Supp. 2d 1145 (C.D. Cal. 2010) ...................................................9, 12, 23

*Velasco v. Chrysler Grp. LLC*,
No. 13-08080, 2014 WL 4187796 (C.D. Cal. Aug. 22, 2014) .........14, 15, 16, 17

*Wilson v. Amerada Hess Corp.*,
168 N.J. 236 (2001) ...............................................................................28

## STATUTES

CAL. CIV. CODE § 1795.90 ...............................................................................21

13 CAL. CODE REGS. §§ 2035, 2037 ...................................................................17

N.J. ADMIN. CODE § 7:27 ................................................................................14

N.J. REV. STAT. § 39:10-19 .............................................................................24

N.J. REV. STAT. § 56:10-27, § 56-10-28 ...........................................................24

RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 ...........................................19

## OTHER AUTHORITIES

Cong., *Hearing on "The GM Ignition Switch Recall: Why Did It Take So Long?"* 5 (2014) ..............................................................................13

# I.    INTRODUCTION

Subaru is right when it says that "All motor vehicles consume oil." But this case is not about older cars leaving a few drops of oil in the driveway. Subaru marketed the vehicles in this case as being "partial zero emission"—among the cleanest vehicles in the country—yet Subaru knew that once the new vehicles left the lot, they would start burning—not leaking—excessive amounts of oil. So much so that the class vehicles are major polluters, have worse-than-expected fuel economy, and can stall unexpectedly if not repaired in due course.

Subaru concealed the defect from prospective car buyers for years, leading hundreds of thousands to buy the defective vehicles. Even so, the circumstances today would be mitigated if Subaru were simply honest with drivers—telling them the problem exists and how to fix it—and by honoring its warranty to fix the vehicles. But Subaru does the opposite. Drivers are routinely denied repairs under warranty, are told there is no known problem, and are encouraged to constantly add oil and to keep driving the vehicles unrepaired. This practice is not safe, however, as burning this much oil can damage various components and can cause the vehicles to fail abruptly. Plaintiff Laura Hegle's vehicle, for example, after making repeated visits to Subaru dealerships, eventually bucked, lost power, and then stalled while she was driving on the highway.

Subaru apparently recognizes that its conduct is of the type that New Jersey and other states' consumer protection and warranty laws seek to prohibit, as Subaru's motion to

dismiss is quite narrow in scope.  The motion does not seek dismissal of Plaintiffs' whole case and does not contest the sufficiency of the allegations that Subaru knew of the defect from the beginning, yet to this day continues to deny its existence to drivers and continues to frustrate attempts to obtain warranty repairs.  Thus, Subaru does *not* seek dismissal of the following claims:

| Count | Description | Classes |
|-------|-------------|---------|
| I | New Jersey Consumer Fraud Act | New Jersey |
| II | Express Warranty | New Jersey<br>California[1]<br>Florida<br>New York<br>Pennsylvania |
| III | Implied Warranty of Merchantability | New Jersey<br>Connecticut<br>Pennsylvania |
| V | Consumer Legal Remedies Act | California |
| VI | Unfair Competition Law | California |
| VII | Florida Deceptive & Unfair Trade Practices Act | Florida |
| X | Connecticut Unfair Trade Practices Act | Connecticut |
| XI | Song-Beverly Consumer Warranty Act (Express Warranty) | California |
| XII | Song-Beverly Consumer Warranty Act (Implied Warranty) | California |

To the limited extent that Subaru does seek dismissal of certain of Plaintiffs' claims, Plaintiffs are willing to concede that the following claims can properly be dismissed:

---

[1] Plaintiffs Yaeger & Montgomery only.

| Count | Description | Classes |
|-------|-------------|---------|
| IV | Breach of the Duty of Good Faith and Fair Dealing | Florida Pennsylvania |
| VIII | New York General Business Law § 349 | New York |
| IX | New York General Business Law § 350 | New York |

Beyond those three claims, however, Subaru's motion mischaracterizes the operative complaint and disregards applicable case law, often obscuring the very simple factual point: Subaru knew about its vehicles' defect from the beginning yet failed to disclose that knowledge to customers.  This suit may proceed, and brings with it the potential to notify drivers about the defect and its risks, clarify Subaru's warranty obligations, and ensure Subaru does not profit unduly from its misconduct.

## II.   STATEMENT OF FACTS

About four years ago, Subaru introduced a new generation engine called the "FB." (Compl., at ¶ 101.)  Subaru installed the FB engine in five of its models during years between 2011 and 2014:  the Forester, Legacy, Outback, Impreza, and Crosstek.  (*Id.* at ¶ 104.)  Subaru marketed and sold each of the FB engine models as being partial zero emission vehicles, which means the vehicles are supposed to meet low emission standards.  (*Id.* at ¶ 106.)  In other words, the class vehicles are supposed to be among the cleanest gasoline powered vehicles in the country.  (*Id.*)  From the beginning, however, class vehicles have been far from the cleanest, regularly burning oil and releasing pollutants into the atmosphere.  (*Id.* at ¶¶ 116-19.)

Like all vehicles, the class vehicles use engine oil to lubricate the vehicles' pistons and cylinder walls.  (*Id.*at ¶ 107.)  The pistons have a ring on them (known as the oil control ring), which is designed to serve the crucial purpose of pulling away excess oil so that most of the oil used to lubricate the pistons is *not* sent into the combustion area and burned along with gasoline.  (*Id*. at ¶¶ 108-09.)  This is important for a variety of reasons ranging from the technical (burning oil can damage internal components), to the practical (burning oil in the combustion process worsens fuel economy, decreases engine performance, and pollutes the environment).  (*Id*. at ¶¶ 112, 116.)

Subaru has known from the beginning that the oil control rings in the class vehicles do not integrate properly with their surrounding parts.  (*Id.*at ¶¶ 111, 121-35.)  Even though the rings are supposed to last as long as the vehicles themselves, the rings wear down almost immediately, and allow substantial amounts of oil to be burned off into the atmosphere.  (*Id*. at ¶ 111.)  Accordingly, the supposed partial zero emission vehicles are actually major polluters, with worsened fuel economy, with various internal parts (such as oxygen sensors, the catalytic converter, and even the engine) that can abruptly fail.  (*Id*. at ¶¶ 112, 116, 119-20.)

