IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| KEITH YAEGER, et al.,<br><br>             Plaintiffs,<br><br>    v.<br><br>SUBARU OF AMERICA, INC., *a New Jersey Corporation*, et al.,<br><br>             Defendants. | HONORABLE JEROME B. SIMANDLE<br><br>No. 1:14-cv-4490 (JBS-KMW)<br><br>**OPINION** |

**APPEARANCES:**

Joseph G. Sauder, Esq.
Matthew D. Schelkopf, Esq. (Argued)
Joseph B. Kenney, Esq.
McCUNE WRIGHT LLP
1055 Westlakes Drive
Suite 300
Berwyn, PA  19312

Richard D. McCune, Esq.
McCUNE WRIGHT LLP
2068 Orange Tree Lane
Suite 216
Redlands, CA  92374

Benjamin F. Johns, Esq. (Argued)
CHIMICLES & TIKELLIS LLP
One Haverford Centre
316 West Lancaster Avenue
Haverford, PA  19041

Eric Gibbs, Esq. (Appeared by Telephone)
GIRARD GIBBS, LLP
601 California Street, #1400
San Francisco, CA  94108
     *Attorneys for Plaintiffs and the Settlement Class*

Neal Walters, Esq.
Michael R. Carroll, Esq. (Argued)
Casey G. Watkins, Esq.
BALLARD SPAHR, LLP
210 Lake Drive East, Suite 200
Cherry Hill, NJ  08002-1163
        *Attorneys for Defendants*

Amy Lynn Bennecoff Ginsburg, Esq.
Robert Silverman, Esq.
Shannon Harkins, Esq. (Argued)
KIMMELL & SILVERMAN, P.C.
30 East Butler Pike
Ambler, PA  19002
        *Attorneys for Jose Melgar, Objector*

**SIMANDLE, Chief District Judge:**

## Table of Contents

Introduction.................................................. 3

I.   Factual Background, Procedural History and Terms of ....... Proposed Settlement ....................................... 6

 A.   Plaintiffs' Claims ...................................... 6

 B.   Terms of Proposed Settlement ............................ 9

II.  Certification of Proposed Settlement Class under Fed. R. Civ. P. 23(a) & (b)(3) .................................... 14

 A.   Numerosity Under Rule 23(a)(1) .......................... 15

 B.   Commonality Under Rule 23(a)(2) ......................... 15

 C.   Typicality under Rule 23(a)(3) .......................... 16

 D.   Adequacy of Representation under Rule 23(a)(4) ......... 17

 E.   Predominance and Superiority under Rule 23(b)(3) ....... 18

III. Whether Proposed Class Settlement is Fair, Reasonable and Adequate under Rule 23(e)(2) ........................... 20

 A.   Girsh & Prudential Factors ............................. 21

  1.   First Girsh Factor:  Complexity, Expense, and Likely Duration of the Litigation.................... 23

  2.   Second Girsh Factor:  Reaction of the Class to the Settlement....................................... 24

3.    Third <u>Girsh</u> Factor:  Stage of the Proceedings and
Amount of Discovery Completed ....................... 25

4. & 5.    Fourth and Fifth <u>Girsh</u> Factors:  Risks of
Establishing Liability and Damages...................... 27

6.    Sixth <u>Girsh</u> Factor:  Risks of Maintaining Class
Action Through Trial .................................. 29

7.    Seventh <u>Girsh</u> Factor:  Ability of Defendants to
Withstand a Greater Judgment ......................... 30

8. & 9.    Eighth and Ninth <u>Girsh</u> Factors:  Range of
Reasonableness of the Settlement in Light of the Best
Possible Recovery and All Attendant Risks of
Litigation ............................................... 30

B.    Consideration of Objections .......................... 36

   1.    General Objections ................................... 36

   2.    Submission on Behalf of Objector Jose Melgar .......... 51

C.    Summary of Determinations .............................. 58

D.    Quarterly Reporting Requirement ....................... 62

Conclusion................................................. 64

## <u>Introduction</u>

The nine named plaintiffs in this case are owners and
lessees of various Subaru vehicles who allege that their
vehicles suffer from an engine defect that caused these vehicles
to consume excessive engine oil.  Through their Master
Consolidated Complaint filed herein on November 17, 2014 [Docket
Item 29] ("Complaint"), plaintiffs sought certification of a
nationwide class of similarly situated persons and the grant of
classwide relief against defendants Subaru of America, Inc. and
Fuji Heavy Industries, Ltd.

The parties reached a Settlement Agreement in November 2015 to certify a nationwide class for settlement purposes and to afford significant relief to the class including oil consumption testing, certain repairs and replacements of engine components, reimbursements for certain past expenses including for excess oil consumption, and an extension of the warranty to cover repairs and replacements of parts necessary to address the oil consumption problem in class members' vehicles, all as described further below.

This Court gave preliminary approval to the proposed settlement and required due notice to members of the proposed class by Order entered January 19, 2016 [Docket Item 53], as amended January 27, 2016 [Docket Item 55].  Following notice of the proposed settlement to the owners and lessees of over 550,000 Subaru vehicles in the settlement class[1] and the opportunity for putative class members to object to the settlement terms or to opt out of the settlement, the matter of final approval of the proposed settlement, the settlement class,

---

[1] The settlement class vehicles include specified vehicles with Manual transmissions from the following model years:  2011-2015 Forester 2.5L, 2012-2015 Impreza 2.0L, 2013-2014 Legacy 2.5L, 2013-2014 Outback 2.5L, and 2013-2015 Crosstrek 2.0L; and also specified vehicles with Automatic or CVT transmissions including 2011-2014 Forrester 3.5L, 2012-2013 Impreza 2.0L, 2013 Legacy 2.5L, 2013 Outback 2.5L, and 2013 XV Crosstrek.  For all vehicles except the manual Legacy 2.5L and the manual Outback 2.5L, the class vehicle status ends in the last listed model year at a specified VIN number and engine number.  A complete list of the Settlement Class vehicles appears in the Settlement Agreement [Docket Item 49-2 at ¶ 32].

and attorneys' fees and costs came before the Court at a final hearing on July 26, 2016.

Specifically, in this Opinion, the Court will address Plaintiffs' Motion for an Order Granting Final Approval of the Class Action Settlement and Certifying a Settlement Class [Docket Items 85 & 99], statements objecting to the proposed settlement submitted by 34 individual class members [Docket Items 57-62, 64-68, 70-74, 76-81, 83-87, 91-97], one of whom (Jose Melgar) is represented by counsel [Docket Item 90], and the Defendants' Response [Docket Item 98], together with exhibits received at the hearing [Exs. C-1, C-2, and C-3], as well as the materials submitted in connection with the earlier Motion for Preliminary Approval of the Class Action Settlement [Docket Items 49 and 51].

Defendants join in these motions and have responded to the objectors, both in writing [Docket Item 98] and at the final hearing, as discussed below.

No party or putative class member objects to the attorneys' fees and costs, to be paid by Defendants and capped at $1,500,000, or to the payment of incentive awards of $3,500 to each of the named class representatives, or to any aspect of the notice, timing or opportunity to be heard.  The Court independently reviews the requests for attorneys' fees and costs

pursuant to Rule 23(h), Fed. R. Civ. P., in a separate Memorandum Opinion to be filed.

The principal issues to be decided are whether the proposed settlement class should be certified under Rule 23(a) & (b)(3), Fed. R. Civ. P.; and whether the proposed settlement is fair, reasonable, and adequate under Rule 23(e)(2), Fed. R. Civ. P.

## I.  Factual Background, Procedural History and Terms of Proposed Settlement

### A.  Plaintiffs' Claims

The operative Complaint alleged that Subaru warranted and sold certain vehicles with a new generation "FB" engine in five of its models (certain models of the Forester, Legacy, Outback, Impreza, and Crosstrek) during model years between 2011 and 2014 which had a defect causing over-consumption of engine oil. Plaintiffs alleged that Subaru knew that these engines tended to burn excessive amounts of oil and that Subaru did not acknowledge and fix the problems as allegedly required by warranty and by various states' consumer protection laws.

Plaintiffs alleged that Subaru's dealers were unresponsive to their complaints about the oil consumption problem and that Subaru set an unreasonably high threshold in oil consumption testing before it would acknowledge a problem in a particular vehicle.

The Complaint defined two classes.  The first was a nationwide class comprised of all consumers in the United States who purchased or leased a class vehicle.  The second was an "Emissions Warranty Class" comprised of consumers from eleven specified states who purchased or leased a class vehicle that required or will require repair of the alleged defect during the applicable emissions warranty period.

Plaintiffs asserted five causes of action on behalf of the putative nationwide classes.[2]  Alternatively, the Complaint sought certification of six statewide classes under the laws of California, Florida, New Jersey, New York, Pennsylvania, and Connecticut respectively.

Defendants moved to dismiss various claims (arguing that injunctive relief is preempted by federal law) on grounds including preemption and failure to state a claim, and to narrow other claims on choice of law grounds.  See Def. Br. in Support of Motion to Dismiss [Docket Item 31-1].  After the partial dismissal motion was fully briefed and set for oral argument,

---

[2] These claims may be summarized as follows:

1.   Violations of the New Jersey Consumer Fraud Act ("NJCFA"),
     N.J.S.A. § 56:8-1 to -20 (Count I) (Nationwide Class);
2.   Breach of Express Warranty (Count II) (Nationwide Class);
3.   Breach of Implied Warranty of Merchantability (Count III)
     (Nationwide Class);
4.   Breach of the Duty of Good Faith and Fair Dealing (Count
     IV) (Nationwide Class); and
5.   Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301-
     2312 (2012) (Count XIV) (Emissions Warranty Class).

7

counsel requested that the argument be deferred pending ongoing settlement negotiations [Docket Items 41, 44]. Counsel announced on December 16, 2015 that they had reached a tentative agreement [Docket Item 47]. Plaintiffs' motion for preliminary approval of a proposed class action settlement was filed on January 4, 2016 [Docket Item 49] and granted after a hearing on January 19, 2016 [Docket Item 53 amended at Docket Item 55].