When concerned drivers call Subaru or return to dealerships with their vehicles, they are often told the same story that Subaru told in its motion to dismiss: Oil consumption is normal; there's nothing wrong with your vehicle.  (Compl., at ¶¶ 131, 134-35.)  Many drivers are thus sent home without repairs, while the more "fortunate"

drivers are permitted to pay for oil consumption tests—which require frequent return trips to the dealership over the course of several months.  (*Id.* at ¶ 144.)  The oil consumption test monitors how much oil the vehicles are burning, and during much of the relevant time period, Subaru refused to repair any vehicle that was not burning at least a quart of oil per 1,200 miles (even though that rate alone is enough to burn *all* of a vehicle's oil between Subaru's regularly-scheduled oil changes).  (*Id.* at ¶¶ 145-46, 148.)  Some drivers grow so frustrated with this process that they trade in their vehicles (at a loss) for a different model, and at least one Plaintiff did so only to find out that the newer Subaru model has the exact same problem.  (*Id.* at ¶¶ 25-26, 65-67.)

All the while, Subaru's actions internally acknowledge that the defect poses a major problem.  (*Id.* at ¶¶ 113-15, 122-35.)  Subaru has so far issued four different bulletins to its dealerships—though Subaru has not shared them with drivers—and in the bulletins Subaru candidly acknowledges that it knows about the problem, that the defect causes class vehicles to burn engine oil at rates "consistently higher than normal," and that the problem will persist until a repair requiring more than ten hours of labor is performed.  (*Id.* at ¶¶ 114-15.)  In the bulletins, Subaru also alters its warranty coverage for the defect: rather than denying warranty coverage unless a *full quart* of oil burns, dealerships can provide warranty repairs if just *one-third of a quart* burns every 1,200 miles.  (*Id.* at ¶¶ 152-154.)  This too is kept a secret from drivers, so those who were previously denied warranty repairs under the full quart threshold are not notified of the change, and those

presently seeking repairs may or may not be told of the policy (and if they're not notified, they of course have no way to knowledgably assert their warranty rights). (*Id.* at ¶ 155.)

As time passes, the defect worsens. (*Id.* at ¶ 3.) For drivers who Subaru strings along until their vehicles are out of warranty, the repairs can cost thousands of dollars. (*Id.* at ¶¶ 115, 151, 155.) Meanwhile, as class members continue to drive their vehicles, various components (such as the oxygen sensors, catalytic converters, and the engine) are increasingly at risk of sudden failure. (*Id.* at ¶¶ 116, 119.) Laura Hegle, one of the named plaintiffs, learned this the hard way. After visiting her Subaru dealership repeatedly, her vehicle eventually became so oil-clogged that it failed violently: While she was driving on the freeway with a semi-truck behind her and a motor home driving alongside, her vehicle bucked violently, lost power, and stalled. (*Id.* at ¶ 64.) Ms. Hegle was fortunate not to be hurt, but it is likely only a matter of time before a serious accident does occur as a result of this condition.

Through this lawsuit, Plaintiffs seek certification of a class and an order requiring Subaru to make its customers whole. (*Id.* at ¶ 6 and pgs. 90-91.) Appropriate relief will likely need to take several forms, ranging from a declaration of drivers' warranty rights and an order that requires Subaru to honor its warranty obligations, to remuneration for consumers' out-of-pocket costs. (*Id.*) In short, Plaintiffs view this case as their only means to hold Subaru accountable for deceiving them at the point of sale and for shirking its responsibilities ever since.

### III.   STANDARD OF REVIEW

Under the liberal pleading standard of FED. R. CIV. P. 8(a), only "a short plain statement of the claim showing that the pleader is entitled to relief" is required, the purpose of which is to place the opposition on notice of the conduct charged. A motion to dismiss should therefore be denied whenever a complaint alleges "enough factual matter (taken as true)" to plausibly suggest that a violation occurred. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (citation omitted). A court's task in resolving a Rule 12(b)(6) motion is to test the sufficiency of a complaint, not to resolve disputed facts or decide the merits of the case. *See Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).

### IV.   ARGUMENT

#### A.   Plaintiffs' Request For Injunctive Relief Is Not Preempted.

Subaru asks the Court to dismiss Plaintiffs' request for an injunction on preemption grounds. Since federal law empowers the National Highway Traffic Safety Administration ("NHTSA") to administer automotive recalls, Subaru argues that this Court lacks the power to enjoin Subaru to do anything resembling a recall—even something as basic as notifying drivers about the defect and its risks. Subaru's arguments fail for two reasons.

#### 1.   An Injunction Need Not Resemble A NHTSA Recall.

As a preliminary matter, Subaru's arguments do not apply to much of the injunctive relief that Plaintiffs are requesting and that the Court might conceivably enter after adjudicating the merits. Although Subaru implies that any injunction the Court might enter

would take the form of a recall, this ignores the fact that Subaru's conduct remains ongoing and therefore subject to distinct forms of injunctive relief.  (Compl. at ¶¶ 142, 149, 155.)  Three examples:

- Subaru, by its own admission, refuses to repair defective vehicles pursuant to the emissions warranty obligations imposed by the laws of New Jersey and eleven other states.  (Def. Mem. at 11.)  An injunction could require Subaru to honor its warranty obligations.  (Compl. at ¶¶ 292, 298.)

- Plaintiffs allege Subaru altered the scope of its warranty coverage, but did so secretly, without telling drivers.  (Compl. at ¶¶ 4, 6, 282.)  An injunction could require Subaru to notify drivers of this change.

- Subaru dealerships will likely continue to sell pre-owned vehicles for years to come.  An injunction could require disclosure of the defect so prospective customers can make informed decisions about whether they still want to buy the defective vehicles.

In sum, while the proper scope of any injunction will depend on how the merits of Plaintiffs' claims are ultimately resolved, there are available forms of injunctive relief that bear no resemblance to a NHTSA-supervised safety recall.

### 2.    Recall-Related Injunctive Relief Is Not Preempted.

Should Plaintiffs ultimately prevail on the merits, they may also request that the Court enter an injunction that provides drivers with relief similar to what an administrative recall would achieve.  For instance, Plaintiffs believe that drivers should be told their

vehicles can harm the environment and jeopardize driver safety.  A Court-ordered notice

could be particularly important if Subaru dealerships continue to tell customers that their oil

loss is normal and they have nothing to worry about.  (Compl. at ¶¶ 3, 151.)  An injunction

could also require Subaru to stop charging drivers for out-of-warranty repairs.  The Court

would not be ordering Subaru to implement new or different repairs, only requiring that

Subaru remedy its concealment of a serious defect by providing existing repairs free of

charge.