As directed by the Court, Subaru sent the court-approved notice of the proposed settlement to owners or lessees of the 577,860 Settlement Class Vehicles. Because some vehicles have been resold, a total of 665,730 notices were disseminated. See Decl. of Terri Woodard Claybrook, ¶ 2 [Docket Item 98-1]. After making follow-up efforts such as through the USPS National Change of Address database and the Coding Accuracy Support System, it is quite impressive that only 94 notices were returned as undeliverable out of 665,730 notices sent. Id. ¶¶ 3-4.

Beyond the extensive plain-language notice, the consumers were also invited to visit the class litigation website at www.oilconsumption.settlementclass.com, or to contact class counsel with any questions or concerns.

Out of the 665,730 recipients, a total of 2,328 individuals have elected to opt out (representing approximately 0.35% of the

class), and approximately 34 filed objections to the settlement

(a rate of 0.005%).[3]

The Court finds that the notice procedures fully comply

with Rules 23(c)(2) and 23(e)(1), Fed. R. Civ. P., as well as

due process with respect to all parties and the members of the

proposed class.

**B.    Terms of Proposed Settlement**

The proposed Settlement Agreement [Docket Item 49-2]

stipulates to certification of a Settlement Class defined as

follows:

> All residents of the continental United States who
> currently own or lease, or previously owned or
> leased, a Settlement Class Vehicle originally
> purchased or leased in the continental United
> States, including Alaska. Excluded from the
> Settlement Class are Subaru, Subaru's employees,
> employees of Subaru's affiliated companies, Subaru's
> officers and directors, dealers that currently own
> Settlement Class Vehicles, all entities claiming to
> be subrogated to the rights of Settlement Class
> Members, issuers of extended vehicle warranties, and
> any Judge to whom the Litigation is assigned.

Id., ¶ 39.[4]  The Settlement Agreement stipulates to appointment

of the nine plaintiffs as representatives of the Class and to

the appointment of class counsel to serve as counsel for the

---

[3] Several of these "objector" filers were actually seeking clarification
[Docket Items 58 & 59] or praised Subaru [Docket Item 66], or contained no
specific objection [Docket Items 77 & 81], or was not a member of the
settlement class [Docket Item 84].  Setting these six aside, there remain 28
persons stating specific objections to the proposed class settlement.
[4] The Settlement Class Vehicles are the various Forester, Impreza, Legacy,
Outback, and XV Crosstrek vehicles categorized in Settlement Agreement ¶ 32,
summarized supra at n. 1.

Settlement Class.  Id., ¶ 41.  The Settlement Agreement contains 35 pages including recitals, definitions, disclaimers, settlement considerations, claims administration procedures, mechanisms for class notice and responses including opt-outs and objections (already undertaken, see supra), Subaru's administrative obligations, and the settlement approval process. [Docket Item 49-2 at ¶¶ 1-50].

The principal terms of the settlement agreement's benefits to the class may be summarized as follows:

- Subaru has agreed to cover repairs in Class Vehicles as needed to correct excessive oil consumption during an extended warranty period of eight (8) years or one hundred thousand (100,000) miles, whichever comes first; this extended warranty is more than twice the length of Subaru's new vehicle limited warranty and is an increase over Subaru's powertrain limited warranty of five (5) years and sixty thousand (60,000) miles.

- For class vehicles that have already exceeded the term of the above warranty extension, Subaru will extend an additional period of one year from the "notice date" in which to obtain the free repairs. The notice date is the date by which Defendants first initiated mailing of the notice of this settlement to the class, which was on March 24, 2016 (see Claybrook Cert., ¶ 2).

- Class members will receive free oil consumption tests and repairs performed pursuant to Subaru's Technical Service Bulletins related to the oil consumption issue.

- The threshold for failing the oil consumption test is triggered if the test confirms that the vehicle consumes more than one-third of a quart of engine oil in 1,200 miles.

10

- Subject to reasonable proofs and conditions, Subaru will reimburse Settlement Class Members for 100 percent of out-of-pocket expenses they incurred for oil consumption tests or Technical Service Bulletin repairs.

- Subaru has agreed to reimburse Settlement Class Members for the cost of additional oil purchased up to a maximum of six (6) quarts.

- Subaru has agreed, subject to reasonable proofs and conditions, to reimburse Settlement Class Members for towing costs and rental car expenses (up to $45 per day for a maximum of two days) that were incurred as a result of an oil consumption repair.

See Settlement Agreement, Part V ("Settlement Consideration") [Docket Item 49-2]; see also Pl. Mem. in Support of Motion for Final Approval [Docket Item 85-1 at 5-7].  These benefits to the Settlement Class members are summarized in the following table from Pl. Mem. in Support at 7:

| Warranty Extension for Current Owners and Lessees | Eight (8) years or one hundred thousand (100,000) miles, whichever comes first, for Oil Consumption Tests and TSB Repairs. If a Class Vehicle has exceeded eight (8) years or one hundred thousand (100,000) miles at the time of the notice date, Subaru will perform Oil Consumption Tests and TSB Repairs for a period of one (1) year from the notice date, without regard to mileage. |
|---|---|
| Reimbursement for Out-of-Pocket Expenses for Current and Past Owners and Lessees | With appropriate proof, Settlement Class Members are entitled to reimbursement for 100 percent of all out-of-pocket expenses incurred for: <br> 1.    Oil Consumption tests or TSB Repairs conducted prior to the Notice Date; <br> 2.    Additional oil purchased by Settlement Class Members, up to a maximum of six (6) quarts; and <br> 3.    Towing costs and rental car fees up to $45 per day for a maximum of two (2) days. |
| Free Oil Consumption Tests and TSB Repairs for Qualifying Class Vehicles | All current owners and lessees can bring their Settlement Class Vehicles to an Authorized Subaru Dealer for free Oil Consumption Tests and TSB Repairs. |

The proposed Settlement Agreement also states the claims that Settlement Claim Members will be deemed to have settled and released.  The Settlement Agreement's lengthy definition of "Released Claims" or "Settled Claims", see Settlement Agreement at ¶ 29, contains the operative language.  It can be best described as a release of all claims and causes of action whether known or unknown, existing now or in the future, based on oil consumption of settlement class vehicles, whether arising under federal, state, or local law, statute, rule, or regulation (several of which are enumerated at length as examples).  Claims for death, personal injuries, or property damage (other than

12

damage to the Settlement Class Vehicle) are exempted from the release, as are pending automobile lemon law suits pertaining to oil consumption.  Id., ¶ 29.  The "Released Parties" include those listed in the Settlement Agreement at ¶ 30, including defendants herein and the many listed entities and types of entities, including manufacturers, distributors, and dealers, and their directors and employees, among others.  Id., ¶ 30.

The Settlement Agreement proposes "Service Awards," sometimes elsewhere referred to as "incentive awards," to be paid by Subaru to each of the nine class representatives in the sum of $3,500 each, for a total of $31,500, subject to Court approval.  Id., ¶¶ 31 & 52.

The Settlement Agreement also contains Subaru's promise to pay an award of reasonable attorneys' fees and expenses of class counsel in an amount not to exceed $1,500,000 as determined by the Court upon application of class counsel.  Id., ¶ 51.

Importantly, the Settlement Agreement provides that Subaru's payments of the class representatives' incentive fees and class counsel's attorneys' fees and costs do not diminish the benefits to the Settlement Class.  Id., ¶¶ 51 & 55.

Likewise, the Settlement Agreement provides that Subaru bears all costs of notification of the class and administration of the claims process, including provisions for any second reviews and appeals therefrom by class members to the Better

Business Bureau (except that Subaru is not responsible for a
class member's attorney's fees and expenses if the member
retains counsel in the Better Business Bureau proceeding).  Id.,
Parts V.F, VI.C., & VII.E(1).

    In other words, Subaru's payments of incentive awards,
attorneys' fees and costs awards, and costs of class notice,
administration of the claims process, and costs of the claims
appeals procedures, are not from a common settlement fund but
are instead beyond, and separate from, the benefits promised to
the Settlement Class.  Further, the Settlement Agreement places
no cap upon the aggregate expense to Subaru in fulfilling its
obligations to the class such as for future repairs of class
vehicles and reimbursements to class members.  Subaru, and not
the Settlement Class, bears the risk that the incidence of such
covered repairs and reimbursements will be larger than currently
foreseen.

    Against this background, the Court first examines whether
the proposed settlement class should be certified.

**II.  <u>Certification of Proposed Settlement Class under Fed. R.
       Civ. P. 23(a) & (b)(3)</u>**

    To certify a settlement class, the plaintiffs must satisfy
the four threshold requirements of Rule 23(a) -- namely
numerosity, commonality, typicality, and adequacy -- and one of
the subparts of Rule 23(b) -- in this case, the requirements of

Rule 23(b)(3) that the "questions of law or fact common to class members predominate over questions affecting only individual members [predominance], and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy [superiority]." Fed. R. Civ. P. 23(b)(3).

### A.   Numerosity Under Rule 23(a)(1)

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable."  The total number of Settlement Class Vehicles is approximately 577,860, and the number of eligible past and present owners and lessees of these vehicles is approximately 665,730, easily satisfying the numerosity requirement.

### B.   Commonality Under Rule 23(a)(2)

The Rule 23(a)(2) requirement of commonality is satisfied where the plaintiffs assert claims that "depend upon a common contention" that is "of such a nature that it is capable of class wide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).  "[F]or purposes of Rule 23(a)(2), even a single common question will do."  Id. at 359.

The common questions of law and fact are many.  They include:  (1) whether the Settlement Class Vehicles were subject

15

to a common defect; (2) whether Subaru failed to adequately
disclose material facts related to the Settlement Class Vehicles
prior to sale; (3) whether Subaru's conduct was unlawful; and
(4) how any resulting monetary damages to consumers should be
calculated, just to name a few.  The proposed class easily
satisfies the commonality requirement.