 Should Plaintiffs ultimately request injunctive relief that resembles aspects of a

NHTSA recall, dismissal on preemption grounds would be improper.  While Subaru cites

decade-old decisions that favor its position, it fails to acknowledge more recent rulings to

the contrary.  *See, e.g.*, *Marsikian v. Mercedes Benz USA*, No. 08-04876, 2009 WL

8379784, at *8 (C.D. Cal. May 4, 2009) (following *Chamberlan v. Ford Motor Co.*, 314

F.Supp.2d 953 (N.D. Cal. 2004), due to the fact that "in an extremely thorough analysis,

the [Chamberlan] court determined that Congress did not intend that there be an exclusive

and uniform federal remedy for motor vehicle defects"); *Rosen v. J.M. Auto*, No. 07-61234

, 2008 WL 9901501, at *2-4 (S.D. Fla. Mar. 6, 2008) (rejecting argument that "Plaintiffs'

claims for a recall or other injunctive relief" were conflict preempted); *In re Toyota Motor*

*Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*, 754 F. Supp.

2d 1145, 1194 (C.D. Cal. 2010) (holding that the *Marksikian* and *Chamberlan* cases were

more persuasive than the *Bridgestone* case cited by Subaru); *see also Stroderd v. Yamaha Motor Corp., U.S.A.*, No. 04–3040, 2005 WL 2037419, at \*5 (E.D. La. 2005).

*Chamberlan* and the other decisions listed above discuss in depth the sound reasons for rejecting Subaru's preemption argument. Perhaps most importantly, unlike the cases Subaru cites, *Chamberlan*, et al., are consistent with—and in some cases specifically rely upon—Third Circuit jurisprudence holding that: (1) a presumption against preemption applies, and (2) Congress's primary goal in enacting the Safety Act was <u>safety</u>, not uniformity.

On the first point, the Third Circuit has long recognized "there is generally a presumption against pre-emption." *Pokorny v. Ford Motor Co.*, 902 F.2d 1116, 1122 (3d Cir. 1990). This presumption applies whenever a case falls within an area "of traditional state regulation." *Holk  v. Snapple Beverage Corp.*, 575 F.3d 329, 334 (3d Cir. 2009). The question then becomes what "area" of law this case deals with: Subaru, on the one hand, focuses very narrowly on the area of automotive recalls. (Def. Mem. at 7.) But the Third Circuit's typical practice is to focus on broader areas—here, that would be the areas of vehicle safety and consumer protection. *See, e.g., Chamberlan*, 314 F. Supp. 2d at 959 (citing *Noel v. United Aircraft Corp.*, 342 F.2d 232, 242 (3d Cir.1964) ("States historically have provided injunctive remedies in the field of vehicle safety."); *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 240 (3d Cir. 2009) (applying presumption against preemption because it was "beyond refute" that "issues of health and safety have traditionally fallen within the

province of state regulation."), *aff'd sub nom.*, 562 U.S. 223 (2011); *Farina v. Nokia Inc.*, 625 F.3d 97, 116 (3d Cir. 2010) (applying the presumption because "state governments have traditionally regulated the field of public health and welfare").

On the second point—the primary goal of the Safety Act—Subaru's argument merely repeats the analysis of cases that did not adhere to Third Circuit jurisprudence.  In fact, Subaru makes the same argument rejected in cases like *Chamberlan* when it argues that a court-ordered recall (or something like it) would frustrate Congress's goal of having recalls uniformly administered by a single federal agency.  *Compare Chamberlan*, 314 F. Supp. 2d at 962 (defendant argued "that Congress' main goal … was to ensure uniform federal oversight of motor vehicle defect notification and correction"); *with* (Def. Mem. at 8-9) ("Parallel, competing systems of court-ordered and supervised recalls would undermine and frustrate the Safety Act's objectives of prospectively protecting the public interest through a scheme of administratively enforced remedies.").  The Third Circuit is on record, in a passage quoted in *Chamberlan*, that the primary goal of the Safety Act was safety, not uniformity:

> It remains our view, as it was in *Pokorny*, that ***uniformity was merely a secondary concern to Congress*** when it enacted the Safety Act. Accordingly, ***uniformity cannot take precedence over Congress's primary goal of safety***, nor can it defeat Congress's intent, as set out in section 1397(k) of the Act to permit state common law to develop more stringent design requirements in the interest of increased safety. ***Strict uniformity may even interfere with the safety goal***, thus frustrating the Act's purpose. … Therefore, even though state common law may have some negative effect on uniformity, it is not preempted.

*Chamberlan*, 314 F. Supp. 2d at 962-63 (quoting *Buzzard v. Roadrunner Trucking Inc.*, 966 F.2d 777, 783-84) (3d Cir. 1992) (emphasis added); *accord In re Toyota Unintended Acceleration*, 754 F. Supp. 2d at 1198, n.33 (quoting *Buzzard*, 966 F.2d at 783-84).

Because Third Circuit jurisprudence underlies and thus favors the line of cases supporting Plaintiffs' position, Plaintiffs' prayer for injunctive relief is not preempted, even to the limited extent it does seek recall-like relief.

### B.    Plaintiffs' Demand For Injunctive Relief Should Not Be Dismissed On Primary Jurisdiction Grounds.

Subaru's one-paragraph primary jurisdiction argument relies heavily on yet another out-of-circuit opinion, *Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614 (M.D.N.C. 2006), but the test applied in that case differs from the Third Circuit's standard.  *Compare with Baykeeper v. NL Industries*, 660 F.3d 686, 691 (3d Cir. 2011) (requiring consideration of two additional factors which support Plaintiffs' position).  Judge Chesler recently applied the Third Circuit's factors in the automotive safety context and rejected the application of primary jurisdiction.  *McQueen v. BMW of N. Am., LLC*, No. 12-6674, 2013 WL 4607353, at *5 (D.N.J. Aug. 29, 2013) ("cases like the one at bar are only very rarely referred to the NHTSA"); *see also In re General Motors Corp. Pickup Truck Fuel Tank Prods. Liab. Litig.*, 1993 WL 204116, at *5-6 (E.D. Pa. June 10, 1993) (rejecting primary jurisdiction argument since the warranty and state law claims were "ordinarily ones which the court decides"); *see also O'Keefe v. Mercedes-Benz USA*, No. 01CV2902, 2002 WL

377122, at *4 (E.D. Pa. Jan. 31, 2002) (rejecting "primary jurisdiction" argument since "nothing in the Safety Act prohibits liability under common law claims.").