### C.   <u>Typicality under Rule 23(a)(3)</u>

The representative plaintiff's claims must be "typical" of
those of other class members under Rule 23(a)(3).  Typicality is
found, for example, where the claims of the representative
plaintiffs arise from the same event or course of conduct and
are based on the same legal theories.  <u>Danvers Motor Co., Inc.
v. Ford Motor Co.</u>, 543 F.3d 141, 150 (3d Cir. 2008).  Here,
plaintiffs allege that the class claims arise out of the same
conduct of the defendants related to their design, manufacture,
and sale of the class vehicles that suffered from an alleged oil
consumption defect, and defendants' alleged failure to disclose
that material fact.  The Complaint duly asserts that the conduct
of defendants regarding the alleged oil consumption problem was
essentially the same toward them as toward the members of the
putative class.  The causes of action bear common labels such as
breach of express warranty and consumer fraud, while involving
the laws of differing states of residence.  That the laws of
more than one state may apply to such claims of class members

16

does not amount to significantly different legal theories so much as the application of various legal requirements to a common course of alleged conduct by defendants that extends across the class.

The proposed class thus meets the typicality requirement.

### D. Adequacy of Representation under Rule 23(a)(4)

Plaintiffs must demonstrate that "the representative part[y] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy depends on the class representative having the ability and incentive to protect class wide interests, as well as having obtained able and experienced counsel. Ritti v. U-Haul Int'l, Inc., No. 05-4182, 2006 WL 1117878, at *5 (E.D. Pa. Apr. 26, 2006); Senter v. General Motors Corp., 532 F.2d 511, 524-25 (6th Cir. 1976).

The class representatives have each participated in pursuing this litigation, including active assistance to counsel in preparing for litigation and for settlement negotiations. It appears there is no conflict or antagonism between the named plaintiffs and the settlement class members, and there is no substantial prospect that time will be wasted to sort out atypical aspects of any named plaintiff's circumstances or claims.

Regarding class counsel, the Court observes that lead counsel Richard McCune, Esq., from the law firm of McCune Wright

17

LLP; Matthew Schelkopf, Esq., formerly of Chimicles & Tikellis LLP and currently of McCune Wright LLP; and Eric Gibbs, Esq., of the firm of Girard Gibbs LLP are all experienced class action counsel who have worked efficiently to bring this case to conclusion.  Messrs. McCune, Schelkopf, and Gibbs shall continue as Class Counsel.

### E.   Predominance and Superiority under Rule 23(b)(3)

To establish predominance, plaintiffs must demonstrate that the common questions predominate over individual issues.  When assessing predominance, as well as superiority, in the settlement class context, a showing of the manageability of a class trial is not required, "for the proposal is that there be no trial."  Amchem Products, Inc. v. Windsor, 521 U.S. 592, 618 (1997).  The focus of the predominance inquiry "is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct."  Sullivan v. DB Invs., Inc., 667 F.3d 273, 298 (3d Cir. 2011), cert denied sub nom. Murray v. Sullivan, 132 S. Ct. 1876 (2012).

The common issues of law and fact identified above in Part II.B present the dominant determinations to be made.  Do the class vehicles tend to exhibit excessive oil consumption, and by what measure or test?  Does this amount to a design defect?  Did defendants market the class vehicles without adequate warning of

the possibility of this defect?  Is this condition covered by
the vehicle's limited warranty and/or the powertrain warranty?
What compensation, if any, is due to class members?

Although one can also imagine individual situations that do
not seem to fit the paradigm of plaintiffs' allegations, the
proposed settlement is all-encompassing, including all class
vehicles, so that there will be no need for individual trials.
Quite simply, if the problem of excessive oil consumption is
manifested through an objective, reasonable, and free test,
within the extended warranty period, then the defendants will
repair and reimburse in accordance with the class settlement.
Common engineering issues of the existence, causation, and cure
of the problem are resolved in the settlement and need not be
proved in individual cases, while the particular class member's
compensation will be determined in a simple claim process.

The Court finds that the common questions of law and fact
predominate over the individual questions in specific vehicles,
and that the proposed settlement indeed resolves the common
questions and accommodates the individual vehicle experiences.
Predominance is clearly satisfied under Rule 23(b)(3).

There can likewise be little doubt that the settlement
class certification would satisfy the superiority requirement
when considering the relevant Rule 23(b)(3) factors.  The
proposed settlement provides class members with the means to

19

obtain prompt and predictable relief, which a plethora of individual cases would not.  The settlement dispenses with the need for individualized expert witness assessments of the alleged engine problems and fixes.  The settlement provides an evaluation and repair scheme of a current problem avoiding the delays inherent in litigation and appeals.  Within the settlement's compensatory claim process, due process is met in the individual cases through administrative procedures including appeal in an alternative dispute resolution forum.  Finally, the savings in time and expense needed to litigate individual cases is realized through class-based relief.  The class action status is probably the only feasible way to seek to establish liability and damages in a case of this type where the harm to an individual class member is generally in the realm of a fraction of the price of the class vehicle.  The superiority prong of Rule 23(b)(3) is well satisfied.

In conclusion, the Court finds that certification of the proposed settlement class is appropriate under Rules 23(a) & 23(b)(3).

### III. **Whether Proposed Class Settlement is Fair, Reasonable and Adequate under Rule 23(e)(2)**

In reviewing proposed class action settlements, Federal Rule of Civil Procedure 23(e)(2) compels an inquiry into the fairness, reasonableness, and adequacy of a proposed settlement

to "'protect[]'" absent class members through "'the court's assur[ance] that the settlement represents adequate compensation for the release of the class claims.'"  In re Nat'l Football League Players Concussion Injury Litig., 821 F.3d 410, 436 (3d Cir. 2016) (quoting In re Pet Food Prods., 629 F.3d 333, 349 (3d Cir. 2010) (citation and internal quotation marks omitted)). Indeed, where courts certify a class and approve "'a settlement in tandem, they should be even more scrupulous than usual when examining the fairness of the proposed settlement.'"  Id. (citations and internal quotation marks omitted).  Courts apply an "initial presumption of fairness" to settlements that occurred, as here, [1] through arm's-length negotiations by [2] individuals "experienced in similar litigation," [3] following "sufficient discovery," and [4] that prompted objections from "'only a small fraction of the class.'"[5]  Id.

A.    Girsh & Prudential Factors

In Girsh v. Jepson, the Court of Appeals for the Third Circuit outlined nine factors to consider when determining the fairness of a proposed class action settlement:

> [1] the complexity, expense and likely duration of
> the litigation; [2] the reaction of the class to the
> settlement; [3] the stage of the proceedings and the
> amount of discovery completed; [4] the risks of

---

[5] There can be little doubt that the initial presumption applies here, because experienced (and numerous) class counsel negotiated the proposed settlement at arm's length, the parties engaged in motion practice and informal settlement-related discovery, and because the proposed settlement drew only thirty-four objections.

establishing liability; [5] the risks of
establishing damages; [6] the risks of maintaining
the class action through the trial; [7] the ability
of the defendants to withstand a greater judgment;
[8] the range of reasonableness of the settlement
fund in light of the best possible recovery; and [9]
the range of reasonableness of the settlement fund
to a possible recovery in light of all the attendant
risks of litigation.

521 F.2d 153, 157 (3d Cir. 1975) (internal quotation marks and

ellipses omitted) (hereinafter, "the Girsh factors").  In

applying the initial Girsh factors, the "'settling parties bear

the burden of proving that [the inquiry] weigh[s] in favor of

approval.'"  In re Nat'l Football League Players Concussion

Injury Litig., 821 F.3d at 437.

Then, in In re Prudential Ins. Co. America Sales Practice

Litigation Agent Actions, the Court of Appeals expanded the

Girsh factors to include several additional and non-exhaustive

factors:

[1] the maturity of the underlying substantive issues,
as measured by experience in adjudicating individual
actions, the development of scientific knowledge, the
extent of discovery on the merits, and other factors
that bear on the ability to assess the probable
outcome of a trial on the merits of liability and
individual damages; [2] the existence and probable
outcome of claims by other classes and subclasses; [3]
the comparison between the results achieved by the
settlement for individual class or subclass members
and the results achieved—or likely to be achieved—for
other claimants; [4] whether class or subclass members
are accorded the right to opt out of the settlement;
[5] whether any provisions for attorneys' fees are
reasonable; and [6] whether the procedure for
processing individual claims under the settlement is
fair and reasonable.

22

148 F.3d 283, 323 (3d Cir. 1998) (hereinafter, "the <u>Prudential</u>

considerations").  Unlike the mandatory <u>Girsh</u> factors, however,

"'the <u>Prudential</u> considerations are just that, prudential.'"  <u>In</u>

<u>re Nat'l Football League Players Concussion Injury Litig.</u>, 821

F.3d at 437.

In this case, where the settlement class certification, the

proposed settlement, the incentive fees to class representative

plaintiffs, and the uncontested cap on reimbursement of

attorneys' fees and costs were simultaneously negotiated, there

must be a heightened standard of review to determine the

fairness of the proposed settlement.  <u>In re Warfarin Sodium</u>

<u>Antitrust Litigation</u>, 391 F.3d 516 (3d Cir. 2004).  The

reviewing court must take special care to determine whether

class counsel yielded class members' rights in exchange for

generous attorneys' fees, and whether incentive fees to

individual representative plaintiffs caused them to agree to an

unreasonable deal for the other class members.

> **1.  First <u>Girsh</u> Factor:  Complexity, Expense, and**
> **Likely Duration of the Litigation**

"The first [<u>Girsh</u>] factor captures the probable costs, in

both time and money, of continued litigation."  <u>Id.</u> at 535-36

(citations and internal quotation marks omitted).  In this case,

the nuances of various state laws raised the specter of

protracted motion practice (as evident from the dismissal briefing), and a lengthy and costly discovery period (given the size and geographic scope of the class). The longer the litigation extended, the more the owners of affected class vehicles would suffer. Where motor vehicles have a relatively short lifespan, there is a premium upon promptly finding a remedy for alleged defects to restore full enjoyment of the vehicle.