Also, even if the *Bussian* test did apply in this circuit, this case is different from *Bussian* since there is no recall or NHTSA investigation underway. *McQueen*, 2013 WL 4607353, at *5 ("cases … which are dismissed are usually dismissed because of an ongoing investigation by the NHTSA); *In re Toyota Hybrid Brake Mktg., Sales, Practices and Prods. Liab. Litig.*, 890 F. Supp. 2d 1210, 1223 (C.D. Cal. 2011) (distinguishing *Bussian* on the ground that no recall was underway); *see also Rosen*, 2008 WL 9901501, at *4, n.5 ("the cases cited by the Defendant … at most suggest that the Court should defer to decisions of the NHTSA … when the agency has already taken jurisdiction and acted."). As things stand, there is little possibility of a NHTSA-mandated recall occurring. Not only does Subaru steadfastly deny that the defect is dangerous, but even though the NHTSA has been receiving complaints for nearly three years, (Compl. at ¶ 129), it has not opened a preliminary investigation, which would be a necessary first step to mandating a recall (an action the agency has taken only once in the past 30-plus years).[2]

---

[2] Prior to the recall of Takata airbags in November 2014, NHTSA had not issued a mandatory recall since 1979. *See* Nat. Highway Transportation Safety Agency, USDOT Calls for National Recall of Defective Takata Driver Side Air Bags, NHTSA 45014 (Nov. 18, 2014), *available at* http://www.nhtsa.gov/About+NHTSA/Press+Releases/2014/DOT-calls-for-national-recall-of-takata-driver-air-bags; Memorandum from Staff of H.R. Comm. on Energy and Commerce, 113th Cong., *Hearing on "The GM Ignition Switch Recall: Why Did It Take So Long?"* 5 (2014), *available at*

### C.     Plaintiffs Allege Plausible Claims for Breach of the Emissions Warranty Under the Magnuson-Moss Warranty Act.

Subaru next seeks dismissal of Plaintiffs' claim that Subaru violates the

Magnuson-Moss Warranty Act by breaching the emissions warranty obligations

imposed upon it by the laws of New Jersey and eleven other states.  Although

Plaintiffs allege that Subaru's warranty obligations arise under state law, Subaru

seeks dismissal on the sole ground that Subaru did not list the parts at issue in the

warranty booklet that it distributed to customers.  Subaru does not challenge the

allegations that the class vehicles were marketed and sold as partial zero emission

vehicles or that the defect increases the vehicles' pollution, and Subaru freely

acknowledges that it is refuses to repair the defect pursuant to the emissions

warranty.  (Compl., ¶¶ 291-92; Def. Mem. at 11.)

New Jersey and eleven other states have codified state emissions warranty

laws, all of which are basically identical since they are modeled after the original

law enacted in California.  The emissions warranty law requires automotive

manufacturers like Subaru to warrant "any part … which affects any regulated

emission."  *Velasco v. Chrysler Grp. LLC*, No. 13-08080, 2014 WL 4187796, at

*12 (C.D. Cal. Aug. 22, 2014) (quoting 13 CAL. CODE REGS. §§ 2035, 2037); *see*

*also, e.g.*, N.J. ADMIN. CODE § 7:27.  The duration of the emissions warranty

---

http://democrats.energycommerce.house.gov/sites/default/files/documents/Memo-GM-Recall-Investigation-2014-3-31.pdf.

depends on the cost of repair.  If the cost is substantial enough to reach the "High Priced part" threshold (typically $550-$600), then rather than 3 years and 50,000 miles, the law imposes an emissions warranty of 7 years and 70,000 miles. *Velasco*, 2014 WL 4187796, at *12 (citing § 2037(b), (c)(2)).  The duration extends even further for High Priced parts installed in partial zero emission vehicles, like those at issue in this case, through the earlier of 8 years and 100,000 miles.  (Compl. ¶ 139; ECF No. 31-2 at 12.)

The key parts at issue in this case—the pistons and their oil control rings— fall squarely within the law's High Priced part definition.  First, the parts play a major role in regulating emissions:  The primary function of a piston's oil control ring is to minimize the amount of oil burned by the engine—any additional oil burned leads directly to increased emissions.  (Compl. ¶¶ 107-12, 117-19).  Second, the repairs necessary to fix the defective class vehicles consistently cost well more than the High Priced part threshold, since the repairs typically require more than 10 hours of labor and can cost over $8,000.  (*Id*. at ¶ 115.)  Subaru is therefore violating state emissions warranty law, and thus the Magnuson-Moss Warranty Act, by refusing to repair the vehicles for free through the 8-year, 100,000-mile warranty period. (Def. Mem. at 11.)

Subaru's sole argument is that by simply choosing not to list the pistons as "covered" in its warranty booklet, the company is free and clear of warranty

obligation.  Accordingly, even though Subaru provides a warranty contract via the booklet to its customers, the scope of its emissions warranty obligations are defined by law.  *See Velasco*, 2014 WL 4187796, at *12-13.  "It is well settled the existing applicable law is part of every contract, the same as if expressly referred to or incorporated in its terms."  *People v. Gipson*, 117 Cal. App. 4th 1065, 1069 (2004) (citing *Farmers' & Merchants' Bank of Monroe, N.C. v. Fed. Reserve Bank of Richmond, VA*, 262 U.S. 649, 660 (1923)).  In other words, state emissions warranties can be read into Subaru's warranty booklet, since "[s]tatutory provisions of the state in which the contract is executed or performed become a part of the contract."  *Johnson v. McCrackin-Sturman Ford, Inc.*, 527 F. 2d 257, 268 (3d Cir. 1975).

Subaru tries to bring the list of "covered" parts in its warranty booklet within the imprimatur of the California Air Resources Board (CARB) by noting that Subaru submitted the list of covered parts to CARB before publishing the booklet. All automakers are required to submit such a list, but that does not mean the "decision already has been made" which parts are covered by the emissions warranty.  (Def. Mem. at 12.)  The regulation itself imposes no obligation on CARB to actually review or sign off on the submitted lists, and there is no allegation that any such review actually took place here.  In reality, even if CARB did review Subaru's list, the CARB executive officer must sift through and rely on

the information submitted by many different automakers for a host of different vehicles, and cannot realistically catch every omission that might occur.  *See* 13 CAL. CODE REGS. § 2037(c)(5)-(6).  That is why Subaru's warranty obligations are defined to include all parts that meet the definitions of "high-priced" and a "warranted part"; not just those that are identified by the automaker in the list provided to CARB and to consumers.