### 2. Second <u>Girsh</u> Factor:  Reaction of the Class to the Settlement

"The second <u>Girsh</u> factor attempts to gauge whether members of the class support the settlement." <u>In re Nat'l Football League Players Concussion Injury Litig.</u>, 821 F.3d at 438 (citations and internal quotation marks omitted). In evaluating the reaction of the class, courts look primarily to the "objection rate," all while considering the potential concern "that the passive victims of a product defect lacked 'adequate interest and information to voice objections.'" <u>Id.</u> (citation omitted). Here, the objection rate rests at a very low percentage (less than 1 in 16,000 class members), and the nature and inconvenience of the alleged defect (<u>i.e.</u>, excessive oil consumption) creates the impression that most affected persons would have voiced their concern, if any.

Out of approximately 665,730 notices, only 34 filed comments, of which 28 can fairly be characterized as specific objections.  (See supra note 3 and accompanying text.)  Assuming 34 objectors, the rate for objections by members of this 665,730-member settlement class is only 0.005%, that is, five thousandths of one percent, which represents a trace amount. That 2,328 individuals have opted out (0.35% of the settlement class) is also not a large number given the size of the class. While no reasons were stated by opt-outs, one can surmise that the opt-outs included persons who had unusual circumstances, or persons who were induced to opt out by the objector law firm Kimmel & Silverman, P.C. (as discussed below), perhaps wishing to retain the opportunity to pursue a future lemon law claim for excessive oil consumption, while foregoing the extended warranty and other benefits that settlement class members will receive. Finally, it is noteworthy that approximately 2,900 class members have already made reimbursement claims by the time of the July 26th final hearing.  [Tr. 7/26/16 at 18:5-9].  In any event, the overall reaction of the class has been strongly positive.

The objections will be further addressed in Part III.B, below.

        **3.**    **Third Girsh Factor:  Stage of the Proceedings and Amount of Discovery Completed**

"The third Girsh factor captures the degree of case
development that class counsel [had] accomplished prior to
settlement."  In re Nat'l Football League Players Concussion
Injury Litig., 821 F.3d at 438 (citations omitted).  In other
words, courts consider "'whether counsel had an adequate
appreciation of the merits of the case before negotiating.'"
Id. at 438-39 (citations omitted).  Here, the parties engaged in
significant dismissal motion practice, and then several months
of settlement negotiations and discovery.  The case was in an
early stage of litigation, with much future discovery and motion
practice remaining.

Plaintiffs' counsel had conducted its own investigation,
researched and responded to numerous inquiries from class
members, received and analyzed documents produced by defendants,
and conducted confirmatory deposition discovery of defendant's
Rule 30(b)(6) designated deponent.

Although plenary discovery was in its early stages, class
counsel were sufficiently well prepared and informed enough to
engage in robust settlement negotiations.  They did not need
further adversarial litigation to learn the engineering
principles, the scope of defendants' conduct in design,
marketing and manufacture, the overall scope of the issues, and
the uncertainties and difficulties of proof that would lie ahead
if the case was not resolved.  More than that was not required

26

here, especially in view of the fact that greater knowledge, gained at the expense of delay in the resolution of these claims, would likely not have led to any substantial change of the legal and factual landscape.  The amount of discovery completed is thus a neutral factor overall.

### 4. & 5.   Fourth and Fifth Girsh Factors:  Risks of Establishing Liability and Damages

"'The fourth and fifth Girsh factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement.'"  Id. at 439 (citations omitted).

The Court had a preview of the breadth and complexity of the legal issues raised by Plaintiffs' pleadings.  Defendant Subaru moved to dismiss many of Plaintiffs' claims in a comprehensive motion filed in December 2014 [Docket Item 31] which was addressed in Plaintiffs' Memorandum in Opposition in January 2015 [Docket Item 34.]  While Plaintiffs conceded to the dismissal of a few claims, the remainder of the motion was strenuously contested.  Also, Subaru had not sought dismissal of other claims enumerated by Plaintiffs' Memorandum in Opposition [Docket Item 34 at 2], which would have gone forward for factual development and probably summary judgment motion practice. Further, Plaintiffs had not sought class certification by the

27

time the parties entered into negotiations, and the outcome of any contested motion to certify the class would have depended upon further class-based discovery consuming many more months.

When considering the risks of establishing liability and damages, the Court is not called upon to resolve the parties' disputed legal and factual contentions at this time.  That would have been the function and goal of protracted and expensive litigation over coming months and years.  What must be said, however, is that the outcome was uncertain.  A few further observations are in order.

The Court recognizes, as do class counsel, that defendants' liability for fraud -- the gravamen of the case -- is not clear.  For example, without proof defendants knew of the alleged design defect before selling the vehicles, a plaintiff cannot recover under the New Jersey Consumer Fraud Act and other similar state consumer fraud statutes.  See, e.g., Nelson v. Nissan N. Am., Inc., No. 11-5712, 2014 WL 7177276, at *3 (D.N.J. Dec. 16, 2014).  This is a case requiring particular expertise about the design and servicing of engine oil systems, and the establishment of a defect for purposes of claims for breach of warranty was certainly questionable.  Indeed, where both sides agree that the oil consumption problem manifests itself in a low overall percentage of the class vehicles, the establishment of a class of plaintiffs was also uncertain.

The Court also agrees with class counsel's assessment that
even if liability were established, "Plaintiffs still would have
likely met substantial challenges in proving damages, and doing
so on a class-wide basis."  Pl. Mem. in Support, p. 32.
Establishing damages on a classwide basis would have required
winning a battle of experts, which is not a foregone conclusion.
All of this would have taken additional years, and may have
resulted in no classwide recovery.

Due to these real and substantial difficulties in getting a
class certified and proving liability and damages, the Court
finds these Fourth and Fifth <u>Girsh</u> factors favor approval of the
Settlement Agreement.

### 6.    Sixth <u>Girsh</u> Factor:  Risks of Maintaining Class Action Through Trial

Although an aspect of the <u>Girsh</u> analysis, "'a district
court need not inquire whether the case, if tried, would present
intractable management problems[,]" because the settlement
proposes, on its face, "'that there be no trial.'"  <u>In re</u>
<u>National Football League Players Concussion Injury Litig.</u>, 821
F.3d at 440 (citations omitted).  In other words, the sixth
<u>Girsh</u> factor "becomes essentially "'toothless,'" and "deserve[s]
only minimal consideration."  <u>Id.</u>  As a result, the sixth <u>Girsh</u>
factor proves neutral here.

### 7.   Seventh <u>Girsh</u> Factor:  Ability of Defendants to Withstand a Greater Judgment

The seventh <u>Girsh</u> factor proves most relevant when the settlement amount rests upon "the defendant's professed inability to pay" or "potential financial instability."  <u>Id.</u>  In any class action against a large corporation, as here, "'the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors," and so the financial wherewithal "does not [ordinarily] undermine the reasonableness'" of the settlement. <u>Id.</u> (citations omitted).  As a result, the seventh <u>Girsh</u> factor too is neutral.

### 8. & 9.   Eighth and Ninth <u>Girsh</u> Factors:  Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and All Attendant Risks of Litigation

In evaluating the eighth and ninth <u>Girsh</u> factors, courts consider whether "'the settlement represents a good value for a weak case or a poor value for a strong case.'"  <u>Id.</u> (citations omitted).  "'The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial.'"  <u>Id.</u> (citation omitted).  "'[T]he present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not

prevailing, should be compared with the amount of the proposed settlement.'" Id. (citation omitted).

The proposed settlement reflects a compromise between the parties' respective litigation positions, as do all settlements. It is not possible to forecast the precise value of the damages plaintiffs would likely recover if successful.  Perhaps the strongest theory of recovery, in relative terms, was breach of the warranty, since the parts involved herein, if defective, would be eligible for warranty repairs.  The fraud-based theories may be difficult or impossible to prove, as Subaru's knowledge of the defect at or before the time of sale would be required; there is scant, if any, such knowledge prior to sale or lease of the class vehicles.  At most, the data reflected that Subaru received an elevated number of warranty claims of excess oil consumption involving fewer than 1% of the vehicles in production after introduction of the FB engine platform in 2010.[6]  Overall, according to Subaru, more than 98% of the settlement class vehicles have not experienced, and will not experience, any oil consumption concerns.[7]  The engineering countermeasures enacted by Subaru improved the oil consumption

---

[6] Subaru offered the expert report of the automotive engineer Robert Kuhn, PE, who reviewed and summarized the extensive warranty claim data, technical documents regarding design countermeasures, and the deposition of Subaru's representative John Gray.  See Kuhn Report, Jan. 14, 2016, at 1-3 [Docket Item 51-2.]

[7] Id. at 10.

picture by 2014 to the negligible levels of a typical background rate.[8]  In other words, if the case went to trial, Subaru would have had evidence that when it spotted a trend of oil consumption issues somewhat above the normal background level, it instituted a series of countermeasures in engine design that essentially resolved the design problem, and which will provide an appropriate fix for the relatively small incidence of class vehicles that were affected or may exhibit an oil consumption issue related to the alleged defect.

Whether Plaintiffs would have been able to prove that Subaru dishonored its own warranty is also quite uncertain at this stage.  Subaru's documentation, exchanged in discovery and analyzed by its retained automotive expert, Robert Kuhn, similarly reflects that many claims were not confirmed -- they turned out to be "false positives" for which no warranty remedy was necessary.[9]  Again, Plaintiffs' likelihood of proving widespread breaches of warranty would be questionable if Subaru's summary of nationwide warranty and claims experience is accurate.

---

[8] Id. at 11.

[9] Id. at 3, 11.  Indeed, Kuhn's report indicates his finding that "most" of the claims "were simply due to the calibration and function of the oil level sensing system."  Id. at 3.  In other words, on those vehicles the oil indicator light would give warning, incorrectly indicating the need to add oil, and the more precise oil consumption test would determine that there was not undue oil loss.