As the *Velasco* court explained, it is possible to gain great insight into CARB's expectations when it comes to the scope of emissions warranty coverage by simply reading CARB's "list of examples of emissions-related parts." *Velasco*, 2014 WL 4187796, at *13; (Pls.' Req. for Jud. Notice, Ex. A, at iv.)  As the *Velasco* decision reflects, the inclusion (or non-inclusion) of a particular part on this list is far more probative than the part's inclusion in the Subaru-crafted booklet.  *See Velasco*, 2014 WL 4187796, at *12.  In *Velasco*, like here, the part at issue was *not* listed in the emissions section of the manufacturer's warranty booklet, but the court proceeded with two points of further analysis:  First, whether CARB was likely to deem the part emissions-related (based on its inclusion in the CARB list of emission-related parts).  *Id*. at *13.  Second, whether the complaint sufficiently alleged that the part at issue directly impacted vehicle emissions.  *Id*. In this case, both points weigh in favor of Plaintiffs' claim.  CARB expressly identifies the piston as an example of an emissions-related part, (Pls.' Request for

Judicial Notice, Ex. A, at iv), and the Complaint provides substantial details about how the pistons and their oil control rings are essential for limiting the amount of oil that is burned off and released into the atmosphere as pollutants.  (Compl. at ¶¶ 1, 108-12, 116-19, 150.).  Plaintiffs' Magnuson-Moss emissions warranty claim should therefore not be dismissed.

### D.   The New Jersey Claims Asserted by the Non-New Jersey Plaintiffs Should Not be Dismissed.

Subaru next argues that the claims brought under New Jersey law by the non-New Jersey Plaintiffs should be dismissed.  (Def. Mem. at 13-23.)  The comprehensive choice of law analysis contemplated by Subaru, however, which spans some 10 pages of its brief, is premature because (i) there are two New Jersey Plaintiffs (Vanlaarhoven and Tuzovskaya) who unquestionably have standing to pursue all of the New Jersey claims asserted in the complaint, and (ii) each of the non-New Jersey plaintiffs also assert claims, in the alternative, under their home state's laws.  And while Subaru correctly notes that some courts have determined that a choice of law analysis was appropriate in connection with deciding a motion to dismiss,[3] there is no rule that such analysis must be undertaken at this preliminary stage.  To the contrary, "the decision about whether a choice-of-law issue is ripe or premature should be made on a case-by-case basis depending on the

---

[3] *See* Def. Mem. at 13, n.7.

facts presented.  *Montich v. Miele USA, Inc.*, 849 F. Supp. 2d 439, 445 (D.N.J. 2012).

Where, like here, the Court's choice of law analysis could benefit from a fuller factual record, it should be deferred.  *See In re Samsung DLP TV Class Action Litig.*, No. 07-2141 (GEB), 2009 WL 3584352, at *3 (D.N.J. Oct. 27, 2009) ("… it can be inappropriate or impossible for a court to conduct that analysis at the motion to dismiss stage when little or no discovery has taken place."); *Starbucks Corp. v. Wellshire Farms, Inc.*, No. 14-0041 (NLH/AMD), 2014 WL 6611308, at *5 (D.N.J. Nov. 21, 2014) (denying motion to dismiss, without prejudice to be raised on "a record more robust," in lieu of performing a § 188 analysis).  Indeed, New Jersey's choice-of-law analysis is "fact-intensive."  *See Harper v. LG Elecs. USA, Inc.*, 595 F. Supp. 2d 486, 490 (D.N.J. 2009).

Since discovery in this case is not yet underway, Plaintiffs are not yet able to offer proof on the various factors that are material to New Jersey's choice-of-law analysis, including the state in which Subaru's decision-makers (i) learned of the defect, (ii) decided to conceal it from consumers, (iii) decided against honoring the obligations imposed by the emissions warranty laws, and (iv) decided to keep the warranty expansion for the defect a secret.  *Cf. Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 210-11 (3d Cir. 2013) (discussing the potential weight of facts such as whether "all of the misconduct took place in New Jersey"); *see also*

*Prudential Ins. Co. of Am. v. Goldman, Sachs & Co.*, No. 12-6590, 2013 WL 1431680, at *4-5 (D.N.J. Apr. 9, 2013) (listing factors needed to appropriately weigh each state's contacts to the litigation).  Without discovery from Subaru, Plaintiffs are unable to present facts sufficient for the Court to conduct the robust analysis required by New Jersey's fact-intensive choice of law analysis.  *See, e.g.*, *In re Samsung DLP TV Class Action Litig.*, 2009 WL 3584352, at *3 (stating the court was unable to conduct New Jersey's fact-intensive governmental interest test based upon the pleadings).

*Maniscalo*, the primary case Subaru relies on, arose in the context of an appeal from a motion for summary judgment, involved a single plaintiff from South Carolina, and did not involve any contract-based claims.  *Maniscalco*, 709 F.3d at 208; *see also id.* at 210-11 (distinguishing *Tele-Aid* on the grounds that it was decided in the context of a motion to dismiss rather than summary judgment).  That opinion also explained that New Jersey's interest in deterring misconduct by corporations headquartered there

> might well be served by actions involving in-state plaintiffs or actions involving additional contacts within New Jersey without opening the floodgates to nation-wide consumer fraud class actions brought by out-of-state plaintiffs involving transactions with no connection to New Jersey other than the location of the defendant's headquarters.

*Id.* at 210.  As this language suggests, *Maniscalco* did not unequivocally hold that a non-New Jersey resident could *never* assert claims based on New Jersey law; it

would just require "additional contacts within New Jersey" for that to be appropriate.  As such, Plaintiffs respectfully request the Court defer a full choice of law analysis until the class certification proceedings.

### E.   Plaintiffs' Claim For Violation of California's Secret Warranty Law Should Not be Dismissed.

Under California law, automotive manufacturers may not secretly adjust the scope of their warranty coverage when they discover a defect affecting one of their models.  CAL. CIV. CODE § 1795.90; § 1795.92.  As discussed above, Subaru recently directed its dealerships to expand the scope of warranty coverage to any vehicle burning one-third of a quart of oil per 1,200 miles, whereas previously a vehicle had to burn three times that amount.  (Compl., at ¶¶ 152-54.)  Subaru has not notified drivers of this warranty adjustment, and Plaintiffs thus allege that Subaru violated California's "Secret Warranty" law.