Moreover, Subaru would also take the position that development of future oil consumption problems in class vehicles is unlikely because of the nature of the engineering involved. Based upon analysis of FB engine oil consumption warranty claims, Subaru posits that the date shows a greatly diminished claim trend, peaking in the 20-30,000 mile interval and declining rapidly.  Thus, Subaru's expert would opine that these issues "typically affect a specified portion of the subject population early in their service life and do not occur at a later date in the remaining portion of the population."[10]  In other words, it is unlikely that unaffected class vehicles will experience anything other than a declining risk of developing oil consumption problems as time goes by, because if a vehicle is going to have excessive oil consumption problems due to faulty engine design, the issue will manifest itself early in the vehicle's life.  That is consistent with the experience of the representative plaintiffs and of the objectors who generally claimed to begin experiencing excess oil consumption early in their vehicles' lives.

The proposed settlement falls within a range of reasonableness, given the risks to plaintiffs of achieving a

---

[10] Id. at 9.

worse outcome and the possibility of a more favorable outcome if
the case went to trial.  Without the settlement, plaintiffs
would face the hurdles of obtaining class certification, which
Subaru would oppose and which may present a closer question if
manageability of a nationwide class were to be considered;
without a class, each plaintiff feeling aggrieved would have to
bring an individual action seeking compensation and injunctive
relief, including replacement or exchange of the vehicle.  If
fraud could be shown at the time of the purchase of the
particular vehicle -- a difficult prospect under the present
facts -- there could be a double damage award under the consumer
protection laws of many states.  The proposed settlement, on the
other hand, includes compensation for out-of-pocket expenses
incurred for oil consumption tests or previous Technical Service
Bulletin (TSB) Repairs, as well as reimbursement for additional
oil consumed up to six quarts, plus towing costs and rental car
fees up to $45 per day, but the compensatory sum is not doubled
or trebled.

    The proposed Settlement Agreement's objective standard for
ascertaining excess oil consumption -- namely, loss of one-third
of a quart of oil in 1,200 miles determines by the Subaru oil
consumption test -- is the product of negotiations.  Obviously,
a standard that recognized the oil consumption problem at any
level of detectable oil loss would be more beneficial to class

members, but would also be unrealistic.  All vehicles consume at least some engine oil in normal operations and no one suggests that normal loss of oil is covered by the warranty.  This standard strikes a balance, with Subaru agreeing to substantially liberalize the oil consumption test standard compared with its prior level, while removing the subjectivity from the determination of what is excessive.  This standard of measurement appears to be a reasonable compromise of the best and worst that might emerge from continued litigation on the subject.

The settlement extends the warranty for current owners to obtain free oil consumption testing and TSB Repairs, while confirming the right to obtain much testing and repairs within the original warranty period, as well.  The settlement does not provide compensation for possible diminution of value of class vehicles by alleged stigma, but such an outcome may be unlikely given the rather limited incidence (perhaps 1%)[11] of oil consumption problems in the class vehicles, the success of countermeasures, and the lack of notoriety of this alleged oil-consumption defect.  Finally, the financial risk of the costs of all these settlement obligations to class members is placed upon

---

[11] Counsel for Subaru indicated that "[w]e see historically approximately 1 percent of the vehicles manifesting this problem."  (Tr. 7/26/16 at 24:19-20).

35

Subaru, not the class, as there is no cap upon the total aggregate expenses to be reimbursed or the aggregate costs of eligible TSB Repairs, all of which is borne by Subaru.

The Court finds that the proposed settlement is within the zone of reasonable compromise satisfying the eighth and ninth <u>Girsh</u> factors.

**B.    Consideration of Objections**

The Court has considered each of the 28 objections to the proposed settlement.  Such objections are sought and considered before a court determines whether to approve a class settlement, pursuant to Rule 23(e)(5).  They are generally detailed and often attach documents such as relevant service records of their oil consumption and Subaru's reactions to their problems.  The most developed objection was submitted on behalf of Jose Melgar [Docket Item 90], represented by the law firm of Kimmel & Silverman, P.C., through attorney Shannon Harkins, Esq., the only objector appearing at the fairness hearing on July 26, 2016.[12]

**1.    General Objections**

The other 27 written objections reflect concerns with specific aspects of the proposed settlement, falling into

---

[12] The Melgar objection, set forth in the form of a memorandum of law, was accompanied by an affidavit of Scot Turner (an automotive expert) and the affidavit of Robert S. Silverman, Esq., discussed further in Part III.B.2, <u>infra</u>.

several common themes:  (1) the settlement is too strict in
requiring documentation for reimbursement of oil change
expenditures; (2) the settlement does not reimburse class
members who purchased an extended warranty; (3) the settlement
does not address the diminished vehicle value associated with
the excessive oil consumption issue; and (4) the extended
warranty is not long enough; and (5) Subaru is not to be trusted
to administer the testing and repair program fairly.

### a.   Objections to Documentation Requirements

First, several objectors oppose the requirements for
documentation of past repairs for which reimbursement is sought.
For example, objector Stacy Goss [Docket Item 64] indicates she
had to add a quart of oil between changes and did not save her
receipts for the extra oil, and she expects to continue to need
extra oil in the future for which the settlement will not
reimburse her.  The settlement's requirement for documentation
"Proof of Purchase must be submitted," see Settlement Agreement,
§ V.D.2(b)), is reasonable to prevent fraudulent claims.  At the
final hearing, class counsel also clarified that an acceptable
proof of purchase may include a credit card statement for the
oil purchase or for prior reimbursable repairs, accompanied by
the claimant's declaration that the claim is true.  (Tr. 10:8-
17).  The proof can be "anything that can be used to corroborate
that an individual paid for a repair." (Id. at 10:16-17).  This

is a reasonable requirement for documentation triggering
compensation, and this objection is overruled.  Finally, Ms.
Goss's concern, also expressed by several other objectors, that
her vehicle will continue to consume excess oil in the future,
is also overruled.  If her vehicle is found to consume excess
oil in the future under the settlement during the extended
warranty period, the vehicle will receive the free oil
consumption test and the indicated countermeasure repair that is
solving the problem.

### b.    Objections by Purchasers of Extended Warranties

Second, several objectors (see, e.g., Docket Items 60, 62,
71-73, 87, 91 & 97) would like the settlement to reimburse them
for the extended warranty they purchased, or further extend that
warranty, because otherwise the settlement's extended warranty
provision is of less value to them than it would be to other
class members.  For example, Objector Wesley Lane [Docket Item
97] seeks reimbursement of the cost of his seven-year/100,000
mile extended warranty.  The extended warranty still has
substantial value because of the many systems and repairs it
covers.  It would not be logical to refund the whole purchase
price of the extended warranty where it provides exclusive
coverage for a myriad of repairs beyond oil consumption.
Certainly nothing in the class settlement voids the valuable

38

coverage of any extended warranty.  Moreover, the extended warranty for class members is for eight years, not the typical seven years of the purchased warranties of these objectors.

Several of the objectors who have extended warranties also have not had oil consumption problems (or at least none are mentioned in their letters and attachments) [for example, see Docket Items 71 (Swank), 87 (Morgan), 91 (Howard), and 97 (Lane)].  For such class members, the refund of the price they paid for a full extended warranty would represent a windfall. For others with extended warranties who have experienced excess oil consumption according to their objection letters [for example, see Docket Items 60 (French), 72 (Fort), and 73 (Stubenrauch)], it appears that their stated levels of oil consumption would qualify their vehicles for the repairs negotiated in this proposed settlement, where the threshold for Subaru to recognize excess oil consumption was greatly reduced from one quart per 1,200 miles to one-third of a quart of oil in 1,200 miles.  (Settlement Agreement, § V.C.4).  The class settlement, in which Subaru will greatly liberalize the standard for recognizing excess oil consumption, is a benefit whether or not a class member has previously purchased an extended warranty.

Finally, several of the objecting extended warranty purchasers apparently misunderstood the nature of the class

settlement's extended warranty.  [See Docket Items 71 (Swank), 73 (Stubenrauch), 87 (Morgan)].  For example, Mr. Morgan indicates that, without a refund for his extended warranty, "[W]e own a $2,000 piece of paper that was given away to other class participants."  [Docket Item 87 at 1].  The extended warranty conferred upon class members as part of their settlement, generally speaking, is limited to the oil consumption tests and Technical Service Bulletin (TSB) repairs to correct the oil consumption problem, as defined in the Class Settlement, while not extending coverage for unrelated issues. The Class Settlement indeed does not confer the same range of benefits for free upon class members that Mr. Morgan and others have paid for in their extended warranties.  There is, however, no deductible in the Class Settlement extended warranty, while purchased warranties may have such deductibles of $50-$100 typically (Tr. 7/26/16 at 20:13-15).  Further, the settlement warranty provides coverage for an eighth year, or for another year from the notice date for vehicles that have already reached 100,000 miles, while the purchased extended warranties have neither feature.  The prospect also exists that a class member with over 100,000 miles on the vehicle, but within 12 months of the class notice date, would receive the TSB repairs mandated by the settlement that would be unavailable under any extended warranty.

Overall, the Court finds that the failure of the proposed
class settlement to provide reimbursement to class members who
have purchased extended warranties is not unfair, and that it
strikes a reasonable compromise.

### c.  Objections Seeking Compensation for "Diminished Value"

Third, a number of objectors would like to receive
compensation for the allegedly diminished value of settlement
class vehicles.  [See Docket Items 62 (Kurkowski), 67
(Siemiatkowski), 70 (Mahon), 79 (Farrell), 90 (Melgar), 97
(Lane)].  Mr. Mahon's objection is typical, stating:  "When I
attempt to sell or trade this vehicle, the value will be greatly
depreciated because everyone in or around the industry will know
of the issue."  [Docket Item 70 at 1].