Subaru contends that Plaintiffs' secret warranty claim "must be dismissed for one simple reason:  the plain language of the statute expressly excludes both safety and emissions *issues*."  (Def. Mem. at 28 (emphasis added).)  What that statute actually excludes is *recalls*—not "issues."  *See* CAL. CIV. CODE § 1795.90 ("other than service provided under a safety or emission-related recall campaign"). Subaru is not conducting either a safety-related campaign (which must be overseen by the NHTSA) or an emission-related campaign (which must be overseen by the EPA), and so its adjustment program falls under California's Secret Warranty law.

*Cf.  Ehrlich v. BMW of N. Am., LLC,* 801 F. Supp. 2d 908, 918, 920-21 (C.D. Cal. 2010) (finding that plaintiffs stated a claim for violation of the Secret Warranty law in a case involving an alleged safety issue); *Marsikian*, 2009 WL 8379784, at *6-7 (same).

As Subaru acknowledges, it has neither notified consumers nor issued a recall regarding the alleged defect.  (Def. Mem. 6-10.)  The Secret Warranty law exists precisely because automakers were avoiding official recalls (which require that consumers be promptly notified) by classifying their safety problems as mere "issues" that they would then address through technical service bulletins (TSBs)— "which have come to be known as 'secret warranties' (also known as silent recalls)."  Cal. Bill Analysis, Assem. Comm., 7/7/1993.  The Legislature found that the NHTSA's recall procedures did not provide enough protection for consumers precisely because there was "too much discretion left to automakers to decide what's 'safety-related.'"  Cal. Bill Analysis, Sen. Comm., 5/4/1993.  Studies of TSBs found that automakers were often using them for serious problems that could affect vehicle safety, *id.*, and that "people have been seriously injured and died in auto accidents where a manufacturer's defect, which was the subject of a secret warranty, was the cause of the accident."  Cal. Bill Analysis, Assem. Fl., 8/23/1993.   The Secret Warranty law was thus enacted to address issues exactly like this one here—where Subaru is minimizing a serious defect in its vehicle

rather than informing all consumers that the defect exists and that Subaru is providing free repairs. *Id.* By claiming that its service bulletins are safety-related, Subaru is not demonstrating that its conduct falls outside of the Secret Warranty law, but rather that it falls neatly within the law's purview.

### F.   Plaintiffs' New York Consumer Protection Claims May Be Dismissed.

Plaintiffs agree with Subaru that these statutory claims may be dismissed.

### G.   The Implied Warranty Claims Should Not be Dismissed.

Subaru argues that the California, Florida, and New York Plaintiffs cannot maintain implied warranty claims. (Def. Mem. at 30.) It points to older cases requiring vertical privity, but ignores more recent case law that established exceptions to the general rule and permits implied warranty claims to proceed against automakers.

California and Florida both recognize a third-party beneficiary exception to the requirement of vertical privity, and have used that exception to find that in automotive cases like this one—where the end-consumer is the intended beneficiary of the implied warranty that runs with automobiles—consumers can maintain implied warranty claims against the auto manufacturer. *In re MyFord Touch Consumer Litig.*, --- F. Supp. 2d ----, No. C-13-3072 EMC, 2014 WL 2451291, at *29-31 (N.D. Cal. May 30, 2014); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Products*, 754 F. Supp. 2d

1145, 1184-85 (C.D. Cal. 2010); *Sanchez-Knutson v. Ford Motor Co*., No. 14-61344-CIV, --- F.Supp.3d ----, 2014 WL 5139306, at *10-11 (S.D. Fla. Oct. 7, 2014).  Further, almost every state prohibits automobile manufacturers from selling directly to the public.  *See, e.g.*, N.J. REV. STAT. § 39:10-19.  All sales must instead take place through dealerships that have a franchise agreement with manufacturers, and manufacturers cannot own or operate dealerships.  N.J. REV. STAT. § 56:10-27, § 56-10-28.  As such, a strict privity requirement would have the effect of depriving all consumers of the protection of implied warranties.

New York likewise recognizes a third-party beneficiary exception to its privity requirement.  *Praxair, Inc. v. Gen. Insulation Co*., 611 F. Supp. 2d 318, 330 (W.D.N.Y. 2009).  But in permitting consumers to assert implied warranty claims against automakers, courts have generally used a different exception:  the "thing of danger" exception.  *See In re Ford Motor Co. E-350 Van Prods. Liab. Litig. (No. II)*, No. CIV. A. 03-4558, 2010 WL 2813788, at *74 (D.N.J. July 9, 2010) ("a vehicle with an alleged increased propensity to rollover is likely to be a thing of danger to foreseeable drivers and passengers"); *Hubbard v. Gen. Motors Corp.*, No. 95 CIV. 4362, 1996 WL 274018, at *5 (S.D.N.Y. May 22, 1996) ("a vehicle equipped with a defective braking system is likely to be a source of danger when driven").  As in the *Ford* and *Hubbard* cases, Plaintiffs have alleged that the breach of its implied warranty poses an unreasonable risk to safety.  (Compl. ¶

195.)  As discussed above, one of the Plaintiffs very nearly crashed on the freeway due to the defect.  (Compl. ¶ 2; *see also* ¶ 129 at 45 (driver reporting to the NHTSA that the engine could seize up and stall while driving at highway speeds)).  Under the "thing of danger" exception, Plaintiffs' implied warranty claims may therefore proceed under New York law.

In addition to its privity arguments, Subaru contends that each named plaintiffs' implied warranty claim should be dismissed because only one of their nine vehicles has become totally inoperable as a result of the alleged defect.  (Def. Mem. at 31.)  However, the implied warranty does more than only protect consumers against total inoperability.  It requires that a vehicle placed into commerce provide "safe, reliable transportation" and operate "substantially free of defects."  *Henderson v. Volvo Cars of N. Am., LLC*, No. 09-4146, 2010 WL 2925913, at *9 (D.N.J. July 21, 2010).  Plaintiffs' vehicles are far from safe and reliable, and certainly are not substantially free of defects.  Each has experienced excessive oil burning due to a defect that that allows a significant amount of oil to seep into the combustion chamber.  (Compl. ¶¶ 10-93.)  This is not a safe and reliable way for any vehicle's engine to perform.  Consequently, this has caused Plaintiffs to make repeated trips to repair facilities and resulted in a frightening experience for Ms. Hegle.  (*Id*.)  Under these circumstances, Plaintiffs are entitled to pursue implied warranty claims against Subaru for failing to deliver vehicles

substantially free of defects.  *See, e.g.*, *Henderson*, 2010 WL 2925913, at *9 (allegations that vehicles were predisposed to transmission problems sufficient to state a claim); *Morris v. BMW of N. Am., LLC*, No. C 07-02827, 2007 WL 3342612, at *8 (N.D. Cal. Nov. 7, 2007) (allegations that tires wore out abnormally quickly sufficient to state a claim).