The objection on behalf of Mr. Melgar raises various issues
(discussed herein and infra Part III.B.2), one of which is
diminished value of vehicles with a history of oil consumption
problems.  Mr. Melgar's automotive repair expert, Scot Turner,
has stated an opinion:  "Vehicles with service histories
reflecting oil consumption and/or significant repairs have
substantially diminished value."  Affidavit of Scot Turner,
Docket Item 90-3 at ¶ 18.  Mr. Turner does not point to any
source for his opinion, such as an evaluation of resale values
for the class vehicles.  Mr. Melgar's attorney has argued that

41

"as a result of the stigma attached to [Melgar's] vehicle, the value will likely be affected when he seeks to resell his vehicle.  The situation could also arise where the vehicle remains unrepaired."  Obj. of Jose Melgar at 13 [Docket Item 90].  Mr. Melgar's counsel points out, citing to the Turner Affidavit, supra, that a vehicle with a service history reflecting oil consumption and/or significant engine repairs as set forth in the nine operative Technical Service Bulletins and revisions is likely to have substantially diminished value. Counsel further points to the allegation of class representative plaintiff Michael Schuler that when Schuler traded his vehicle with oil consumption defects, he believes he sustained a loss, citing Plaintiffs' Master Consolidated Complaint at ¶ 26 [Docket Item 29].  Mr. Melgar's objection is that as a class member, he will be releasing his right to file a lemon law claim for diminished value.  Obj. of Melgar at 11-15 [Docket Item 90].

If the case were tried, Subaru would argue that such a reduced value is speculative and untethered to the facts of the case.  Its expert, Mr. Kuhn, has opined that the countermeasures Subaru is undertaking as part of the settlement are "appropriate and effective in correcting the root cause" of the excess oil consumption, with the data showing a "steady and measurable reduction" in oil consumption claims "back to a typical background level."  Kuhn Report at 12 [Docket Item 51-2].  If

42

the problem no longer manifests itself after repair, this
problem is unlikely to be of concern or affect the resale value.
Further, if the repair includes a new redesigned short block for
the engine, a vehicle with a new engine may be worth _more_ than a
comparable vehicle with an original engine having higher
mileage.

Plaintiffs' class counsel, Mr. Schelkopf, also examined the
"diminished resale value" issue and stated at the hearing that
he found no evidence of diminished value due to the short block
replacement. (Tr. 7/26/16 at 40:10-14). The premise of
diminished value articulated by Melgar's expert Scot Turner is
that the vehicles "remain unrepaired." Obj. of Melgar, _supra_, at
13 [Docket Item 90]. Subaru has responded convincingly that the
class vehicles exhibiting oil consumption problems in the
extended warranty period will be properly repaired and that the
fix has been shown to cure the problem, as discussed above. Mr.
Melgar's counsel agreed with the premise that a Subaru with a
newer engine that solves the oil consumption problem may be
worth more than a problem-free vehicle with an older engine.
(Tr. 39:13-19). If in a particular vehicle the fix doesn't cure
the problem, Subaru could be liable for breach of the settlement
agreement and breach of warranty, as its counsel acknowledged at
the final hearing. (Tr. 7/26/16 at 22:5-14). Counsel has also
portrayed Subaru as eager to protect its reputation and retain

43

and satisfy its customers. (Tr. 7/26/16 at 22:15-19 & 23:14-20). Further, Subaru's counsel has pointed out that Subaru vehicles, including the model years for the class vehicles, have high resale values, and that Subaru received the 2016 Best Brand Award from Kelley Blue Book for resale value. (Tr. 7/26/16 at 50:11-16). All those circumstances suggest that less of value would be difficult and unlikely to be proved on a classwide basis.

Overall, the Court finds that the proposed settlement's silence as to diminished value does not impair the fairness and adequacy of the proposed settlement. First, the evidence of diminished value of a particular vehicle, given the multiple variables determining market value, may be difficult to obtain and to prove. Whether there is likely to be any reduced value for settlement class vehicles would be hotly contested if the case were to be tried. Second, even assuming a diminished value for a vehicle that remains unrepaired, the settlement assures proper repairs during the life of the extended warranty. Third, as discussed above, the likelihood that excessive oil consumption problems beyond the normal background level will manifest themselves for the first time beyond the class settlement's extended warranty period is remote, thereby further diminishing the prospect of excess loss of value.

44

### d.   Objections that the Extended Warranty is Not Long Enough

Several objectors assert that the proposed settlement is inadequate because it is not long enough.  The proposed settlement's extended warranty for oil consumption issues extends to eight years and 100,000 miles, whichever comes first, and one extra year regardless of mileage for a class vehicle that has exceeded 100,000 miles, measured from the settlement notice date, as described above.

For example, Mr. Jalbert [Docket Item 57] seeks a warranty of an additional three years after oil consumption repairs are made, citing the complexity of disassembling and reassembling the engines.  Dr. Kreider [Docket Item 65] indicates that his 2014 Impreza has twice shown low oil levels in its first 40,000 miles, that the Subaru dealer has not recognized the problem, and that he has twice been stranded due to the problem of oil loss.  (Id.)  His expectation was that he would put 300,000 miles on his vehicle and is concerned the settlement's extended warranty is not sufficiently protective.

Mr. Martin [Docket Item 92] also believes the extended warranty should extend for 100,000 miles from the installation of any replacement engine, as his 2012 Impreza engine has already been replaced twice.  His vehicle had almost 62,000 miles as of May 31, 2016.  (Id. at 3).

45

Subaru's counsel confirmed at the final hearing that class
vehicles will be entitled to the coverage of oil consumption
repairs as defined in the settlement, including replacements of
any new parts that fail to solve the problem.  Counsel confirmed
that such new parts are themselves warranted by Subaru for
12,000 miles, even if that period goes beyond the extended class
warranty.  (Tr. 7/26/16 at 23:32 to 24:3).  If, for example, the
replacement engine fails to resolve the problem, that defect
will have to be cured either within the extended warranty period
or within 12,000 miles of the new part's installation under
Subaru's normal new parts warranty.  The proposed settlement
makes clear that the Settlement Agreement does not diminish or
affect any other Subaru warranty, duty, or contractual
obligation, see Settlement Agreement [Docket Item 49-2, ¶
V.A.5].

Likewise, Plaintiffs' Class Counsel indicated their belief
that the oil consumption issue is resolved by the redesigned
short block and other parts contemplated by the TSB measures
under the proposed settlement, indicating, "Our position on that
is the oil consumption issue is now resolved."  (Tr. 21:22-23).
Anecdotes of the failure of the replacement engine block
described by Mr. Martin appear to be exceptionally rare, as the
oil consumption condition has affected approximately 1% of class
vehicles since the introduction of Subaru FB engine in 2010.

46

Since the new engine block was redesigned with countermeasures, as explained in the expert report of Robert Kuhn, PE [Docket Item 51-2], which have brought about a significant reduction of oil consumption, one would expect the oil defect rate to become negligible, and the prospect of a second replacement to be very small.

The Court acknowledges that providing a second warranty upon a replacement engine (beyond the 12,000 mile new part warranty) is not an unreasonable objective. A replacement engine will also be covered for the duration of the extended class settlement warranty already in existence if the class settlement is approved. Certainly, the proposed settlement contains advantages to class members that will not otherwise exist if the settlement is rejected, as already discussed.

Subaru's concessions in the settlement, including installation of the redesigned short block and other countermeasures, together with reimbursements for prior TSB repairs, which benefit the class, are part of a negotiated compromise which draws a line at the eight-year/100,000 mile extended warranty term with the 12,000 mile addendum for vehicles with 100,000 miles on the class notice date. Like any compromise, a case could be made for the longer warranty period advocated by these objectors, or for the status quo that Subaru might achieve if the settlement were rejected and it ultimately

47

prevails on its legal and factual arguments.  Also, like any compromise, the result may be disappointing to those in rare situations, such as Mr. Martin, whose replacement engine also failed to meet oil consumption standards.  Of course, for those in aggravated situations there was the opportunity to opt out of this class and to pursue one's own remedies.  That the proposed settlement does not provide a second 100,000 mile warranty upon the remedial parts is not reason for this Court to reject it.

### e.   Other Miscellaneous Objections

### i. Trust Issues

The Court has considered various other objections raised in response to the notice of proposed settlement.  For example, several objectors do not trust their Subaru dealer to carry out the terms of the settlement in a proper fashion because they feel that dealers have been deceptive on oil consumption testing and remediation, see, e.g., the objections of Jalbert [Docket Item 57], Michalek [Docket Item 61], Taramasco [Docket Item 74], Arnett [Docket Item 86], Melgar [Docket Item 90] and Svoboda [Docket Item 96].  The Settlement Agreement places obligations upon defendant Subaru, subject to Court oversight.  The individual dealers do not have an incentive to cheat on these obligations, according to counsel for Subaru and for the Plaintiff Class, because they are reimbursed in full by Subaru for the promised warranty repairs.  (Tr. 7/26/16 at 23:10-14.)

48

Objectors who simply do not wish to deal with the Subaru dealerships anymore due to past disappointments are few in number and appear to be those who unfortunately endured bad experiences.  Moreover, the plaintiff class representatives, despite initially claiming unresponsive repair efforts by Subaru, are urging the Court to approve the proposed settlement provisions including those requiring that the repairs be done at a Subaru facility.

### ii. **Inclusion of Other Vehicles**

One objector, Mr. Becker [Docket Item 84], asserts that his 2011 Subaru Forester should be included in the class but is not because its VIN number is too low.  Mr. Becker has misread the notice, in which _all_ 2011 Foresters are included as class vehicles; the notice limiting vehicles below certain VIN numbers pertains only to 2015 Foresters with manual transmission below VIN #543624 and 2014 Foresters with automatic or CVT transmission below VIN #529004.  To the contrary, all 2011 Foresters are included.  His 2011 Forester is indeed a class vehicle.