### H.    Plaintiff Hegle's Warranty Claims Should Not Be Dismissed.

Subaru acknowledges that Plaintiff Hegle's vehicle "failed to provide reliable transportation."  (Def. Mem. at 33.)  Indeed, Plaintiff Hegle alleges that the initial vehicle she purchased became clogged with burnt oil and "bucked violently, lost power, and stalled" while she was driving on a busy highway.  (Compl. ¶ 64.) Subaru nevertheless contends that Plaintiff Hegle's breach of express and implied warranty claims should nevertheless be dismissed because "she does not allege that Subaru failed to repair her vehicle."  (Def. Mem. at 33.)

But the complaint contains several allegations concerning Subaru's failure to repair Ms. Hegle's vehicle under warranty.  First, as with many other drivers, even though Subaru knows there is a defect and knows of the serious problems it causes, Ms. Hegle was forced to return to the dealership repeatedly, and pay to undergo multiple oil consumption tests, before repairs were performed.  (Compl. ¶¶ 61-63.) Even then, the repairs were almost immediately proved inadequate, as less than a week later, Ms. Hegle was in the near-accident on the highway after her vehicle's

"exhaust system had clogged with burnt excess engine oil."  (*Id.* ¶ 64; *see also* ¶¶

116-20.)  At that point, Ms. Hegle lost faith in the dealership's ability to repair the

vehicle in a manner that would make it safe to drive, and she traded it in at a loss.

(*Id.* at ¶ 65.)  Unbeknownst to Ms. Hegle, the new vehicle had the same defect,

putting Ms. Hegle through yet another loop of repairs.  (*Id.* at ¶ 65-67.)

Accordingly, there are ample facts pled to plausibly state claims for breach of

warranty, particularly since those claims typically present questions of fact for a

jury to ultimately decide.  *See Brown v. Grass,* 544 Fed. Appx. 81, 85 (3d Cir.

2013); *McKinney v. Bayer Corp.*, 744 F. Supp. 2d 733, 755 (N.D. Ohio 2010)

(whether a warranty exists or was breached are questions of fact).  Accordingly,

Ms. Hegle's warranty claims should not be dismissed.

    **I.**    **Plaintiffs Have Sufficiently Alleged Their Claim for Breach of the Covenant of Good Faith and Fair Dealing.**

Finally, as discussed below, Subaru's challenges to Plaintiffs' claims for

breach of the covenant of good faith and fair dealing are without merit under New

Jersey law, as well as the laws of California, Connecticut, and New York.[4]

---

[4] While Plaintiffs contend that a choice of law analysis is premature at this juncture (see § IV.D., *supra*), they address each of the potentially applicable state laws below.

27

### 1.    New Jersey

Under New Jersey law, the covenant of good faith and fair dealing is implied in all contracts.  *Sons of Thunder v. Borden, Inc.,* 148 N.J. 396, 420 (1997).  It mandates that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."  *Id.*  Although this covenant cannot override an express term in a contract, it "has been utilized to allow redress for the bad faith performance of an agreement even when the defendant has not breached any express term."  *Seidenberg v. Summit Bank,* 348 N.J. Super. 243, 257 (App. Div. 2002); *see also Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 244 (2001).

The case of *Alin v. Am. Honda Motor Co.*, No. 08-4825, 2010 WL 1372308 (D.N.J. Mar. 31, 2010), and its progeny, are instructive.  *Alin* involved a plaintiff who leased a new Honda vehicle and was provided Honda's express warranty covering it for a number of years or miles.  Because the vehicle's air conditioning unit was defective, the plaintiff brought the vehicle to the dealer to make a claim under the warranty, but Honda denied the warranty claim.  The plaintiff then brought suit alleging claims of breach of express warranty and breach of the covenant of good faith and fair dealing.  *Id.* at *1-2.

In denying Honda's motion to dismiss such claims, the court found the plaintiff stated a viable claim because he had alleged "that Honda unfairly

exercised its discretion in not performing under the warranty by deciding not to notify [plaintiff] of the defects in the A/C system and by not covering the repair costs." *Id.* Subsequent courts have adopted the reasoning of *Alin. See, e.g., Coba v. Ford Motor Co.*, No.12-1622, 2013 WL 244687, at *7-8 (D.N.J. Jan. 22, 2013) (holding that allegations that Ford was aware of a fuel tank defect but failed to effectively remedy the defect under the express warranty were sufficient to survive motion to dismiss); *Majdipour v. Jaguar Land Rover N. Am., LLC*, No. 2:12-CV-07849, 2013 WL 5574626, at *21-22 (D.N.J. Oct. 9, 2013) (explaining that although there was no specific contractual obligation to notify customers of any alleged defect, such an obligation could be imposed by the implied covenant of good faith and fair dealing and, thus, allegations that Land Rover failed to alert customers that the suspension system was defective injured customers' were sufficient to survive the motion to dismiss). Accordingly, the Complaint sufficiently alleges a plausible breach of good faith and fair dealing claim since it alleges that Subaru failed to honor its applicable express warranties in good faith, failed to repair the defect, and failed to notify Plaintiffs and class members of its existence. (Compl. ¶ 188.)

Subaru also seeks dismissal of this claim on the basis that Plaintiffs failed to provide "proof of bad motive or intention," citing *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Associates*, 182 N.J. 210, 224, 864 A.2d 387 (2005).