### iii. **Court Should Impose a Better Settlement**

Finally, several objectors have suggested that the Court should insert other, more favorable terms into the proposed settlement.  The Court does not have the power to alter the terms of the proposed settlement.  See Evans v. Jeff D., 475 U.S. 717, 726-27 (1986); Ehrheart v. Verizon Wireless, 609 F.3d 590, 593 (3d Cir. 2010).  It has the discretion to approve the settlement taking all relevant facts and circumstances into account, after due notice to class members and an opportunity for objectors to be heard, if the settlement is "fair, reasonable, and adequate" under Rule 23(e)(2), Fed. R. Civ. P. Otherwise, the Court shall reject the proposed settlement and put the case back on the litigation track.  There is no middle ground of inserting or deleting terms at the request of an objector based on the judge's conception of what would be more fair, reasonable, or adequate.  Evans v. Jeff D., 475 U.S. at 727.

In summary, the response of the class members has produced only about 28 objectors out of about 665,730 recipients, showing strong overall acceptance.  Each of the objections has been considered, and those raised by at least a few objectors have been discussed herein and found not to undermine the overall fairness, reasonableness, and adequacy of the proposed settlement.  The Class Representatives and Defendant Subaru have

sustained their burden, as proponents of the class settlement, in the face of the objections.

### 2.   Submission on Behalf of Objector Jose Melgar

As noted above, a controversial objection was filed on behalf of Jose Melgar by the law firm Kimmel & Silverman, P.C., on July 6, 2016 [Docket Item 90 & 90-1 through -4], containing objections similar to those addressed above.[13]  This objection was accompanied by some documents concerning the purchase of Mr. Melgar's 2013 Legacy [Docket Item 90-2] but no repair documents. Mr. Melgar also attached the Affidavit of an experienced automotive technician, consultant, and appraiser Scot Turner [Docket Item 90-3], as previously discussed, which offers Turner's opinions on the causes and consequences of excessive oil consumption, the nature of Subaru's replacement of the short engine block and risks thereof, some speculation about motivation of repair technicians to do slipshod work, and consequences of over-consumption for other engine parts.  (Id.

---

[13] Mr. Melgar objects that the proposed settlement is not fair, adequate, and reasonable in four respects:  (a) the extension of the warranty provides little value to the class; (b) the individual rights under state lemon laws and breach of warranty far exceed the relief provided in the proposed Settlement Agreement; (c) the relief Subaru routinely provides to individual consumers far exceeds the relief provided in the proposed Settlement Agreement; and (d) there is no evidence the condition has been fixed and consumers who do not opt out of the settlement will have limited relief available to them in the event it is not.  (Melgar Objection, Docket Item 90 at 1-16).  Melgar objects to the release as being overbroad, and that the Settlement Agreement should permit class members to retain individual rights if the repairs under the class settlement do not exceed, such rights to include state lemon law and breach of warranty statutes.  (Id. at ¶¶ 16-19).

51

¶¶ 4-17).  Mr. Turner finally offers his general opinion on valuation, as previously noted:  "Vehicles with service histories reflecting oil consumption and/or significant engine repairs have substantially diminished value."  (Id. ¶ 18.)

Finally, the Affidavit of Robert Silverman[14] is attached [Docket Item 90-4], listing his experiences and opinions as an attorney in opposition to the settlement.  Specifically, Mr. Silverman declares that he has "personally handled hundreds of claims for Subaru consumers claiming their vehicles consume oil," (id. ¶ 4); that "Subaru consumers claiming their vehicles consume oil routinely receive full replacements or repurchases of their vehicles," (id. ¶ 5); that "Subaru consumers claiming their vehicles consume oil routinely receive substantial cash for the diminished value of their vehicles," (id. ¶ 6); that "Subaru consumers claiming their vehicles consume oil routinely receive extended warranties with bumper to bumper coverage for up to 100,000 miles," (id. ¶ 7), all leading Mr. Silverman to conclude that "[t]he relief offered in the proposed Settlement Agreement is grossly inadequate in comparison to the relief

---

[14] Although labeled as an Affidavit, this document is not notarized.  [Docket Item 90-4.]  It is instead made as a declaration under penalty for willfully false statements, see id. ¶ 9, and it will be regarded as a declaration under penalty of perjury under 28 U.S.C. § 1746.

Subaru customarily offers to individual consumers in oil consumption cases." (Id. ¶ 8).[15]

Subaru's counsel responded to the Melgar objection by letter of July 18, 2016 [Docket Item 98]. Subaru's response is accompanied by the Declaration of John Gray [Docket Item 98-2], who is Subaru's Field Quality Assurance Analysis Manager; and the Declaration of Charles McEntee [Docket Item 98-3], who is Subaru's Director, Customer Retailer Services, which handles records of lemon law claims.[16] Subaru's counsel further contested Melgar's objection and Silverman's declaration at the final hearing. (Tr. 7/26/16 at 48:4 to 54:16).

Two threshold issues must be addressed. First, as Plaintiffs' class counsel argued at the hearing based on the

---

[15] As the settlement negotiations between counsel herein were occurring, Mr. Silverman wrote an email to Paul Russell, Esq., at Berger & Montague, P.C., insisting that any settlement must have an exception to permit Lemon Law claims of his "present and future clients" because Subaru's repairs don't work, and he will submit "Affidavits from 50-100 Subaru Owners" saying so, plus affidavits from three mechanical experts "with clear evidence… the repairs don't work and the settlement is woefully inadequate." Silverman email, Oct. 2, 2015 to Russell Paul, Ex. C-2, supra, at 1. Mr. Silverman's message concluded: "Frankly, if both sides want to get this settlement agreement approved, they will work with me directly." Id. Although filing the objection for Melgar, the Kimmel & Silverman firm presented no client affidavits and one mechanical expert (Mr. Turner) who outlines risks of contamination and reassembly in the repair and replacement process but does not express an opinion that the repairs do not work or will not work. (Turner Aff., Docket Item 90-3).

[16] Further, at the final hearing on July 26, 2016, Plaintiffs introduced three documents, namely: Affidavit of Robert Tedesco, Jr. [Ex. C-1]; an email chain including a communication from Robert M. Silverman, Oct. 2, 2015 [Ex. C-2]; and a news release from Kimmel & Silverman dated May 26, 2016, appearing at www.prweb.com/releases/2016/5/prweb13443168.htm [Ex. C-3] point out the rights class members will lose if they do not opt out.

Robert Tedesco Affidavit [Ex. C-1], which was unrebutted by objecting counsel from Kimmel & Silverman, it appears that Kimmel & Silverman may have a conflict in both having represented plaintiffs' class representative Robert Tedesco, Jr. in connection with Tedesco's oil consumption issues alleged in this case, and then representing Jose Melgar in opposing the class action settlement that Mr. Tedesco, as class representative, strongly supports.  According to Mr. Tedesco, he consulted Kimmel & Silverman with regard to his oil consumption problems in his 2013 Subaru XV Crosstrek 2.0i in September 2014, and that firm referred him to the firm of Berger & Montague, P.C., for purposes of filing the class action complaint in this Court.  (Tedesco Aff., Ex. C-1, ¶¶ 7-9).  Berger & Montague filed that complaint, with Mr. Tedesco as plaintiff's class representative, Civil No. 14-6317 (JBS), which was later consolidated into the present case.  (Id. ¶ 11).  Because Kimmel & Silverman had referred Mr. Tedesco to Berger & Montague, Mr. Tedesco understood that "Kimmel & Silverman will expect to receive a referral fee from any fees that Berger & Montague, P.C., receives in this case."  (Id. ¶ 10).  Thereafter, Mr. Tedesco reviewed and signed the proposed settlement as a proposed class representative and he strongly supports it.  (Id. ¶¶ 12, 14 & 15).  In any event, at the final hearing, counsel for Mr. Melgar, on behalf of Kimmel & Silverman, stated she was

authorized to renounce any claim for a referral fee for Kimmel &
Silverman on account of their former representation of Mr.
Tedesco.  (Tr. 7/26/16 at 56:19-24 and 57:1-3).[17]

     Second, it appears that Mr. Melgar lacks standing to object
that the proposed settlement precludes future lemon law claims
by class members (other than Lemon Law lawsuits already pending
pertaining to oil consumption, see Settlement ¶ II.29).  Mr.
Melgar, it turns out, "has already signed a release as to his
own potential lemon law claims.  Specifically, in exchange for
certain consideration, Mr. Melgar signed a complete release of
his lemon law claims, and Subaru paid fees to his attorneys --
Kimmel & Silverman," according to the letter of Michael Carroll,
Esq., dated July 18, 2016 [Docket Item 98 at 2].  While the
terms of that settlement are confidential, Subaru offered to
submit the settlement documents under seal for in camera
inspection if Mr. Melgar contested Subaru's assertions, and Mr.
Melgar, through his counsel, did not do so.  Thus, Mr. Melgar,
who has already released his lemon law claims as to the oil
consumption issue in exchange for consideration, cannot object
to the release terms of the proposed Settlement Agreement on

---

[17] The Court makes no finding whether the firm had a conflict of interest in
opposing the interests of its former client, Mr. Tedesco, as Tedesco's
current counsel has not moved to disqualify Kimmel & Silverman on that ground
and has accepted Kimmel & Silverman's withdrawal from any referral fee
arrangement.  To explore this to conclusion at this time would be the cause
of delay in recognizing the interests of 665,000 class members.

this point.  Accordingly, the Court does not further consider Mr. Melgar's lemon law related objections.

Turning to the merits, the Court finds Mr. Silverman's objections to the effect that Subaru "routinely" provides his clients, in "hundreds of claims" about oil consumption, with "full replacements or repurchases of their vehicles" and "substantial case for the diminished value of their vehicles" [Silverman Aff. (Docket Item 90-4) at ¶¶ 3-6] appear to be gross overstatements.  Subaru's Charles McEntee declares that "[a] review of Subaru's files reveals that 152 cases by the law firm of Kimmel & Silverman, P.C. in which the complaint related to engine oil consumption."  [McEntee Decl. (Docket Item 98-3) at ¶ 2].  Further, "[o]f those 152 cases, Subaru repurchased the vehicle in 6 cases.  As good will, Subaru provided trade assistance in another 4 cases."  [Id. ¶ 3].  Counsel from Kimmel & Silverman did not contest these facts at the final hearing.  Overall, contrary to Mr. Silverman's averments that Subaru "routinely" repurchases his clients' vehicles in light of oil consumption concerns, this has been true in at most 10 out of 152 of the Subaru oil consumption claims his firm has presented.  The Court overrules these objections about Subaru's "routine" relief being better.