(Def. Mem. at 37-38.)  This argument is unpersuasive.  While a claim for breach of the duty of good faith and fair dealing ultimately requires a showing of "bad motive or intention," all that is required at the pleading stage is an allegation of bad faith.  *See Seidenberg,* 348 N.J. Super. at 263 *Alin*, 2010 WL 1372308 at *11; *cf. Brunswick Hills*, 182 N.J. 210, 224-29 (proof of bad faith was established at a bench trial, not at the motion to dismiss stage).  Here, the Complaint *does* specifically and sufficiently alleges bad motive and intent.  It details Subaru's early knowledge of the defect from numerous sources and alleges its active concealment of the defect from customers, (Compl ¶¶ 108-122); outlines Subaru's systematic and intentional failure to honor the applicable express warranties, (Compl. ¶¶ 123-142); and alleges intent and bad faith under the allegations of several causes of action, (*see*, *e.g.,* Compl. ¶¶ 162, 189, 218, 230).  Therefore, Subaru's argument should be rejected.

### 2.    California

As in New Jersey, California law implies the covenant of good faith and fair dealing in every contract, and requires that neither party do anything that will injure the right of the other to receive the benefits of the contract.  *Habitat Trust for Wildlife, Inc. v. City of Rancho Cucamonga*, 175 Cal. App. 4th 1306, 1332 (2009) (citing *Cates Construction v. Talbot Partners*, 21 Cal.4th 28, 43 (1999)).  To state a cause of action for breach of the implied covenant of good faith and fair

dealing, "breach of a specific provision of the contract is not a necessary prerequisite.  Were it otherwise, the covenant would have no practical meaning, for any breach thereof would necessarily involve breach of some other term of the contract."  *Carma Developers (Cal.), Inc. v. Marathon Development Cal., Inc.*, 2 Cal.4th 342, 373 (1992) (internal citations omitted).  The covenant is intended to prevent a contracting party from engaging in conduct that does not technically transgress express terms, but which frustrates the other parties' benefits to the contract.  *McClain v. Octagon Plaza, LLC*, 159 Cal.App.4th 784, 806 (2008).

Subaru challenges Plaintiffs' claim under California law based on two logically contradictory assertions—first, that Plaintiffs failed to allege a specific contractual term that was frustrated, and second, that Plaintiffs rely on allegations that Subaru frustrated the terms of the express warranties.  (Def. Mem. at 34-36.) The first assertion is defeated by the second.  And, contrary to Subaru's contention, this claim that Subaru frustrated the express warranty is not duplicative of the breach of that warranty claim.  As discussed above, this claim is premised on the fact that Subaru failed to inform plaintiffs of the existence of the defect— something not explicitly required by the warranty, but which impedes drivers' ability to derive the benefit of the warranties.  As such, the claim should not be dismissed.

### 3.    Connecticut

While Subaru contends the obligation of good faith and fair dealing is "discussed almost exclusively in the insurance context," Connecticut law imposes on "every contract …an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Landmark Inv. Grp., LLC v. Chung Family Realty P'ship, LLC*, 10 A.3d 61, 75 (Conn. App. 2010) (internal quotations omitted).  Subaru challenges this claim because there are no allegations that Subaru acted in bad faith.  Once again, this overlooks numerous allegations in the Complaint that describe Subaru's bad faith conduct (*see infra*, Section IV.I.1), therefore, Plaintiffs' have met their burden to allege bad faith under this claim.

### 4.    New York

Subaru's sole argument with respect to New York law is that Plaintiffs' claim is duplicative of their breach of express warranty claim.  (Def. Mem. at 38.) As discussed in connection with the law of California above, Plaintiffs' claim that Subaru frustrated the express warranty is not duplicative of the claim for breach of those warranties because the claim relies on additional conduct such as Subaru's failure to tell drivers about the defect.  So for the same reasons discussed above, dismissal is not appropriate.

### 5.    Pennsylvania and Florida

Plaintiffs agree that the claim for breach of the covenant of good faith and fair dealing under the laws of Pennsylvania and Florida may be dismissed.

## V.    <u>CONCLUSION</u>

Plaintiffs appreciate the Court's attention to this matter and request the opportunity to answer any questions the Court may have at oral argument.  To the extent any portion of Subaru's motion is granted, Plaintiffs request leave to amend consistent with Rule 15(a), which provides that "leave shall be freely given when justice so requires."  FED. R. CIV. P. 15(a); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) (instructing that leave to amend should be freely granted "in the absence of ... undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party ... futility of amendment, etc."); *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204 (3d Cir. 2006) (reversing denial of leave to amend).


Dated:  January 9, 2014                    Respectfully submitted,

                                           By:    *//s// Matthew D. Schelkopf*
                                                  Joseph G. Sauder
                                                  Matthew D. Schelkopf
                                                  Benjamin F. Johns
                                                  Joseph B. Kenney
                                                  CHIMICLES & TIKELLIS LLP
                                                  One Haverford Centre
                                                  361 West Lancaster Avenue
                                                  Haverford, PA 19041

Telephone: (610) 642-8500
Facsimile: (610) 649-3633
E-mail: JGS@chimicles.com
MDS@chimicles.com
BFJ@chimicles.com
JBK@chimicles.com

Richard D. McCune
Jae K. Kim
Michele M. Vercoski
**MᴄCᴜɴᴇWʀɪɢʜᴛ, LLP**
2068 Orange Tree Lane, Ste. 216
Redlands, CA  92374
Telephone: (909) 557-1250
Facsimile: (909) 557-1275
E-mail: rdm@mccunewright.com
jkk@mccunewright.com
mmv@mccunewright.com

Eric H. Gibbs
Dylan Hughes
**GIRARD GIBBS LLP**
601 California Street, 14th Floor
San Francisco, CA 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846
Email: ehg@girardgibbs.com
dsh@girardgibbs.com

Matthew R. Mendelsohn
**MAZIE SLATER KATZ &
FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone:  (973) 228-9898
Email: mmendelsohn@mskf.net

Sherrie R. Savett
Eric Lechtzin
**BERGER & MONTAGUE, P.C.**

H0041280.3                              34

1622 Locust Street
Philadelphia, PA 19103
Telephone:  (215) 875-3038
Facsimile: (215) 875-4613
Email: ssavett@bm.net
elechtzin@bm.net

J. Gordon Rudd
**ZIMMERMAN REED, PLLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone:  (612) 341-0400
Facsimile: (612) 341-0844
Gordon.Rudd@zimmreed.com

*Attorneys for Plaintiffs and the Class*

## <u>CERTIFICATE OF SERVICE</u>

I, Matthew D. Schelkopf, certify that on January 9, 2015 I filed the

foregoing using the Court's CM/ECF system, thereby causing these materials to be

electronically served upon all counsel of record in this case.

*/s/Matthew D.* Schelkopf
Matthew D. Schelkopf