Finally, the Kimmel & Silverman press release reprinted from the prweb.com website, Ex. C-3, supra, appears to contain

56

similar exaggeration of the results of pursuing Lemon Law claims.

This press release says, in relevant part:

> Silverman, who has successfully resolved hundreds of Subaru oil consumer claims for his clients, feels those owners who are currently experiencing the oil consumption issue need to read this notice [of proposed class settlement] very carefully…. "We have been able to use State Lemon Laws and Federal Warranty Laws to secure repurchases of affected vehicles with refunds of the entire original purchase price paid plus collateral charges, compensation to reflect diminished value, and premium extended warranties covering the entire car bumper to bumper for just as long as the class remedy that only covers the oil consumption issue. These are remedies [that] far exceed what is being offered in this settlement…."

"Subaru Oil Consumption Class Action Settlement May Leave Certain Drivers Stranded When it Comes to their Lemon Law Rights," PRWeb, Ex. C-3 (May 26, 2016). Plaintiffs' counsel has alleged that Kimmel & Silverman's publication of this information, giving the impression that Subaru already routinely gives better relief to oil consumption problems than does the proposed settlement, may have caused putative class members to opt out in reliance upon the Kimmel & Silverman overstatements, which appeared about 18 days before the June 13, 2016 opt-out deadline. Counsel pointed out that approximately one-half of the 2,328 opt-outs reside in the states where Kimmel & Silverman

practice.[18]  Certainly, those who wished to preserve other remedies, for whatever reason, were free to opt out of this proposed settlement and preserve individual claims, and many have done so.

Additional points asserted as objections on behalf of Mr. Melgar have already been considered and rejected above and will not be repeated here.

### C.    Summary of Determinations

As discussed above, the Court finds that certification of the proposed settlement class is appropriate.  Such certification recognizes, pursuant to Rules 23(a) & (b)(3), Fed. R. Civ. P., that the proposed class has numerosity (with approximately 665,000 members); that the contentions share commonality; that the representative plaintiffs' claims are typical of the class members; that the class representatives and class counsel are more than adequate to the task and faithful to the interests of absent class members; that common questions predominate over individual issues (and that manageability of a class trial is not at issue where there will be no trial); and that the certification of the proposed class provides a means of

---

[18] Counsel for Plaintiff pointed out at the final hearing that almost half of the opt-out filings are from Subaru owners in states where Kimmel & Silverman advertise, [Tr. 7/26/16 at 14:1-6] but whether the firm's press release, republished on the internet, prompted a number of those opt-outs would be speculative upon the present record.

determining the disputes which is far superior to individualized proceedings in timeliness, effectiveness and practicality.

Further, the Court has closely examined the proposed settlement by applying the Girsh and Prudential factors, with enhanced scrutiny where settlement of class certification, incentives to class representatives, attorney fee and cost reimbursement caps, and the merits took place at once. The Court also gave special consideration to the objections of record as well as the arguments of parties and the objector appearing at the final hearing.

The Court finds the proposed Settlement Agreement to be fair, reasonable, and adequate under Rule 23(e)(2). Most of the relevant factors militate strongly in favor of approval. Namely, the proposed settlement produces a huge savings of time and money compared with litigating each claim to a final outcome; the reaction of the class has been favorable, with an objection rate of 0.0005% and an opt-out rate of 0.35% of the class members, while approximately 2,900 class members have already begun to present claims for reimbursement; the settlement strikes a reasonable balance for the class recovery given the risks of establishing liability and damages; and the administrative claims process is fair, prompt, straightforward and subject to monitoring by Plaintiff's Class Counsel and to judicial oversight.

Several factors are neutral, pointing toward neither acceptance nor rejection of the settlement.  Namely, this settlement was reached at an early stage of the case before much discovery was completed, but Plaintiffs' counsel had the benefit of sufficient analysis of the facts and law to form an educated view of how the settlement should be structured to obtain a reasonable result for the class.  The incremental benefit to the class from dragging this case into plenary discovery and motion practice does not exceed the benefit of achieving a rapid and certain resolution.  A second neutral factor is Subaru's ability to pay a greater judgment if awarded at trial; however, Plaintiffs have seized upon Subaru's financial strength by placing upon Subaru the financial risk that more class vehicles will require costlier repairs than anticipated, since there is no overall monetary cap upon future repairs and reimbursements. This open-ended financial obligation protects the class because this settlement is not constrained by a common fund and the obligations to bear the expenses of testing, expensive replacement and repairs (the cost of short block engine replacement is about $4,000), and reimbursement of past oil purchases and for eligible repairs, as well as towing and car rental, falls only upon Subaru and is secured by Subaru's financial strength.  To some degree, as class counsel and Subaru's counsel have both noted, the integrity of Subaru's

60

undertakings is also secured by Subaru's desire to preserve its reputation for dependable vehicles and its commitment to its loyal customer base.  These are favorable factors giving confidence in the class settlement and its administration by Subaru.

The Court also examined whether engineering countermeasures and replacement parts will fix oil consumption problems, recognizing that the proposed settlement is of diminished value if the replacement scheme is substandard.  Although the record has several anecdotes of owners claiming that the fix did not succeed in their vehicles, the evidence supports the views of class counsel, the class representatives, and Subaru's counsel that the fix does work.  If in some unusual cases it fails, adequate mechanisms are in place to "fix the fix" at no cost to class members, during the extended warranty term.

The simultaneous negotiations of class certification, the merits, incentive awards for the class representatives, and reimbursement of class counsel's fees and costs have not created a distorted or unfair settlement.  The representatives' incentive fee of $3,500 each is proportional to their contributions to the litigation effort as well as to the expected benefit to a class member whose excess oil consumption problems are resolved through the settlement (i.e., repairs costing approximately $4,000, reimbursement for past relevant

61

repairs and oil replacement within limits of the Settlement Agreement).  Further, as discussed in a separate Memorandum Opinion and Order, the negotiated reimbursement by Subaru of class counsel's fees and costs up to $1.5 million total is also proportional to the services rendered (and to be rendered) to the class.  This was certainly not a program of favoritism to the class representatives or to class counsel to induce acceptance of an unreasonable or inadequate compromise.

Finally, as further protection to the class, the Court will retain jurisdiction to enforce its terms, monitoring the overall implementation and administration, as the Settlement Agreement provides.[19]  Where, as here, the Settlement Agreement calls upon the defendant itself to administer the settlement -- by receiving and paying claims and diagnosing and repairing excess oil consumption problems -- there should be continuing judicial supervision.

### D. <u>Quarterly Reporting Requirement</u>

Within this continuing jurisdiction, the Court will require Defendant Subaru to file quarterly reports of settlement administration progress, which shall also be monitored by Plaintiffs' Class Counsel.  Under the Settlement Agreement at

---

[19] The Settlement Agreement provides:  "Continuing Jurisdiction.  The Parties agree that the Court may retain continuing and exclusive jurisdiction over them, including all Settlement Class members, for the purpose of administration and enforcement of this Agreement."  Settlement Agreement, Part XIV.N [Docket Item 49-2].

Section V.F, the parties have agreed that Subaru shall be responsible for the costs of settlement administration, and that "Plaintiffs retain the right to audit and review the handling of the claims by Subaru." (Settlement Agreement, § V.F and Docket Item 49-2). Further, the parties have agreed that Class Counsel "have the right to reasonably monitor the claims administration process and ensure that Subaru is acting in accordance with the Settlement Agreement." (Id. at VI.B.6).

Subaru's quarterly report shall at a minimum summarize the numbers of claims for reimbursement received and pending under Section VI.A; the numbers of claims granted in full, granted in part and denied; the number pending under the Second Review procedure of Section VI.A.3 & B; and the number of claims appealed to the Better Business Bureau Appeals process of Section VI.C, and the outcomes of such appeals. The quarterly report shall also summarize the nationwide experience with repairs performed pursuant to the Extended Warranty, including the number of Oil Consumption Tests and TSB Repairs performed on class vehicles during the reporting period, if such data can reasonably be gathered by Subaru.[20] The report shall also note

---

[20] The precise contents of Subaru's quarterly progress reports, and the timing of such submissions, may be modified for good cause shown. The Court's purpose is to set a meaningful baseline for supervision of the administration of the class settlement and for identifying any areas where further supervision is needed. Additionally, class counsel may request additional information reasonably necessary to monitor the claims administration process and ensure that Subaru is acting in accordance with the Settlement Agreement. Any dispute regarding provision of such information may, after a meet-and-

any circumstances requiring the Court's attention under the Settlement Agreement.

The first quarterly report will be due on October 15, 2016 and will cover the three-month period ending September 30, 2016. Subsequent reports are due at three-month intervals covering the experiences of the analogous three-month periods.

## Conclusion

For the foregoing reasons, the Court finds that the proposed Settlement Class should be certified under Rules 23(a) & (b)(3), that the objections to the settlement should be overruled, and that the proposed Settlement Agreement should be approved as fair, reasonable, and adequate under Rule 23(e)(2). The Court further finds that those who have timely filed opt-out notices as listed in Exhibit A to the accompanying Order shall be excluded from the Settlement Class and not partake of the burdens or benefits of the Settlement Agreement.

Final judgment will be entered accordingly as set forth in the accompanying Order.

**August 31, 2016**                    **s/ Jerome B. Simandle**
Date                                   JEROME B. SIMANDLE
                                       Chief U.S. District Judge

confer discussion between counsel, be brought to the Court's attention for resolution.